IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELEWARE

| | |
|---|---|
| KENEXA BRASSRING, INC., | |
| Plaintiff | C. A. No.: 07-521-SLR |
| v. | |
| TALEO CORPORATION, | |
| Defendant. | |

## KENEXA BRASSRING'S REPLY TO DEFENDANT'S COUNTERCLAIMS

Plaintiff, Kenexa BrassRing, Inc. ("Kenexa"), by its counsel, hereby responds to the numbered paragraphs of the Counterclaims of the Defendant, Taleo Corporation ("Taleo"), filed on January 28, 2008.

### Jurisdiction and Venue

1.    Kenexa admits the allegations of paragraph 1 of the Counterclaims to the extent that Kenexa filed it Complaint against Taleo asserting claims of infringement of United States Patent No. 5,999,939 ("the '939 patent") and United States Patent No. 6,996,561 ("the '561 patent") and that declaratory judgment jurisdiction exists for Taleo's Counterclaims that arise from the same events alleged in Kenexa's Complaint. Otherwise, denied.

2.    Kenexa admits that this Court has subject matter jurisdiction for Counterclaims that arise from the same events alleged in Kenexa's Complaint. Kenexa further admits that this Court has personal jurisdiction for Counterclaims that arise from the same events alleged in Kenexa's Complaint. Kenexa denies the allegation that "Kenexa voluntarily appeared before this Court for all purposes."

**The Parties**

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Denied.

## FIRST COUNTERCLAIM

**Declaratory Judgment of Non-Infringement of the '939 Patent**

7.      Kenexa incorporates, by reference, its admissions and denials of the allegations of paragraphs 1 – 6, as set forth above.

8.      Denied.

9.      Denied.

## SECOND COUNTERCLAIM

**Declaratory Judgment of Non-Infringement of the '561 Patent**

10.     Kenexa incorporates, by reference, its admissions and denials of the allegations of paragraphs 1 – 6, as set forth above.

11.     Denied.

12.     Denied.

## THIRD COUNTERCLAIM

**Declaratory Judgment of Invalidity of the '939 Patent**

13.     Kenexa incorporates, by reference, its admissions and denials of the allegations of paragraphs 1 – 6, as set forth above.

14.     Denied.

15.     Denied.

## FOURTH COUNTERCLAIM

### Declaratory Judgment of Invalidity of the '561 Patent

16.    Kenexa incorporates, by reference, its admissions and denials of the allegations of paragraphs 1 – 6, as set forth above.

17.    Denied.

18.    Denied.

## FIFTH COUNTERCLAIM

### Declaratory Judgment of Unenforceability of the '939 Patent

19.    Kenexa incorporates, by reference, its admissions and denials of the allegations of paragraphs 1 – 6, as set forth above.

20.    Kenexa admits that BrassRing, Inc. filed a Declaratory Judgment Complaint ("Complaint") in the United States District Court for the District of Massachusetts, on July 31, 2000.  Otherwise, denied.

21.    Denied.

22.    Denied.

23.    Kenexa admits the allegations of paragraph 23 to the extent that BrassRing, Inc. filed a Request for Ex Parte Reexamination of the '939 patent. Otherwise, denied.

24.    Denied.

25.    Denied.  (See Exhibit A, the United States Patent and Trademark Office File History for the Reexamination of the '939 patent, especially the "Response Under 37 CFR §1.111" dated Nov. 3, 2003, and the copy of the "Complaint" dated July 31, 2000, in the matter of BrassRing, Inc. v. Interactive Search, Inc., 00-cv-11525 (D. Mass.)

attached thereto.)

26.     Denied.  (See Exhibit A, the United States Patent and Trademark Office File History for the Reexamination of the '939 patent, especially the "Response Under 37 CFR §1.111" dated Nov. 3, 2003, and the copy of the "Complaint" dated July 31, 2000, in the matter of BrassRing, Inc. v. Interactive Search, Inc., 00-cv-11525 (D. Mass.) attached thereto.)

27.     Denied.

28.     Denied.

29.     Denied.

## SIXTH COUNTERCLAIM

### Declaratory Judgment of Unenforceability of the '561 Patent

30.     Kenexa incorporates, by reference, its admissions and denials of the allegations of paragraphs 1 –6 and 19-29, as set forth above.

31.     Admitted.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

**Exceptional Case**

38.    Denied.

WHEREFORE, Kenexa requests that the Counterclaims be dismissed with prejudice, that the matter be declared an exceptional case and that it be awarded its attorneys' fees and costs and such other relief as the Court deems proper.

_____
Frederick L. Cottrell, III (#2555)

OF COUNSEL:

Cottrell@rlf.com
Steven J. Fineman (#4025)

Matthew B. Lowrie
Robert J. Silverman
LOWRIE, LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street, 11th Floor
Cambridge, MA 02142
Tel : 617-395-7000

Dated:  February 19, 2008

Fineman@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, DE   19899

*Attorneys for Plaintiff*
*Kenexa Brassring, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2008, I caused to be served by hand delivery

the foregoing document and electronically filed the same with the Clerk of Court using

CM/ECF which will send notification of such filing(s) to the following:

> Jack B. Blumenfeld
> Thomas C. Grimm
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P. O. Box 1347
> Wilmington, DE   19899

I hereby certify that on February 19, 2008, the foregoing document was sent via

Federal Express to the following non-registered participants:

> Jay F. Utley
> Brian C. McCormack
> Nathan A. Engels
> J. Brent Alldredge
> Baker & McKenzie LLP
> 2300 Trammell Crow Center
> 2001 Ross Avenue
> Dallas, TX   75201

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

# EXHIBIT A

FORM PTO - 1520 (REV)
**REEXAMINATION**

CONTROL NUMBER | CERTIFICATE DATE | CERTIFICATE NUMBER

| CLASS | SUBCLASS | *C.R.U.* | ART UNIT | EXAMINER |
|-------|----------|----------|----------|----------|
| 707 | 102 | SCANNED _____ O.A. | 2171 | |

TITLE OF INVENTION (FOR DESIGN APPLICATION ONLY):

☐ TERMINAL
☐ DISCLAIMER

☐ The term of this patent subsequent to _____ (date) has been disclaimed

☐ The term of this patent shall not extend beyond the expiration date of Pat. No. _____

☐ The terminal _____ months of this patent have been disclaimed.

## ISSUING CLASSIFICATION

| ORIGINAL | | CROSS REFERENCE(S) | |
|----------|----------|----------|----------|
| CLASS | SUBCLASS | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) |
| | | | |

**INTERNATIONAL CLASSIFICATION**

| | | |
|--|--|--|
| | | |

☐ Continued on Issue Slip Inside File Jacket

Form PTO-2009
(Rev. 4-97)

**WARNING:** The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

REGISTER | CORRESPONDENCE ADDRESS | PATENT OWNER | THIRD PARTY

*Same As Inside*

# REEXAMINATION

66649 U.S. PTO
90/006570
03/24/03

## PATENT APPLICATION

90006570

### CONTENTS

**When Entering a Paper See
Scanned Notice Inside File**

**Entered**

1. REQUEST PAPERS FILED
2. *Title Report*     03/25/03
3. *Not. of Reexam. Req. Fil. Dt*     04/09/03
4. *" " Assigned Grp.*     04/09/03
5. *Order Granting Request of Reexamination*     5-12-03
6. *Rejection (ssp 2 mos.)*     090203
7. *Letter Response*     1-6-03
8. *Notification of Court Action (565)*     11-6-03
9. *Change of Address*     1-22-04
10. *NIRC*     7-8-04
11. _____
12. _____
13. _____
14. _____
15. _____
16. _____
17. _____
18. _____
19. _____
20. _____
21. _____
22. _____
23. _____
24. _____
25. _____
26. _____
27. _____
28. _____
29. _____
30. _____

ORM PTO--1520 (8-83)
REEXAMINATION
CONTROL NUMBER
666461 0
90/006

CLASS

70

IT

## SEARCH NOTES

| | Date | Ex'r |
|---|---|---|
| | | |

## CLAIM NO.

FOR O.G. _____

## DRAWING FIG.
FOR CERTIFICATE AND
FOR O.G. _____

## LITIGATION REVIEW

☐ _____ _____
(exmr. init.)     (date)

| CASE NAME | DIRECTOR INITIALS |
|---|---|
| | |

## REEXAMINATION FIELD OF SEARCH

| Class | Sub | Date | Ex'r |
|---|---|---|---|
| | | | |

## INDEX OF CLAIMS

| Claim | | Date | | | | | | Claim | | Date | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | | | | | | | Final | Original | | | | | | |
| | 1 | | | | | | | | 26 | | | | | | |
| | 2 | | | | | | | | 27 | | | | | | |
| | 3 | | | | | | | | 28 | | | | | | |
| | 4 | | | | | | | | 29 | | | | | | |
| | 5 | | | | | | | | 30 | | | | | | |
| | 6 | | | | | | | | 31 | | | | | | |
| | 7 | | | | | | | | 32 | | | | | | |
| | 8 | | | | | | | | 33 | | | | | | |
| | 9 | | | | | | | | 34 | | | | | | |
| | 10 | | | | | | | | 35 | | | | | | |
| | 11 | | | | | | | | 36 | | | | | | |
| | 12 | | | | | | | | 37 | | | | | | |
| | 13 | | | | | | | | 38 | | | | | | |
| | 14 | | | | | | | | 39 | | | | | | |
| | 15 | | | | | | | | 40 | | | | | | |
| | 16 | | | | | | | | 41 | | | | | | |
| | 17 | | | | | | | | 42 | | | | | | |
| | 18 | | | | | | | | 43 | | | | | | |
| | 19 | | | | | | | | 44 | | | | | | |
| | 20 | | | | | | | | 45 | | | | | | |
| | 21 | | | | | | | | 46 | | | | | | |
| | 22 | | | | | | | | 47 | | | | | | |
| | 23 | | | | | | | | 48 | | | | | | |
| | 24 | | | | | | | | 49 | | | | | | |
| | 25 | | | | | | | | 50 | | | | | | |

SYMBOLS                              STATUS
✓ .................................................Rejected
= ...............................................Patentable
− ............................(Through numeral) Canceled
∧ ...................................................Appeal
O .................................................Objected

US005999939C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5000th)

## United States Patent
de Hilster et al.

(10) **Number:** US 5,999,939 C1
(45) **Certificate Issued:** Oct. 19, 2004

(54) SYSTEM AND METHOD FOR DISPLAYING AND ENTERING INTERACTIVELY MODIFIED STREAM DATA INTO A STRUCTURED FORM

(75) Inventors: **David Scott de Hilster**, Long Beach, CA (US); **Alan George Porter**, Huntington Beach, CA (US); **John Reese**, Los Angeles, CA (US)

(73) Assignee: **Brassring LLC**, Waltham, MA (US)

Reexamination Request:
No. 90/006,570, Mar. 24, 2003

Reexamination Certificate for:
Patent No.: 5,999,939
Issued: Dec. 7, 1999
Appl. No.: 09/019,948
Filed: Feb. 6, 1998

Related U.S. Application Data

(60) Provisional application No. 60/068,404, filed on Dec. 21, 1997

(51) Int. Cl.[7] .............. G06F 17/00; G06F 17/30
(52) U.S. Cl. ............ 707/102; 707/104.1; 707/10
(58) Field of Search ................... 707/102, 104.1, 707/10; 715/523, 505

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,164,899 A   11/1992  Sobotka et al .......... 364/419
5,832,497 A   11/1998  Taylor ................ 707/104
5,999,939 A   12/1999  de Hilster ............ 707/102
6,246,996 B1 *  6/2001  Stein et al ........... 705/26

FOREIGN PATENT DOCUMENTS

WO    WO 95/24687 A1    9/1995

OTHER PUBLICATIONS

Noah, William W and Rollin V. Weeks, "TRW, Description of the Defi System as Used for MUC-5," pp. 237-248, 1993

* cited by examiner

*Primary Examiner*—Uyen Le

(57)    **ABSTRACT**

A system and method for facilitating the accurate entry of information into a highly structured database by initially extracting information from a plurality of nonuniformly formatted source data streams, e.g., documents/files, and subsequent interactions with users before storing the accepted and/or modified information into the database. Embodiments of the present invention provide an interactive path for each user (e.g., the author of the extracted data, e.g., a source document/file) to interactively modify the extracted data, e.g., according to the source document/file. Preferably, this interactive path is provided via the Internet and the extracted information can be modified by editing and/or selectively copying portions of the source documents/files to supplement and/or modify the extracted information



US 5,999,939 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1–20 is confirmed.

* * * * *

Page 1 of 1



**UNITED STATES**
**PATENT AND**
**TRADEMARK OFFICE**

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

**CONFIRMATION NO. 1696**

Bib Data Sheet

| SERIAL NUMBER 90/006.570 | FILING DATE 03/24/2003 RULE | CLASS 707 | GROUP ART UNIT 2171 | ATTORNEY DOCKET NO. H00644 70004 US |
|---|---|---|---|---|

**APPLICANTS**
5999939, Residence Not Provided;
BrassRing Systems(Owner), San Mateo, CA;
Patent Owner, Residence Not Provided;

** CONTINUING DATA ***********************
This application is a REX of 09/019,948 02/06/1998 PAT 5,999,939
which claims benefit of 60/068,404 12/21/1997

** FOREIGN APPLICATIONS ******************

| Foreign Priority claimed | ☐ yes ☐ no | | | |
|---|---|---|---|---|
| 35 USC 119 (a-d) conditions met | ☐ yes ☐ no ☐ Met after Allowance | | STATE OR COUNTRY | SHEETS DRAWING |
| Verified and Acknowledged | Examiner's Signature        Initials | | | |

ADDRESS
23628

TITLE
SYSTEM AND METHOD FOR DISPLAYING AND ENTERING INTERACTIVELY MODIFIED STREAM DATA INTO A STRUCTURED FORM

| | | TOTAL CLAIMS 20 | INDEPENDENT CLAIMS 3 |
|---|---|---|---|

| FILING FEE RECEIVED 2520 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT No. _____ for following: |
|---|---|

☐ All Fees
☐ 1.16 Fees ( Filing )
☐ 1.17 Fees ( Processing Ext. of time )
☐ 1.18 Fees ( Issue )
☐ Other _____
☐ Credit

H00644/70004 (MBL)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| In re Patent of: | de Hilster et al. | Reexam Control No : |
| Patent No.: | 5,999,939 | Reexam Filed: Herewith |
| Issued: | December 7, 1999 | |
| Serial No: | 09/019,948 | |
| Filed: | February 6, 1998 | |
| For: | System And Method For Displaying And Entering Interactively Modified Stream Data Into A Structured Form | |

CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached. addressed to Box Reexam, Commissioner for Patents, Washington, D.C. 20231, on March 20, 2003.

Signature

Box Reexam
Commissioner for Patents
Washington, D.C. 20231

REQUESTER'S/PATENT OWNER'S DETAILED REQUEST FOR EX PARTE
REEXAMINATION PURSUANT TO 37 C.F.R. §1.510(b)

Sir:

Reexamination of U.S. Patent No. 5,999,939, which issued on December 7, 1999 to David de Hilster et al. ("the '939 patent"), is requested by the Patent Owner under 35 U.S.C. §§302-307 and 37 C.F.R. §1.501. The '939 patent is still enforceable. A copy of the patent in accordance with 37 C.F.R. §1.510(b)(4) is submitted herewith.

I    Introduction

Requester seeks a determination that U.S. Patent No. 5,164,899 et al. ("the '899 patent"), U.S. Patent No. 5,832,497 ("the '497 patent"), PCT Publication 95/24687 ("the PCT publication"), and the article entitled "TRW: Description of the DEFT System as Used for MUC-5" by Noah and Weeks ("the Noah publication") do not adversely affect the patentability of any claim of the '939 patent.

Requester invites the Office to deny the reexamination request or, instead, to issue an order finding a substantial new question of patentability but only because the above-cited

631183.1

U.S. Patent No. 5,999,939                    -2-

references were not of record during the prosecution of the '939 patent, and then to issue an action confirming the patentability of all claims of the '939 patent over the above-cited references.

II.    Claims for Which Reexamination is Requested

Reexamination is requested of all claims 1-20 of the '939 patent in view of the cited-references which are listed on form PTO-1449 submitted herewith.

III.    Explanation of Pertinency and Manner of Applying Cited Art to the Claims

In accordance with the requirements set forth in 35 U.S.C. §302 and 37 C.F.R. §1.510(b)(2), the cited-references are applied to independent claims 1, 7 and 15 and their respective dependent claims, of the '939 patent, as follows:

*A. The '899 patent*

The '899 patent describes how resumes in printed form are converted to a digital image by means of an optical scanner. The image is analyzed to determine areas of contiguous text which are processed by a character recognition unit to generate an ASCII text form of the document. See col. 2, lines 50-59. Text analysis is described from col. 9, line 30, to col. 16, line 26. During textual analysis, predefined text patterns are detected, (See col. 9, lines 39-40), from which a "template" is filled using the detected text patterns, which in turn is stored in an output file. See col. 11, line 61 to col. 12, line 3. "This output file can be altered by the user." Col. 12, line 3, emphasis added. The output from the extractor can be used in many ways. "For example, it can be saved in a computer file, displayed on an output device such as a cathode ray screen, printed, or placed in a database for future retrieval." Col. 12, lines 6-10. See also, col. 16, lines 6-10 and 22-23.

The text extraction method uses a "grammar" to extract text patterns of interest. Col. 9, lines 53-54. The grammar is defined by "pattern objects" formed into "synonyms" and "classes." See col. 9, lines 58-59. "A synonym is a collection of patterns used for the same word. For example, 'January,' 'Jan,' 'Jan.' ... are all synonyms for January." Col. 10, lines 8-11. A "class" is "a collection of patterns ... which collectively relate to the same type of object. For example, 'Jan. 12, 1977,' 'Oct. 27, 1959' and '12/01/57' are all in the class called

631183.1

U.S. Patent No. 5,999,939                    -3-

'DATES'." Col. 10, lines 11-15. As noted below, this grammar is identical to that used in the
DEFT system from TRW.

The '899 patent is silent on the relationship of users to the documents, whether there are
multiple users and any specific mechanism to enable a user to alter an output file as suggested at
col. 12, line 3. Patentee believes that the "user" in the '899 patent is a company that is "using"
the software to extract data from third-party job-seekers, or multiple employees of the company
that are "using" the software over a network, but *not* the job-seekers (i.e., the authors of the
documents) themselves.

*B  The Noah Publication*

The "DEFT" system from TRW described in this publication is mentioned at Column 3,
lines 15-22 of the '939 Patent. This system was described in the patent as being a preferred
implementation of the text data extraction software to "selectively convert information from the
format of the . . resume . . . to the format of the . . . database." No other information was
provided.

According to this reference, the DEFT system "was developed under the assumption that
a user would always be in the loop; it was not intended to run autonomously." p. 242. The
DEFT system also has utilities and functions which "refine the data and re-formulate it into
frames which can be presented to a user for review, editing, and submission to a downstream
application or database." p. 237.

The DEFT system may receive documents from multiple sources (i.e., it is intended to be
embedded in a message handling system) through a "message queue." The text typically
processed by DEFT included government cables, wire service input, native wire services, an
existing full-text database, CD-ROM, optical character recognition (OCR) and so on. See page
238, paragraph 5.

DEFT also uses patterns to locate data of interest in text. See page 240, paragraph 3.
"Lexicons are of two types: list and pattern. The list lexicon associates a set of synonyms (or
spelling variants) with a given object . . . . The pattern lexicon is used when the textual variations
associated with an object cannot be specified. For example, all possible monetary values cannot
be conveniently enumerated, but a single pattern describing monetary values in terms of digits,
punctuation, and denomination strings can be detected." Page 240, paragraph 4. Attributes may

631183.1

U.S. Patent No. 5,999,939                    -4-

specify a normalized form of data. See page 240, paragraph 5. These lexicons in DEFT are similar to the grammars of the '899 patent.

During execution, DEFT creates a "tag file," which is a list of textual patterns identified by DEFT in the text or data created by an extraction function. See page 40, top two lines. The data elements in the tag file are constructed into "frames." In particular, when a pattern is found in the text and that gives rise to a slot value of a type defined for a given frame class, the slot is automatically mapped to any frame whose scope encompasses the location of the pattern. Thus, if names of corporations occur within a two sentence range of a frame defined by a pattern of words indicative of a joint venture, a slot of the frame for the names of corporations would be filled by the instances of the names of the corporations occurring within that two sentence range. See page 241, paragraphs 4 and 5.

"Another important DEFT tool is frame review . . . This package therefore supports simultaneous display of messages and the frames derived from them, providing highlights to show were slot values were extracted. Menus of valid values drawn from the lexicons assist the user in filling slots that were omitted by DEFT." Page 242, paragraph 5. Terms in the text are marked with SGML-like tags to indicate their properties. Page 244, paragraph 5. The lexicons (which, incidentally have the same format as the grammars, and hence output templates in the '899 patent) also may be defined through an X/Motif graphic user interface. Page 242, paragraph 3.

DEFT does not describe the relationship of the "user" that reviews a document to the original document. Given the context of DEFT, however, patentee submits that it does not appear that the user is the source of the original document. Rather, the "user" is a person running the DEFT software who is not the author/source of the document. It does not appear logical that government cables, wire service input, and native wire services would each review the extracted data that they provide. Rather, it would appear from the reference that the people operating the DEFT system (e.g., a government monitoring service) would review the original and extracted data, since native wire services and authors of cable wire service articles would presumably be unwilling to do so and no mechanism for securing this feedback (technologically or logistically) is described. Accordingly, patentee believes that the originator of the document would not review extracted data.

631183 1

U.S. Patent No. 5,999,939                    -5-

## C. The '497 Patent

The '497 patent is prior art because it is a patent granted on a patent application filed (on August 10, 1995) before the presumed date of invention (the filing date of December 21, 1997) of the '939 patent. The '497 patent describes a system that was accessible at www.monster.com. See col. 6, lines 58-60. If true, the web site itself would be prior art for being in public use more than one year prior to the '939 filing date.

In this system, a "communication part 102 is provided to allow access to the system through communications with other computers connected to the network. According to the preferred embodiment, the network may include access over the Internet to any number of external computer systems . . ." Col. 3, lines 8-13. The system may include a resume base. The access to the system through the communication port may be effected through hypertext markup language (HTML) pages. Col. 4, lines 15-20.

"When a user selects the option of creating a resume . . . [the system] passes information for the fields of the specified base from the user's computer through the communication port into the selected database record." Col. 5, lines 24-29. "The resume base is a collection of resume records . . . [including] fields specifying name, address, telephone number, email address and narrative fields containing descriptive information in the form of a cover letter, a description of key skills, and identification of a predetermined number of current and previous positions. A specification of term of employment at current and previous positions, and a description of educational background. The fields in a resume record may be populated through the use of a form presented to the user. The resume record may also include fields for a user password and a field that is used to designate the record as a submission to an accessible resume pool or a specified job." Col. 5, lines 30-43. Thus, the '497 patent discloses the use of a structured form to present fields for insertion of data by one or more applicants for submission to the database.

According to the '497 patent, one field used in the resume record includes a field that is used to designate the record as a submission to an accessible resume pool or a specified job." Col. 5, lines 32-43. Notably, the three types of submission noted on part of the supplemental inquiry form in the '939 patent are "open, confidential or private." See Fig. 6C. These correspond to the types in the '497 patent which are: "maintaining the resume on the system without submission [private], submission of the resume to a resume pool accessible to

631183.1

U.S. Patent No. 5,999,939                    -6-

subscribing employers [open]; or submission of the resume as an application to any posted job listing." Col. 5, lines 44-49

The '497 patent does not state that resume text may be supplied and automatically extracted to obtain an initial set of data for the fields displayed in the form. Rather, it appears that this is done entirely by the user.

*D. The PCT Publication*

The PCT publication describes a system, which, in its broadest description, is for brokering transactions between sellers and buyers of goods and services. See Abstract. However, the example provided in the patent relates to hiring personnel. Page 1, line 8. The "seller" in this example would be a job candidate. The system includes a "seller's interface" that enables sellers to "interactively enter information including multimedia information, into the database." Page 1, lines 28 and 29. Multiple sellers and multiple buyers are connected to the system through a network (see page 28).

The PCT publication also describes an interactive process through which information about the candidate may be placed into a database. In particular, the candidate is interviewed to collect information such as the position the seller seeks, desired salary and geography, and experience. In addition to this information, freeform text such as a work sample, still images such as a resume, or multimedia information may be incorporated into the profile in the database. See page 5, lines 16-24. With respect to resumes, the PCT publication describes that, with a scanner, the seller's interface "can accept scanned-in documents, for instance work samples or a resume. The seller's interface may optionally run the document through a character recognizer to produce free form text. Selected keywords may also be identified for use in retrieval. To correct character recognition errors, the seller's interface would present the resulting text to the seller for review and correction." See page 13, lines 1-10.

One difference between PCT publication and the system in the '939 patent is that character recognition and text extraction in PCT publication are performed on the "seller's interface" and not at a remote location. The PCT publication does not appear to state that the keywords or resulting text would be extracted by fields or presented in a structured form for review by the Applicant.

631183.1

U.S. Patent No. 5,999,939                    -7-

The following table shows how the references described above, if combined, could be used to derive a system that meets each limitation of all the claims of the '939 patent  This table is not an admission, however, that one of ordinary skill would make the combination or that there is a motivation in the prior art to do so or that if such combinations were made that the claims are invalid over such a combination

| | |
|---|---|
| Facilitating the accurate transfer of information from each of a plurality of nonuniformly formatted source data streams into a structured database (Claims 1, 7, and 15) | Noah publication/'899 patent  The Noah publication describes transferring news/articles from multiple sources into a database  The '899 patent refers to submitting resume data from multiple job applicants. |
| Supplying digital data representing each of a plurality of source data streams from a plurality of users, each said source data stream containing data corresponding to multiple discernible source data strings (Claims 1, 7, and 15) | Noah publication/'899 patent, '497 patent  The Noah publication suggests a plurality of sources, e.g., wire news services  The '899 patent may be used over a network where multiple operators extract data from the resumes of third-parties  The '497 patent suggests submitting resume data from multiple job applicants. |
| Processing said digital data for extracting selected ones of said source data strings and generating related target data strings (Claims 1, 7, and 15) | Noah publication/'899 patent |
| displaying a structured form comprised of multiple fields, each field being capable of accommodating a data string and wherein one or more of said fields have said target data strings inserted within (Claims 1, 7, and 15) | Noah publication/'899 patent, '497 patent  The '899 system produces a structured output that corresponds to a database, e.g., of news articles  The '899 patent produces a database of resumes  The '497 patent shows multiple fields in a database, but no automatic extraction of data for the fields. |
| enabling each user to modify and/or accept said target data strings inserted within said displayed form corresponding to said source data stream originating from said user (Claims 1, 7, and 15) | Noah publication/'899 patent, '497 patent  The Noah publication and '899 patent suggest altering the output file to correct extracted text, but the "user" performing this task appears to be a separate "user" of the software rather than the author of the document  If the "user" in the claim is also the original source of the document (as the claims in the '939 patent require), these references do not appear to teach this limitation  The '497 patent forms permit a user (e.g., job hunter) to arbitrarily enter/edit text in the form  This reference does not appear to teach, however, enabling the author of the document to modify target data strings that have been extracted from a nonuniformly formatted document. |
| storing data corresponding to said data strings from said form fields into a database (Claims 1, 7 and 15) | Noah publication/'899 patent, '497 patent  Each suggests storing data in a database, although the '497 patent does not teach storing automatically extracted data and the '899 patent and Noah publication do not teach storing extracted data that has been presented to the originator for editing. |
| supplying and displaying steps performed through remote communication interface, such as Internet (claims 2, 3, 8, 9, 10, 11, 15, 16) | A combination of the Noah publication with the '497 patent could result in submitting text to the Noah publication over the internet, and returning over the Internet a form containing the extracted for display, although patentee submits that hindsight is required to combine these references into such a system. |

631183 1

U.S Patent No. 5,999,939          -8-

| | |
|---|---|
| displaying said source data stream with the displayed structured form (claims 4 and 17), and returning the source data stream from the data extractor to display it (claim 18) | The Noah publication suggests providing both the message and the extracted frames to a user. If the "user" is the source of the document (as the '939 claims require), however, the Noah publication does not appear to teach this step. |
| enabling a user to copy selected portions of said source data stream into selected fields of said form (claims 4, 12 and 17) | Windows (also prior art) inherently enables any user to copy data from one displayed area to another. Patentee believes that the system described in the '497 patent was intended to be compatible with Windows. |
| wherein one or more of said target strings are essentially equivalent to said extracted source data strings (claims 5, 13 and 19) | The Noah publication suggests normalizing, for example, country names. |
| supplying one or more supplemental data strings in response to a supplemental inquiry form (claims 6, 14 and 20) | The '497 patent and the PCT publication present one or more forms to collect various information. The number of forms used to collect it is immaterial. Such supplemental data includes the privacy associated with the resume, as in the '497 patent. |
| The displayed structured form additionally displays fields having said supplemental data strings inserted within. (claims 6, 14 and 20) | The '497 patent and the PCT publication present the supplemental information in a form to the user along with other resume information. |

IV.    Conclusion

      Requester respectfully requests confirmation of the patentability of all claims of the '939 patent over the cited references. Requester seeks an order denying the Request for Reexamination or, instead, an order granting the reexamination request coupled with a first action allowance of all claims of the '939 patent. In the event that the reexamination request is denied, Requester asks that the appropriate portion of the fee for requesting reexamination be refunded to deposit account 23/2825 in accordance with 37 C.F.R. §1.515(b) and §1.26(c)

631183 1

U S  Patent No. 5,999,939 ●      -9-

If there are any questions regarding this Request, please call the Requester's attorney at
the telephone number listed below.

Respectfully submitted,

Matthew B. Lowrie
Reg. No. 38,228
M. Brad Lawrence
Reg. No. 47,210
Attorney for Requester/Patent Owner
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210-2211
(617) 720-3500

Docket No.: H00644/70004 (MBL)
Date: March 20, 2003
**xNDDx**

631183 1

ATTORNEY DOCKET NO.: H00644.70004 US (MBL)

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Patent of: | de Hilster et al. | Reexam Control No.: |
| Patent No.: | 5,999,939 | Reexam Filed: Herewith |
| Issued: | December 7, 1999 | |
| Serial No: | 09/019,948 | |
| Filed: | February 6, 1998 | |
| For: | SYSTEM AND METHOD FOR DISPLAYING AND ENTERING | |
| | INTERACTIVELY MODIFIED STREAM DATA INTO A | |
| | STRUCTURED FORM | |

### CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to Box Reexam, Commissioner for Patents, Washington, D.C. 20231, on March 31, 2003

Jeanne Spinali

Box Reexam
Commissioner for Patents
Washington, D.C. 20231

### SUBMISSION OF PRIOR ART UNDER 37 C.F.R. 1.501

Sir:

The undersigned herewith submits in the above-identified patent the prior art (including copies thereof) which is pertinent and applicable to the patent and is believed to have a bearing on the patentability of claims 1-20. Each of the references listed below are listed on the attached form PTO Form 1449 (modified). Applicant requests that the Examiner initial and sign the attached form.

Taylor, U.S. 5,832,487, November 3, 1998;

Sobotka et al., U.S. 5,164,899, November 17, 1992;

Eagleview, Inc., WO 95/24687 (PCT/US95/03117), September 14, 1995; and

NOAH, William W. and Rollin V. WEEKS, "*TRW DESCRIPTION OF THE DEFT SYSTEM AS USED FOR MUC-5,*" pp. 237-248.

A detailed explanation of each of these references is contained in the "Requester's/Patent Owner's Detailed Request For Ex Parte Reexamination Pursuant To 37 C.F.R. §1.510(b)" which is submitted herewith. While it is believed that each of the references has a bearing on the

U.S. Patent No.: 5,999,939                    -2-                    Art Unit: 2171

patentability of claims 1-20 of the de Hilster patent, the subject matter claimed differs from the references and is believed patentable thereover

Respectfully Submitted,

Matthew B. Lowrie, Reg. No. 38,228
M. Brad Lawrence, Reg. No. 47,210
Representatives for Requester/Patent Owner
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210-2211
(617) 720-3500

Docket No.: H00644.70004.US (MBL)
Date: March 20, 2002
**xNDDx**

609818.1



*Fig. 1.*

**U.S. Patent**          Dec. 7, 1999          Sheet 2 of 10          5,999,939



EXPERIENCE:

11/96 - 7/97 *Relocation Assistance Coordinator*
<u>Tokyo Central Agency (TCA life) Tokyo, Japan</u>
Worked in a completely bilingual environment, involved in all aspects of Expatriate relocation.
Conducted various orientations focusing particularly on life in Tokyo assistance in immigration
and other official procedures, house hunting and school arrangements. Constantly required to use
various skills in interpretation, translation, negotiation and cultural awareness.

*Fig. 2.*



*Fig. 3.*



**Fig. 4**



USER — GENERATE A RESUME
66

USER — REQUEST FIRST WEB PAGE FORM
68

SERVICE PROVIDER — SEND FIRST FORM
72

USER — PASTE COPY OF RESUME IN FIRST FORM & SEND
74

SERVICE PROVIDER — EXTRACT TEXT FROM PASTED RESUME
76

} STEP ONE

SERVICE PROVIDER — SEND SECOND FORM
80

USER — ANSWER SUPPLEMENTAL QUESTIONS AND SEND
84

} STEP TWO

SERVICE PROVIDER — COMBINE EXTRACTED TEXT AND SUPPEMENTAL ANSWER TEXT AND SEND AS THIRD FORM
96

USER — EDIT SUPPLIED TEXT FIELDS INCLUDING PASTING RESUME TEXT INTO SUPPLIED FIELDS
100

USER — SEND ACCEPTED THIRD FORM
102

} STEP THREE

SERVICE PROVIDER — SAVE TEXT FIELDS IN DATABASE PLUS RESUME TEXT
106

*Fig. 5.*

**U.S. Patent**     Dec. 7, 1999     Sheet 5 of 10     **5,999,939**



**job*Engine***                                      **Post Resume**

This page is for posting a new resume. Click here to <u>Change</u> or <u>Remove</u> a previously posted resume

**Instructions:**

There are 3 steps to post your resume:

- Paste in your resume
- Answer a few questions.
- Review our work to ensure that the information in your resume is correct. Then enroll.

And only a few rules:                                      — 68

- Items labelled in Red are Required.
- Items labelled in Black are Optional, but we strongly suggest that you take a few minutes to answer the questions. Your answers provide information, not typically found in a resume, that employers want to know before they contact you.

Don't worry -- nothing will be saved in the database without your review and approval.

**STEP ONE -- PASTE IN YOUR RESUME**

Copy your resume from a text file on your computer and paste into the text block below

Be sure your contact information (name, address, phone number(s) and email address) appears only in the top of the resume, and that nothing in the body of your resume (like your current job description) identifies you. This protects your privacy. This step is Required:

Resume:                                                   — 70

```
Arthur Smith
1234 Main Street
Sausalito, California 94965
Tel: 415-555-5432    Fax: 415-555-5543
E-mail: asmith@isp.com

EXPERIENCE:

11/96 - 7/97 Relocation Assistance Coordinator
Tokyo Central Agency (TGA Inc.) Tokyo, Japan
```

## *Fig. 6A.*

**U.S. Patent**     Dec. 7, 1999     Sheet 6 of 10     **5,999,939**

**Job***Engine*     **Post Resume**

**STEP TWO -- ANSWER A FEW QUESTIONS**

There's some additional information, not typically in your resume, that is very helpful to employers. Most of these questions are optional. However, you should try to answer as many as possible. It will only take a few minutes. promise.

~72

**Job Goals**

**Functional Specialties**

> GENERAL MANAGEMENT
>   Senior Management (CEO Pres, COO, GM)
>   Branch & Regional Management
> INFORMATION TECHNOLOGY MANAGEMENT

~82a

**Type of Position**     Full Time ☑ ~82b

**Expected Compensation**     open ☒ ~82c

**Travel**     Moderate (25%-50%) ☑ ~82d

**Relocation**     Yes - I can relocate to: ☑     Areas   post anywhere ~82f

~82e

**About You**

**Citizenship**     U.S. Citizen ☑ ~82g

**Current Clearances**     No ☑ ~82h

~82i

**Enrollment**

**Type**     ⊙ Open - Your full resume, including contact information, will be available to employers.

  ○ Confidential - Your full resume, except your contact information, will be available to employers. Those interested in contacting you can do so via email forwarded to you confidentially

  ○ Private - No employer can see your resume. It is retained in JobEngine's Resume Center as a convenience to you when applying to jobs.

Comments, questions or suggestions? Please email us at support@JobEngine.com

A ZDNet and i-Search Site

Copyright (c) 1997 jointly by Ziff-Davis (ZDNet) and Interactive Search (i-Search). All rights reserved. JobEngine and "Matchmakers for IT Professionals" are joint service marks of Ziff-Davis and

**ZDNet**                    **i-Search**

*Fig. 6B.*

**U.S. Patent**     Dec. 7, 1999     Sheet 7 of 10     **5,999,939**

## job*Engine*                                    **Post Resume**

### STEP 3 -- REVIEW INFORMATION AND ENROLL

We know you hate to enter again what you have already put into your resume. So, we've tried first to fin information we need. Please review the information carefully and correct errors. A copy of your resum included for copying and pasting as needed. This is an important step. Remember -- Items labeled in Re Required.

Be sure to scroll through all the data in this window, make all needed corrections, select a Resu Access Code and password, and then Post your resume.



Contact Information (confidential)

| Name | Arthur | | Smith | |
|------|--------|--|-------|--|
| Address | 1234 Main Street | | | 94e |
| | | | | 94f |
| | Sausalito | | California | |
| City, State Zip | 94965 | | | |
| Country | USA | | | |
| Phone | Home 415-555-5432 | Work | | Fax 415-555-55 |
| Email | asmith@isp.com | | | |
| Web Page | | | | |

### Experience
Your three most recent positions. The order of jobs is not important. For each job entered, information is in each of the four columns with red labels

| Start Date | End Date | Company | Title |
|-----------|----------|---------|-------|
| 11/96 | 7/97 | TGA Inc. | Relocation Assistan |
| 3/95 | 10/96 | NCR English Language Inst | English Teacher |
| 8/94 | 2/95 | Los Angeles | Sales Associate |
| Year First Employed | 5/93 | | |



### Education
Your three most recent degrees. For each degree entered, information is required in each of the two colu red labels. Information in the other columns is helpful.

| Year | Degree | School | Major |
|------|--------|--------|-------|
| March, 1 | Bachelor of Ar | University of California | Speech Communications |
| | | | |
| | | | |



## *Fig.6C.* (PART 1 OF 3)

**U.S. Patent**        Dec. 7, 1999        Sheet 8 of 10        **5,999,939**

**Job Goals**

Functional Specialties

| Senior Management (CEO Pres, COO, GM) |
| Branch & Regional Management |
| INFORMATION TECHNOLOGY MANAGEMENT |

Type of Position  `Full Time`

Expected Compensation  `open`

Travel  `Moderate (25%-50%)`

Relocation  `Yes - I can relocate to:` Areas `most anywhere`

**About You**

Citizenship  `U.S. Citizen`

Current Clearances  `No`

**Please Help Us**

We are curious about how you learned about JobEngine. Please help us by selecting one of the choices.

**Access Keys**

Select an access code and password for future access to your resume

Resume Access Code  `arthur`

Password  `_____`

Password (again)  `_____`

**Posting**

Neither Ziff-Davis nor I-Search is responsible for the verification of data provided and shall not be liable for any errors, factual, transcript otherwise, contained in the information posted. Further, we assume no obligation with respect to the compliance of the information or a process with applicable governmental laws, rules and regulations of any kind regarding employment practices. With respect to confide Ziff-Davis and I-Search will use reasonable measures to delete the applicant's identity, but shall not be responsible for unintentional dis software malfunctions or exposures of applicant through descriptive information contained in the body of the resume.

`I accept the agreement post my resume`

---

**Your resume text for cutting and pasting information a**

Back to Form

---

Processed by I-Search:   151-9000-5279

⌐ 12'

Arthur Smith
1234 Main Street
Sausalito, California 94965
Tel: 415-555-5432    Fax: 415-555-5543
E-mail: asmith@isp.com

EXPERIENCE:

# *Fig. 6C.* (PART 2 OF 3)

11/96 - 7/97 Relocation Assistance Coordinator
Tokyo Central Agency (TCA Inc.) Tokyo, Japan
Worked in a completely bilingual environment, involved in all aspects of Expa
Conducted various orientations focusing particularly on life in Tokyo assista
other official procedures, house hunting and school arrangements. Constantly
skills in interpretation, translation, negotiation and cultural awareness.

3/95 - 10/96 English Teacher
NCR English Language Institute, Tokyo, Japan
Nova Inter cultural Institute. Tokyo, Japan
Experienced in all aspects of teaching English as a foreign language, includi
T.O.E.F.L.  Actively participated in recruitment of new students, student lev
progress analysis.  Voted Teacher of the Year by students and upper managemen

8/94 - 2/95 Sales Associate
24'—  Los Angeles, CA
Consistently ranked as highest in customer sales and satisfaction in a compet
environment.  Sharpened communicational skills and refined fashion sense gave
privilege of an honest and bright salesperson.

5/93 - 6/94 Resort Hotel Supervisor
Pacific Islands Club, Guam, U. S. A.
Thrived in a resort where the primary focus was to initiate guest interaction
department of sports, entertainment and activities.  Assumed direct responsib
sports complex, training the constant influx of new employees, inventory and
introduction of inventive and efficient motivational techniques) and complete

EDUCATION:

Bachelor of Arts - Speech Communications
University of California at Santa Barbara
Graduation:   March, 1993

Major Courses of Study & Interest
Interpersonal Relations, Creative Writing, Psychology, Sociology

CERTIFICATES:  National Japanese Proficiency Exam - Level 2
  INTERESTS:  Travel, Japanese, Scuba Diving, Tennis

[?GCNT]
[PAGE]

Comments, questions or suggestions? Please email us at support@1stSrchEngine.com

——A ZDNet and I Search Site——

ZDNet   Copyright (c) 1997 jointly by Ziff-Davis (ZDNet) and Interactive Search (I-Search). All rights reserved
jobEngine and "Matchmakers for IT Professionals" are pending service marks of Ziff-Davis and
Interactive Search     I-Search

*Fig.6C. (PART 3 OF 3)*

**Arthur Smith**
1234 Main Street
Sausalito, California 94965
Tel: 415-555-5432   Fax: 415-555-5543
E-mail: asmith@isp.com

/ 12

EXPERIENCE:

*11/96 - 7/97 Relocation Assistance Coordinator*
<u>Tokyo Central Agency (TCA Inc.) Tokyo, Japan</u>
Worked in a completely bilingual environment, involved in all aspects of Expatriate relocation.
Conducted various orientations focusing particularly on life in Tokyo assistance in immigration
and other official procedures, house hunting and school arrangements. Constantly required to use
various skills in interpretation, translation, negotiation and cultural awareness.

*3/95 - 10/96 English Teacher*
<u>NCR English Language Institute, Tokyo, Japan</u>
<u>Nova Inter cultural Institute, Tokyo, Japan</u>
Experienced in all aspects of teaching English as a foreign language, including Phonics, and
T O E F L. Actively participated in recruitment of new students, student level assessment and
progress analysis. Voted Teacher of the Year by students and upper management.

*8/94 - 2/95 Sales Associate*
<u>Nordstrom, Los Angeles, CA</u>
Consistently ranked as highest in customer sales and satisfaction in a competitive retail
environment. Sharpened communicational skills and refined fashion sense gave customers the
privilege of an honest and bright salesperson.

*5/93 - 6/94 Resort Hotel Supervisor*
<u>Pacific Islands Club, Guam, U. S. A.</u>
Thrived in a resort where the primary focus was to initiate guest interaction in the unique
department of sports, entertainment and activities. Assumed direct responsibility, for managing the
sports complex, training the constant influx of new employee, inventory and ordering of supplies,
introduction of inventive and efficient motivational techniques) and complete area maintenance.

EDUCATION:

Bachelor of Arts - Speech Communications
University of California at Santa Barbara
Graduation: March, 1993

Major Courses of Study & Interest
Interpersonal Relations, Creative Writing, Psychology, Sociology

CERTIFICATES: National Japanese Proficiency Exam - Level 2

INTERESTS: Travel, Japanese, Scuba Diving, Tennis

## *Fig. 7.*

5,999,939

| 1 | 2 |

## SYSTEM AND METHOD FOR DISPLAYING AND ENTERING INTERACTIVELY MODIFIED STREAM DATA INTO A STRUCTURED FORM

This application claims the benefit of U.S. Provisional Application No. 60/068,404 filed Dec. 21, 1997.

### BACKGROUND OF THE INVENTION

The present invention relates to data processing systems for entering information into and accessing information from large structured databases and in particular to those systems which allow multiple independent users to enter information from nonuniformly formatted documents/files and to interact with the system to assure the accuracy of the database entries.

The use of databases for storing data records which can be readily searched is well known. A typical application of large structured databases would be a system for matching jobs and applicants. When used in conjunction with a search engine, a program that can search for matches between inquiry data and data stored within the database, such a system significantly reduces the manual efforts required to match the needs of employers (job providers) and applicants (job seekers). In order to enter applicant data into the database, source documents/files (typically, nonuniformly formatted resumes) can be used. Since the format of text data contained within a resume is typically not standardized, text data extraction software is used to retrieve data for entry into the database. Typical of such data extraction software is that described in U.S. Pat. Nos. 5,164,899 and 5,197,004.

### SUMMARY OF THE INVENTION

The present invention is directed to a system for facilitating the accurate transfer of information from a source data stream, e.g., a document/file, to a highly structured database and more particularly to such systems capable of accepting nonuniformly formatted documents, e.g., text documents such as resumes, from a plurality of users via a remote communication interface, e.g., the Internet, and for extracting information therefrom via a procedure which includes user participation to assure the transfer of appropriate entries into the database.

Embodiments of the present invention provide an interactive path for a user (typically, the author of the source document/file) to interactively modify the extracted information. In a preferred embodiment, this interactive path is provided via the Internet and the extracted information can be altered by editing and/or selectively copying portions of the source document/file to supplement and/or modify the extracted information.

A preferred system for facilitating the accurate transfer of information from each of a plurality of nonuniformly formatted source data streams into a structured database comprises (1) means for supplying digital data representing each of a plurality of source data streams from a plurality of users, each source data stream containing data corresponding to multiple discernible source data strings, (2) data extraction means for extracting selected ones of the source data strings and generating related target data strings, (3) means for displaying a structured form comprised of multiple fields, each field capable of accommodating a data string and wherein one or more of the fields have the target data strings inserted within, (4) means for enabling each user to modify the target strings inserted within the displayed form corresponding to the source data stream originating from the user

before accepting the form, and (5) means for storing data corresponding to the data strings from the form fields into the database.

In a further aspect of the present invention, the providing means uses a remote communication interface, preferably using the Internet, to supply the source document/file to the data extraction means and, subsequently, to return the form having target data strings within its fields.

The novel features of the invention are set forth with particularity in the appended claims. The invention will be best understood from the following description when read in conjunction with the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 comprises a simplified block diagram of a system for entering resume data into a database and interactively modifying and/or supplementing such entered data;

FIG. 2 is a portion of the exemplary resume of FIG. 7, showing the extraction of source text strings based on the syntax of surrounding text;

FIG. 3 is a diagram of the structure of an exemplary database comprised of a plurality of applicant data records;

FIG. 4 comprises an expanded block diagram of the flow of the data entry system of FIG. 1;

FIG. 5 comprises a simplified flow chart of the data entry flow of FIG. 4;

FIGS. 6A–6C show exemplary forms for providing resume and/or supplementary data to the database service provider of FIG. 1; and

FIG. 7 shows an exemplary resume used in conjunction with the forms of FIGS 6A–6C

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is directed to a system for facilitating the accurate transfer of information from a source data stream, e.g., a document/file, to a highly structured database and more particularly to such systems capable of accepting nonuniformly formatted documents, e.g., text documents such as resumes, from a plurality of users via a remote communication interface, e.g., the Internet, and for extracting information therefrom via a procedure which includes user participation to assure the transfer of appropriate entries into the database.

Embodiments of the present invention provide an interactive path for a user (typically, the author of the source document/file) to interactively modify the extracted information, e.g., according to the source document/file. In a preferred embodiment, this interactive path is provided via the Internet and the extracted information can be altered by editing and/or selectively copying portions of the source document/file to supplement and/or modify the extracted information.

FIG. 1 comprises a simplified block diagram of a system 10 for entering data from a source data stream 12, e.g., a text document/file such as a resume, into a database 14 and interactively modifying and/or supplementing such entered data. In an exemplary job search environment, the interactive system 10 provides an improved system and method for accurately transferring information from resume source document/file 12, hereinafter referred to as resumes and preferably independently generated by a plurality of applicants 16, to the database 14 where it is accessible (preferably via a search engine as described further below) to one or

5,999,939

3

more employers 18. Resumes are preferably used as the source documents/files 12 in this environment since resumes are a well-accepted tool for providing information from an applicant to an employer and, as such, they typically already exist.

As shown in FIG. 1, the resume 12 is typically generated via path 20 using a word processor (not shown). Interactions between the applicant 16 and resume 12 typically continue via the word processor until a satisfactory resume 12 is generated and stored as corresponding digital data. However, resumes are generally unstructured or loosely structured (and nonuniformly formatted between users) text documents that are only intended to be human readable e.g., by the employer 18 and the applicant 16, and are typically not directly useable in the highly structured database 14. Consequently, the resume 12 is supplied via path 21 to a data extractor 22, preferably implemented as text data extraction software (e.g., the DEFT software developed by TRW as part of their InfoWeb™ system), to selectively convert information from the format of the unstructured (or loosely structured) resume 12 to the format of the highly structured database 14. Essentially as shown in FIG. 2 (a portion of the exemplary resume of FIG. 7), the data extractor 22 isolates one or more discernible source data strings, e.g., text data strings 24, within the resume 12 and, according to the content of the source data strings, e.g., 24a–24z, and using the syntax of surrounding keyword data, e.g., text strings 26, determines a correlation between source text strings 24 and data fields 28 that are to be entered into the database 14. For example, the keyword text string 26 ("EXPERIENCE") identifies the following source text strings 24 as being related to the applicant's job experience due to the syntax of the surrounding text, e.g., the keyword "experience", the existence of dates, the identification of a company (Inc.), etc.

As shown in FIG. 3, an exemplary applicant database 14 is comprised of a plurality of fixed length records 30, each corresponding to a different one of a plurality of applicants 16. Each record 30 is comprised of a plurality of data fields 28 having predefined formats and lengths, corresponding to searchable pieces of information.

Table 1 shows an exemplary partial list of definitions of the information stored in the data fields 28 of the database 14 of FIG. 3.

TABLE 1

| Data Field | Definition |
|---|---|
| 28j | Most recent job start date |
| 28k | Most recent job end date |
| 28l | Most recent job company |
| 28m | Most recent job title |
| 28n | Next job start date |
| 28o | Next job end date |
| 28p | Next job company |
| 28q | Next job title |

First, the data extractor 22 extracts source data strings, e.g., text strings 24a–24f, from the resume 12. Optionally, the text format of one or more of the source text strings 24 are then altered by the data extractor 22 to generate target data strings, e.g., text strings 32, of a standardized format. For example, a date text string could be standardized (e.g., March 12, 1993 could be changed to 3/12/93). Otherwise, the stored

4

target text string 32 is essentially identical to the source text string 24. As described further below, each target text string 32 preferably directly corresponds to the data fields in the database 14 (e.g., the target text string 32 corresponding to source text string 24a corresponds to 28f) and thus, following the modification/acceptance process described below, target text strings 32 are stored via path 34 into the database 14 (following any conversions required by the format of the database 14 and its fields 28).

However, due to lack of structure of the resume 12, the data extractor 22 (also referred to as a natural language processor) is susceptible to making an incomplete or erroneous correlations. Accordingly, the present invention provides an interactive path 36 that enables the applicant 16, generally the individual most acquainted with the contents of the resume 12, to modify the target text strings 32 to best correspond to the resume 12 and, thus, enhance the accuracy of the data stored in the database 14.

FIG. 4 is an expanded block diagram of the system 10 of FIG. 1 showing the data flow which enables each user (i.e., applicant 16 in this exemplary environment) to interact with the information extracted by the data extractor 22 and thus assure the accurate transfer of information from the resume 12 into the structured database 14. The interactive system 10 is preferably comprised of one or more user sites 38 (including a computer 40 operated by the applicant 16) and a database service provider site 42 (generally an automated service) coupled to each other via a remote communication interface 44. In the following discussion, the remote communication interface comprises the Internet 46, the associated hardware and/or software at the user 38 and database service provider 42 sites, typically comprising a modem 48 and a web (Internet) browser 50, and the associated interconnections 52 between (typically phone lines and Internet Service Providers (ISPs)). However, other communication interfaces, e.g., a local area network (LAN) or a direct modem to modem or serial port to serial port connections, are also considered to be alternative remote communication interfaces.

Preferably, each user site 38 is comprised of the computer 40, e.g., a personal computer, having a display control output 54 that drives a display monitor 56 to generate a displayed output 58 and a data entry device, e.g., a keyboard/mouse 60, that directs operation of the computer 40 via control path 62. In contrast, while the database service provider site 42 may typically also include a monitor and a keyboard/mouse, it only requires a computer 64 that interfaces to the Internet 46.

Initially, the user 16 at user site 38 generates the source document/file, i.e., resume 12, at step 66 of FIG. 5. As previously discussed, this generation is interactive and proceeds until user 16 is satisfied with the results. However, the resulting resume 12 is generally unstructured relative to the highly structured form of the database 14.

As a next step, the user 16 requests a first web page form (step 68) via the Internet 46 to begin the process of interactively transferring the resume 12 to the database 14. The first web page form 68 (see FIG. 6A) is stored (see block 70) within computer 64 at the database service provider site 42 and is responsively provided back (see step 72) to the user site 38 via the Internet 46 (commencing STEP ONE) and displayed by the web browser 50 on the monitor 56. The user 16 then preferably provides the existing resume 12 back to the database service provider site 42 via a pasting operation used in conjunction with the web browser 50. In an exemplary Windows 95 environment, the user 16 launches the

5,999,939

| 5 | 6 |

word processor, e.g., Microsoft Word, that had been used to generate the resume 12. Preferably, the user 16 then selects the entire resume document and copies it to the clipboard. Next, the user 16 pastes the resume 12 from the clipboard into a source data input field 70 of the first web page form 68 using the web browser 50, e.g., Microsoft Internet Explorer. Typically, this pasting removes any word processor formatting information and results in digital data (preferably formatted as ASCII text) representing the resume 12 being stored in the web browser 50. (Alternatively, the word processor formatting information can be extracted by the data extractor 22.) The web browser 50 is then used to send (see step 74) the first web page form 68 (now containing the resume 12) to the database service provider site 42 where the resume 12 is stored in resume storage 74. The data extractor 22 then extracts one or more source text strings 24 according to syntactical rules to establish a correspondence between the source text strings 24 (preferably saved as intermediary target text strings 32) and fields 28 of the database 14.

Next, STEP TWO of the process commences by the computer 64 at the database service provider site 42 sending a second web page form 78 (see FIG. 6B) at step 80 which is displayed via the web browser 50 on the monitor 56 at the user site 38. In this example, the second web page form 78 is a supplemental inquiry form, that asks the user 16 one or more supplemental questions. In response, the user 16 fills in supplemental fields 82, e.g., by a pull-down field, free text entry, a radio selection, etc. This filled-in form is sent back to the database service provider 42 in step 84 where supplemental text strings 86 are stored in supplemental text storage 88.

STEP THREE of the process commences by the third web page form generator 90 at the database service provider site 42 generating a third web page form 92 (see FIG. 6C), a structured form having multiple fields 94 each field being capable of accommodating a text string within. Specifically, target text strings 32 (corresponding to source text strings 24) are inserted within fields 94 according to the syntax of the source document/file 12 and the definition (e.g., name, address, city, etc.) of each field 94. Additionally, the supplemental text strings 86 are inserted within the associated fields 94 of form 92. Preferably, the stored resume 12' from resume storage 74 is also added to the third web page form 92. Finally, the third web page form 92 is sent back in step 96 to the user site 38 where it is displayed by the web browser 50 on monitor 56

The user 16 can now use the view the displayed form 92 to determine its accuracy. If the displayed data, including target text strings 32 and supplemental text strings 86, are accurate the user 16 sends back form 92 to the database service provider site 42 where the accepted text strings are extracted in block 98 and stored in database 14. However, as previously discussed, the displayed data is not always accurate. Accordingly, the user 16 can edit data supplied in the third web page form 92 (preferably including using the supplied resume 12) to cause the fields 94 of form 92 to more accurately represent the applicant's resume information. Using features of the web browser 50, the user 16 can in step 100 edit fields 36 replace paste information from resume 12' (now part of form 92) to modify the data fields 94. The user in step 102 then sends the modified form 92 back to the database service provider site 42 where accepted text strings 104 from fields 94 are stored in the database 14 in step 98.

As an example of this modification process, it is noted that if field 94c corresponding to the third "Company" under "Experience" has been filled in with the target text string 32

"Los Angeles". This is inaccurate since the data extractor 22 has apparently mistaken the company name, i.e., Nordstroms, and instead extracted the city name as the target text string 32. Therefore, the user/applicant 16 can identify this inaccuracy and either (1) edit the field 94c by typing in the correct entry or (2) select the source text string 24' from the copy 12' of resume 12 included on the third web page form and paste the proper text (Nordstroms) into field 94c. Accordingly, the user/applicant 16 has been given the opportunity to verify and correct the data before entering it into the database 14, thus assuring the accurate transfer of information into the database 14.

Once the information has been stored in the database 14, a search engine 106, preferably a software program that executes on the computer 64 at the database service provider site 42, can be used to match inquiries, e.g., from one or more employer sites 108 (preferably via the remote communication interface 44) to look for applicants 16 with specific attributes. For example, since the highly structured database 14 contains fields 28 corresponding to the schools attended by each applicant 16, the search engine 106 can, in response to a request from the employer site 108, search for applicants 16 who graduated from specific schools or any other criteria stored in the fields 28 of the database 14.

Although the present invention has been described in detail with reference only to the presently-preferred embodiments, those of ordinary skill in the art will appreciate that various modifications can be made without departing from the invention. For example, while a job search environment has been primarily described, the present invention can be useful in other environments where the source document is essentially unstructured relative to a highly structured database. Accordingly, the invention is defined by the following claims.

I claim:

1. A method for facilitating the accurate transfer of information from each of a plurality of nonuniformly formatted source data streams into a structured database, said method comprising the steps of:

supplying digital data representing each of a plurality of source data streams from a plurality of users, each said source data stream containing data corresponding to multiple discernible source data streams;

processing said digital data for extracting selected ones of said source data strings and generating related target data strings;

displaying a structured form comprised of multiple fields, each field being capable of accommodating a data string and wherein one or more of said fields have said target data strings inserted within;

enabling each user to modify and/or accept said target data strings inserted within said displayed form corresponding to said source data stream originating from said user; and

storing data corresponding to said data strings from said form fields into a database.

2. The method of claim 1 wherein said supplying and displaying steps use a remote communication interface.

3. The method of claim 2 wherein said remote communication interface uses the Internet.

4. The method of claim 1 wherein said displaying step additionally includes displaying said source data stream and said enabling step includes enabling said user to copy selected portions of said source data stream into selected fields of said form.

5. The method of claim 1 wherein one or more of said target strings are essentially equivalent to said extracted source data strings

5,999,939

7

6. The method of claim 1 additionally comprising the step of:

supplying one or more supplemental data strings in response to a supplemental inquiry form; and wherein said displayed structured form additionally displays fields having said supplemental data strings inserted within.

7. A system for facilitating the accurate transfer of information from each of a plurality of nonuniformly formatted source data streams into a structured database, said system comprising:

means for supplying digital data representing each of a plurality of source data streams from a plurality of users, each said source data stream containing data corresponding to multiple discernible source data strings;

data extraction means for extracting selected ones of said source data strings and generating related target data strings;

means for displaying a structured form comprised of multiple fields, each field capable of accommodating a data string and wherein one or more of said fields have said target data strings inserted within;

means for enabling each user to modify said target data strings inserted within said displayed form corresponding to said source data stream originating from said user before accepting said form; and

means for storing data corresponding to said data strings from said form fields into said database.

8. The system of claim 7 wherein said means for supplying digital data to said data extraction means comprises each said user submitting said digital data via a remote communication interface.

9. The system of claim 8 wherein said remote communication interface uses the Internet.

10. The system of claim 7 wherein said data extraction means additionally comprises means for returning said form via a remote communication interface.

11. The system of claim 10 wherein said remote communication interface uses the Internet.

12. The system of claim 7 wherein said means for enabling includes enabling each said user to copy selected portions of said source data stream into selected fields of said form.

13. The system of claim 7 wherein one or more of said target strings are essentially equivalent to said extracted source data strings.

8

14. The system of claim 7 additionally comprising:

means for supplying one or more supplemental data strings in response to a supplemental inquiry form; and wherein

said displayed structured form additionally displays fields having said supplemental data strings inserted within.

15. A system for facilitating the accurate transfer of information from each of a plurality of nonuniformly formatted source data streams into a structured database, said system comprising:

a communication interface for supplying from each of a plurality of user sites a source data stream containing data corresponding to multiple discernible source data strings;

a data extractor for extracting selected ones of said source data strings from said source data streams and generating related target data strings and for returning said target data strings to said user sites;

display apparatus for displaying a structured form comprised of multiple fields, each field capable of accommodating a data string and wherein one or more of said fields have said target data strings inserted within;

data entry apparatus for enabling each user to alter said fields of said form corresponding to said source data originating from said user before accepting said form; and

a database for storing data corresponding to said data strings from said form fields.

16. The system of claim 15 wherein said communication interface uses the Internet.

17. The system of claim 15 wherein said display apparatus additionally displays said source data stream and said data entry apparatus enables said users to copy selected portions of said source data stream into selected fields of said form.

18. The system of claim 17 wherein said data extraction apparatus additionally returns said source data stream to its corresponding user.

19. The system of claim 15 wherein one or more of said target data strings are essentially equivalent to said extracted source data strings.

20. The system of claim 15 additionally comprising:

means for supplying one or more supplemental data strings in response to a supplemental inquiry form; and wherein

said displayed structured form additionally displays fields having said supplemental data strings inserted within.

* * * * *

ATTORNEY DOCKET NO.: H00644.70004 US (MBL)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE 66540 U.S. PTO

90/006570

| In re U.S. Patent of: | de Hilster et al. | Reexam Control No.: |
|---|---|---|
| Patent No.: | 5,999,939 | Reexam Filed: Herewith  03/24/03 |
| Issued: | December 7, 1999 | |
| Serial No: | 09/019,948 | MAR 2 4 2003 |
| Filed: | February 6, 1998 | |
| For: | SYSTEM AND METHOD FOR DISPLAYING AND ENTERING INTERACTIVELY MODIFIED STREAM DATA INTO A STRUCTURED FORM | |

## CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to Box Reexam, Commissioner for Patents, Washington, D.C. 20231, on March 24, 2003

Jeanne Spinell

Box Reexam
Commissioner for Patents
Washington, D.C. 20231

Sir:

Transmitted herewith are the following documents:

[X]   Request For *Ex Parte* Reexamination Transmittal Form (PTO/SB/57)
[X]   Requester's/Patent Owner's Detailed Request For Ex Parte Reexamination Pursuant To
37 C.F.R. §1.510(b)
[X]   Submission of Prior Art Under 37 C.F.R. 1.501
[X]   PTO Form 1449 (modified) and cited references
[X]   U.S. Patent No. 5,999,939 to de Hilster et al
[X]   Return Postcard

If the enclosed papers are considered incomplete, the Mail Room and/or the Application Branch is respectfully requested to contact the undersigned at (617)720-3500, Boston, Massachusetts

A check in the amount of $2520 is enclosed. The Commissioner is hereby authorized to charge any deficit or credit any overpayment to the account of the undersigned, Deposit Account No. 23/2825. A duplicate of this sheet is enclosed.

Respectfully Submitted

Matthew B. Lowrie, Reg. No. 38,228
M. Brad Lawrence, Reg. No. 47,210
Representatives for Requester/Patent Owner
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210-2211
(617) 720-3500

Docket No.: H00644.70004 US (MBL)
Date: March 20, 2002
xNDDx

609818.1

66540 U.S. PTO
90/006570

Approved for use through 01/31/2004  OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO - 1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

| Address to: | Attorney Docket No. |
|---|---|
| Assistant Commissioner for Patents | H00644.70004.US (MBL) |
| Box Reexam    66540 U.S. PTO | Date: |
| Washington, D.C. 20231 | March 20, 2003 |

03/24/03

1. ☒ This is a request for *ex parte* reexamination pursuant to 37 CFR 1 510 of patent number 5,999,939
   issued December 7, 1999 . The request is made by:

   ☒ patent owner.        ☐ third party requester.

2. ☒ The name and address of the person requesting reexamination is:
   BrassRing Systems
   1528 South El Camino Real, Suite 100
   San Mateo, CA  94402

3. ☒ a. A check in the amount of $12,520 is enclosed to cover the reexamination fee, 37 CFR 1 20(c)(i);

   ☐ b. The Commissioner is hereby authorized to charge the fee as set forth in 37 CFR 1 20(c)(i)
      to Deposit Account No _____ ; or

   ☐ c. Payment by credit card  Form PTO-2038 is attached

4. ☒ Any refund should be made by ☐ check or ☒ credit to Deposit Account No. 23/2825
   37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. ☒ A copy of the patent to be reexamined having a double column format on one side of a separate
   paper is enclosed  37 CFR 1 510(b)(4)

6. ☐ CD-ROM or CD-R in duplicate. Computer Program (Appendix) or large table

7. ☐ Nucleotide and/or Amino Acid Sequence Submission
   If applicable, all of the following are necessary
   a. ☐ Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i  ☐ CD-ROM (2 copies) or CD-R (2 copies); or
      ii ☐ paper
   c. ☐ Statements verifying identity of above copies

8. ☐ A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is
   included.

9. ☒ Reexamination of claim(s) 1-20 _____ is requested

10. ☐ A copy of every patent or printed publication relied upon is submitted herewith including a listing
    thereof on Form PTO-1449

11. ☐ An English language translation of all necessary and pertinent non-English language patents and/or
    printed publications is included

[Page 1 of 2]

Burden Hour Statement: This form is estimated to take 2.0 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on
the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC
20231  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS  SEND TO: Assistant Commissioner for Patents  Box Reexam, Washington, DC
20231.

PTO/SB/57 (02-01)
Approved for use through 01/31/2004  OMB 0651-0023
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12 ☒ The attached detailed request includes at least the following items:

  a.  A statement identifying each substantial new question of patentability based on prior patents and printed publications  37 CFR 1.510(b)(1)

  b.  An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13 ☐ A proposed amendment is included (only where the patent owner is the requestor)  37 CFR 1.510(e)

14 ☐ a. It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c)
The name and address of the party served and the date of service are:

_____

_____

_____

Date of Service:_____; or

☐ b. A duplicate copy is enclosed since service on patent owner was not possible.

15 ☒ Correspondence Address: Direct all communication about the reexamination to:

  ☒ Customer Number   23628   →   Place Customer Number Here or Bar Code Label here   23628

  OR   Type Customer Number here

  ☐ Firm or Individual Name

| | | |
|---|---|---|
| Address  (line 1) | | |
| Address  (line 2) | | |
| City | State | Zip |
| Country | | |
| Telephone | Fax | |

16. ☐ The patent is currently the subject of the following concurrent proceeding(s):

  ☐ a. Copending reissue Application No._____.

  ☐ b. Copending reexamination Control No._____.

  ☐ c. Copending interference No._____.

  ☐ d. Copending litigation styled:_____

  _____

  _____

WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.

*[signature]* —M. Brad Lawrence, Reg. No. 47,210

Authorized Signature

March 20, 2003

Date

☒ For Patent Owner Requester

☐ For Third Party Requester

[Page 2 of 2]

| FORM PTO-1449/A and B (Modified) | | | APPLICATION NO : 09/948,408 | | | TY. DOCKET NO.: H00644.70004 |
|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | | | FILING DATE: September 6, 2001 | | | CONFIRMATION NO : 5531 |
| | | | APPLICANT: de Hilster et al. | | | |
| | | | GROUP ART UNIT: 2171 | | | |
| Sheet | *1* | of | *1* | | | |

**U.S. PATENT DOCUMENTS**

| Examiner's Initials# | Cite No. | U.S. Patent Document | | Name of Patentee or Applicant of Cited Document | Class/Subclass | Date of Publication or of Issue of Cited Document mm-dd-yyyy |
|---|---|---|---|---|---|---|
| | | Number | Kind Code | | | |
| *Aur* | A1 | 5,164,899 | A1 | Sobotka et al. | 364/419 | 11-17-1992 |
| *Aur* | A2 | 5,832,497 | A1 | Taylor | 707/104 | 11-03-1998 |
| *Aur* | A3 | 5,999,939 | A1 | de Hilster | 707/102 | 12-07-1999 |

**FOREIGN PATENT DOCUMENTS**

| Examiner's Initials# | Cite No. | Foreign Patent Document | | | Name of Patentee or Applicant of Cited Document (not necessary) | Date of Publication of Cited Document MM-DD-YYYY | Translation (Y/N) |
|---|---|---|---|---|---|---|---|
| | | Office/ Country | Number | Kind Code | | | |
| *Aur* | B1 | WO | 95/24687 | A1 | | 09-14-1995 | Y |

**OTHER ART — NON PATENT LITERATURE DOCUMENTS**

| Examiner's Initials# | Cite No | Include name of the author (in CAPITAL LETTERS) (title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, relevant page(s), volume-issue number(s), publisher, city and/or country where published. | Translation (Y/N) |
|---|---|---|---|
| | C1 | NOAH, William W. and Rollin V WEEKS, "*TRW: DESCRIPTION OF THE DEFT SYSTEM AS USED FOR HUC-5,*" pp. 237-248  1993 | |
| | | | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | 4/21/03 |

#EXAMINER: Initial if reference considered, whether or not citation is in conformance with MEP 609; Draw line through citation if not in conformance and not considered Include copy of this form with next communication to applicant.

*a copy of this reference is not provided as it was previously cited by or submitted to the office in a prior application. _____ filed _____, now _____, and relied upon for an earlier filing date under 35 U S C  120 (continuation, continuation-in-part, and divisional applications)

[NOTE - Must provide a copy of any patent, publication, other information listed, even if it was previously submitted to, or cited by, the U.S. Patent Office in an earlier application, unless the earlier application is identified by the IDS and is relied upon for an earlier filing date under 35 U.S.C. §120, and the copy was provided in the earlier application.]

wysiwyg://QueryFrame.66/http://usp. .=&asne=&asnei=&asns=&submit=Searc

## Patent Assignment Abstract of Title

Total Assignments: 3
Application #: 09019948  Filing Dt: 02/06/1998    Patent #: 5999939    Issue Dt: 12/07/1999
    PCT #: NONE    Publication #: NONE    Pub Dt:
Inventors: DAVID S DE HILSTER, ALAN G PORTER, JOHN REESE
    Title: SYSTEM AND METHOD FOR DISPLAYING AND ENTERING INTERACTIVELY MODIFIED STREAM
        DATA INTO A STRUCTURED FORM
Assignment: 1
    Reel/Frame: 008982/0224 Received: 02/27/1998 Recorded: 02/06/1998 Mailed: 04/18/1998 Pages: 2
    Conveyance: ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
    Assignors: DE HILSTER, DAVID SCOTT    Exec Dt: 01/28/1998
        PORTER, ALAN GEORGE    Exec Dt: 01/28/1998
        REESE, JOHN    Exec Dt: 01/27/1998
    Assignee: INTERACTIVE SEARCH, INC.
        SUITE 1100
        5959 W. CENTURY BOULEVARD
        LOS ANGELES, CALIFORNIA 90045
Correspondent: FREILICH, HORNBAKER & ROSEN
        ARTHUR FREILICH
        10960 WILSHIRE BOULEVARD
        SUITE 840
        LOS ANGELES, CA 90024
Assignment: 2
    Reel/Frame: 011590/0977 Received: 03/23/2001 Recorded: 03/05/2001 Mailed: 05/24/2001 Pages: 19
    Conveyance: SECURITY AGREEMENT
    Assignor: INTERACTIVE SEARCH, INC.    Exec Dt: 01/18/2001
    Assignee: DEVELOPMENT DIMENSIONS INTERNATIONAL, INC.
        1225 WASHINGTON PIKE
        BRIDGEVILLE, PENNSYLVANIA 15017
Correspondent: REED SMITH LLP
        JODY L. BURTNER
        SENIOR PARALEGAL
        P.O. BOX 488
        PITTSBURGH, PA 15230
Assignment: 3
    Reel/Frame: 012691/0366 Received: 03/22/2002 Recorded: 03/18/2002 Mailed: 05/15/2002 Pages: 2
    Conveyance: ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
    Assignor: INTERACTIVE SEARCH, INC.    Exec Dt: 02/13/2002
    Assignee: BRASSRING LLC
        170 HIGH STREET
        WALTHAM, MASSACHUSETTS 02454
Correspondent: WOLF, GREENFIELD & SACKS, PC.
        STEVEN J. HENRY
        600 ATLANTIC AVE
        FEDERAL RESERVE PLAZA
        BOSTON, MA 02210



BOSTON, MA 02210

wysiwyg://QueryFrame.66/http://usp. =&asne=&asnei=&asns=&submit=Searc

Search Results as of 3/25/2003 11:29:27 A M

If you have any comments or questions concerning the data displayed, contact OPR / Assignments at 703-308-9723
Web interface last modified: Oct 3, 2001

Page 1 of 1

**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
Washington, DC 20231
www.uspto.gov

#3

| REEXAM CONTROL NUMBER | FILING DATE | PATENT NUMBER |
|---|---|---|
| 90/006,570 | 03/24/2003 | 5999939 |

23628
WOLF GREENFIELD & SACKS, PC
FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE
BOSTON. MA 02210-2211

**CONFIRMATION NO. 1696**

Date Mailed: 04/09/2003

### NOTICE OF REEXAMINATION REQUEST FILING DATE

### *(Patent Owner Requester)*

Requester is hereby notified that the filing date of the request for reexamination is 03/24/2003, the date the required fee of $2,520 was received  (See CFR 1 510(d)).

A decision on the request for reexamination will be mailed within three months from the filing date of the request for reexamination  (See 37 CFR 1 515(a))

Pursuant to 37 CFR 1 33(c), future correspondence in this reexamination proceeding will be with the latest attorney or agent of the record in the patent file

The paragraphs checked below are part of this communication:

___ 1.   The party receiving the courtesy copy is the latest attorney or agent of record in the patent file
___ 2.   The person named to receive the correspondence in this proceeding has not been made the latest attorney or agent of record in the patent file because:
    ___ A Requester's claim of ownership of the patent is not verified by the record
    ___ B. The request papers are not signed with a real or apparent binding signature
    ___ C. The mere naming of a correspondence addressee does not result in that person being appointed as the latest attorney or agent of record in the patent file
_✓_ 3.   Addressee is the latest attorney or agent of record in the patent file
___ 4   Other _____

Office of Patent Legal Administration
Central Reexamination Unit (703) 308-9692

PART 2 - OFFICE COPY

Page 1 of 1

**UNITED STATES
PATENT AND
TRADEMARK OFFICE**

Commissioner for Patents
Washington DC 20231
www.uspto.gov

| REEXAM CONTROL NUMBER | FILING DATE | PATENT NUMBER |
|---|---|---|
| 90/006,570 | 03/24/2003 | 5999939 |

#4

23628
WOLF GREENFIELD & SACKS, PC
FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE
BOSTON, MA 02210-2211

**CONFIRMATION NO. 1696
REEXAM ASSIGNMENT NOTICE**

Date Mailed: 04/09/2003

## NOTICE OF ASSIGNMENT OF REEXAMINATION REQUEST

The above-identified request for reexamination has been assigned to Art Unit 2171. All future correspondence to the proceeding should be identified by the control number listed above and directed to the assigned Art Unit.

A copy of this Notice is being sent to the latest attorney or agent of record in the patent file or to all owners of record. (See 37 CFR 1.33(c)). If the addressee is not, or does not represent, the current owner, he or she is required to forward all communications regarding this proceeding to the current owner(s). An attorney or agent receiving this communication who does not represent the current owner(s) may wish to seek to withdraw pursuant to 37 CFR 1.36 in order to avoid receiving future communications. If the address of the current owner(s) is unknown, this communication should be returned within the request to withdraw pursuant to Section 1.36.

*M. A. Twitty*

Office of Patent Legal Administration
Central Reexamination Unit (703) 308-9692

PART 2 - OFFICE COPY



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO |
|---|---|---|---|---|
| 90/006,570 | 03/24/2003 | 5999939 | H00644.70004.US | 1696 |

23628    7590    05/12/2003
WOLF GREENFIELD & SACKS, PC
FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE
BOSTON, MA  02210-2211

| EXAMINER |
|---|
| Snfat MetJahic |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2171 | 5 |

DATE MAILED: 05/12/2003

Please find below and/or attached an Office communication concerning this application or proceeding.

90006570.US12203

PTO-90C (Rev 07-01)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

MAY 1 2 2003

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. <u>90/006,570</u>

PATENT NO <u>5999939</u>

ART UNIT <u>2171</u>

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(e)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(e)).

PTO-465 (Rev.04-03)

MAY 12 2003

| Order Granting / Denying Request For Ex Parte Reexamination | Control No. 90/006,570 | Patent Under Reexamination 5999939 |
|---|---|---|
| | Examiner Uyen T Lo | Art Unit 2171 | |

--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--

The request for *ex parte* reexamination filed <u>24 March 2003</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO-1449,    c)☐ Other: _____

1 ☒    The request for *ex parte* reexamination is GRANTED

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535) **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2 ☐    The request for *ex parte* reexamination is DENIED

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

   a) ☐  by Treasury check or,

   b) ☐  by credit to Deposit Account No. _____,  or

   c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTO-471 (Rev 04-01)                     Office Action in *Ex Parte* Reexamination                     Part of Paper No. 5

Application/Control Number: 90/006,570                    Page 2
Art Unit: 2171

### Reexamination

1.    A substantial new question of patentability affecting claims 1-20 of US Patent No.
5,999,939 is raised by the request for reexamination.

2.    All claims are subject to reexamination.

3.    The US Patent No. 5,164,899, US Patent No.5,832,497, PCT Publication
95/24687 and Noah and Weeks article "TRW: Description of the DEFT System as Used
for MUC-5" raise a substantial new question of patentability as to all the claims of the
5,999,939 Patent in that their combination discloses all the claimed subject matter of US
Patent No. 5,999,939. For example, the Noah and Weeks article discloses receiving a
plurality of source data streams, detecting text patterns, assembling frames and editing
by a user (see page 237, first paragraph, page 238, fifth paragraph, page 241, third
paragraph, page 242, fifth paragraph). The PCT Publication shows receiving documents
from multiple sources (see Figure 1) and discloses a seller's interface allowing the user
to input data over the scanner and to review and correct text resulting from the
character recognizer (see page 13, first paragraph). Thus, the combination of the Noah
and Weeks article with the PCT Publication raises a substantial new question of
patentability as to all the claims of the 5,999,939 Patent.

4.    US Patent No 5,832,497, PCT Publication 95/24687 and Noah and Weeks article
"TRW: Description of the DEFT System as Used for MUC-5" are not cumulative to the

Application/Control Number: 90/006,570                    Page 3
Art Unit: 2171

prior art of record in the original file. Accordingly, a substantial new issue of patentability

which was not previously addresses has been raised by the submission of these

references.


5.     The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving US Patent No. 5,999,939 throughout the course of this

reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.


6.     Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that

reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).

Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

*Conclusion*

7.     Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Uyen T Le whose telephone number is 703-305-4134.

The examiner can normally be reached on M-F 7:00-5:30.

     If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Safet Metjahic can be reached on 703-308-1436. The fax phone numbers

for the organization where this application or proceeding is assigned are 703-746-7239

for regular communications and 703-746-7238 for After Final communications

Application/Control Number: 90/006,570                    Page 4
Art Unit: 2171

    Any inquiry of a general nature or relating to the status of this application or

proceeding should be directed to the receptionist whose telephone number is 703-305-

3900

Uyen Le
Patent Examiner
May 9, 2003



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,570 | 03/24/2003 | 5999939 | H00644.70004 US | 1696 |

23528     7590     09/02/2003
WOLF GREENFIELD & SACKS, PC
FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE
BOSTON, MA  02210-2211

| EXAMINER |
|---|
| Uyen Le |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2171 | 6 |

DATE MAILED: 09/02/2003

Please find below and/or attached an Office communication concerning this application or proceeding

E02060-0906570

PTO-90C (Rev. 07-01)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SEP - 2 2003

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. <u>90/006,570</u>.

PATENT NO. <u>5999939</u>

ART UNIT <u>2171</u>.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(e)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(e)).

PTOL-465 (Rev.04-03)

| **Office Action in Ex Parte Reexamination** | Control No. 90/006,570 | Patent Under Reexamination 5999939 |
|---|---|---|
| | Examiner Uyen T Le | Art Unit 2171 |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

a☐ Responsive to the communication(s) filed on _____ .        b☐ This action is made FINAL
c☒ A statement under 37 CFR 1 530 has not been received from the patent owner

A shortened statutory period for response to this action is set to expire *2* month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1 550(d)  EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1  ☒ Notice of References Cited by Examiner, PTO-892        3  ☐ Interview Summary, PTO-474

2  ☐ Information Disclosure Statement, PTO-1449              4  ☐ _____

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-20* are subject to reexamination

1b. ☐ Claims _____ are not subject to reexamination

2☐ Claims _____ have been canceled in the present reexamination proceeding

3☐ Claims _____ are patentable and/or confirmed

4☒ Claims *1-20* are rejected

5☐ Claims _____ are objected to

6☐ The drawings, filed on _____ are acceptable

7☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved

8☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f)

     a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have

     1☐ been received

     2☐ not been received

     3☐ been filed in Application No. _____ .

     4☐ been filed in reexamination Control No. _____ .

     5☐ been received by the International Bureau in PCT application No _____ .

     * See the attached detailed Office action for a list of the certified copies not received

9.  ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
        matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C D
        11. 453 O.G. 213

10  ☐ Other: _____

cc: Requester (if third party requester)
U.S. Patent and Trademark Office
PTOL-466 (Rev  04-01)                    Office Action in Ex Parte Reexamination                    Part of Paper No. 6

Application/Control Number: 90/006,570
Art Unit: 2171

Page 2

### Reexamination

1.    In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents **must** be submitted in response to this Office action. Submissions after the next Office action, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, which will be strictly enforced.

2.    Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c)

3.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 5,999,939 throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

Application/Control Number: 90/006,570                                    Page 3
Art Unit: 2171

Invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which the invention was made

4.      Claims 1, 2, 4-8, 10, 12-15, 17-20 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Noah and Weeks article "TRW: Description of the DEFT System as

Used for MUC-5", further in view of PCT Publication 95/24687, provided by the

applicant.

        Regarding claim 1, Noah and Weeks disclose a method for facilitating the

accurate transfer of information from each of a plurality of non uniformly formatted

source data streams into a structured database including "supplying digital

data... multiple discernible source data strings" when Noah and Weeks show the text

analysis tool called Data Extraction from Text (DEFT), see the background at page 237.

The claimed "processing said digital data...target data strings" reads on the fact that

DEFT extracts elements from input data and normalizes into a value for storage for

example normalizing "England" into "United Kingdom" (see page 241, 3rd paragraph).

The claimed "displaying a structured form...data strings inserted within" reads on the

fact that DEFT simultaneously displays messages and the frame derived from them,

providing highlights that show where slot values were extracted (see page 242, 5th

paragraph). The claimed "enabling each user to modify...from the user" merely reads on

the fact that the originator of the data stream can modify or accept the extracted data.

Although Noah and Weeks do not specifically show that feature, Noah and Week clearly

teach that DEFT was developed under the assumption that a user would always be in

the loop (see page 242, 5th paragraph). Noah and Weeks do not specifically show that

the user in the loop is the originator of the data stream from which target data strings

Application/Control Number: 90/006,570                                    Page 4
Art Unit: 2171

are extracted. However, the PCT Publication clearly shows that it is well known in the

art to allow a user to input data over a scanner and to review and correct text resulting

from the character recognizer (see page 13, first paragraph). Therefore, it would have

been obvious to one of ordinary skill in the art to make the user in the loop of Noah and

Weeks the originator of the data stream from which target data strings are extracted in

order to allow the originator of the data stream to control data extraction and to correct

text resulting from the data extraction process

        Regarding claim 2, the claimed limitations have been noted as per claim 1 above

Furthermore, the PCT Publication clearly shows that the supplying and displaying steps

use a remote communication interface (see local area network and wide area network in

Figure 1).

        Regarding claim 4, Noah and Weeks disclose displaying said source data stream

and enabling the user to copy selected portions of said source data stream into selected

fields of said form when Noah and Weeks show that DEFT supports simultaneous

display of messages and the framed derived from them and that users fill slots omitted

by DEFT (see [page 242, 5th paragraph).

        Regarding claim 5, clearly the target strings, for example United Kingdom, are

essentially equivalent to the extracted source data strings, for example England (see

page 241, 3rd paragraph).

        Regarding claim 6, the claimed supplemental strings read on the extracted

frames from incoming messages shown in Noah and Weeks Therefore, as

Application/Control Number: 90/006,570                                    Page 5
Art Unit: 2171

supplemental strings are supplied, the displayed structure has to form additionally

displays fields having said supplemental data strings inserted within as claimed.

Claim 7 corresponds to a system for performing the method of claim 1, thus is

rejected for the same reasons stated in claims 7, 8, 10, 12, 13, 14 above.

Claim 8 corresponds to a system for claim 2, thus is rejected for the same

reasons stated in claim 2 above.

Regarding claim 10, although Noah and Weeks and the PCT Publication do not

specifically show a means to return said form via a remote communication interface, it

would have been obvious to one of ordinary skill in the art to include such a means in

order to accommodate remote users.

Claim 15 merely differs from claim 7 by reciting components instead of "means"

for performing the method of claim 1, thus is rejected for the same reasons stated in

claim 7 above.

Claim 12, 13, 14 and 17, 19, 20 correspond respectively to a system for

performing the method of claims 4, 5, 6, thus are rejected for the same reasons stated

in claims 4, 5, 6 above.

Regarding claim 18, the system of Noah and Weeks as modified by the PCT

Publication clearly returns said source data stream to its corresponding user since the

system supports simultaneous display of messages and the framed derived from them

(see Noah and Weeks, page 242, 5th paragraph).

Application/Control Number: 90/006,570                                   Page 6
Art Unit: 2171

5.      Claims 3, 9, 11, 16 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Noah and Weeks article "TRW: Description of the DEFT System as Used for MUC-

5", in view of PCT Publication 95/24687, provided by the applicant, further in view of

Stein et al (US 6,246,996).

        Regarding claims 3, 9, 11, 16, although Noah and Weeks and the PCT

Publication do not disclose that the remote communication interface uses the Internet, it

is well known in the art to use the Internet for facilitating transactions between parties as

shown by Stein (see the abstract). Therefore, it would have been obvious to one of

ordinary skill in the art at the time the invention was made to include using the Internet

while implementing the method taught by Noah and Weeks and the PCT Publication in

order to facilitate transactions between parties.

                                        *Conclusion*

6.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Uyen T Le whose telephone number is 703-305-4134.

The examiner can normally be reached on M-F 7:00-5:30.


7.      If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Safet Metjahic can be reached on 703-308-1436. The fax phone number for

the organization where this application or proceeding is assigned is (703) 872-9306.



Application/Control Number: 90/006,570                              Page 7

Art Unit: 2171

8.    Any inquiry of a general nature or relating to the status of this application or

proceeding should be directed to the receptionist whose telephone number is 703-305-

3900.

Uyen Le
Primary Patent Examiner
AU 2171

29 August 2003

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **Notice of References Cited** | | 90/006,570 | 5999939 |
| | | Examiner | Art Unit | |
| | | Uyan T Lo | 2171 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-6,246,996 | 06-2001 | Stein et al. | 705/26 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 6

Docket No.: H00644-70004 US

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:       de Hilster et al.
Serial No:       90/006,570 (Reexamination of U.S. Patent No. 5,999,939)
Confirmation No:  1696
Filed:           March 24, 2003
For:             SYSTEM AND METHOD FOR DISPLAYING AND
                 ENTERING INTERACTIVELY MODIFIED STREAM
                 DATA INTO A STRUCTURED FORM

Examiner:        Uyen Le
Art Unit:        2171

## CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to the Commissioner for Patents. P.O. Box 1450, Alexandria, VA 22313-1450, on the 3rd day of November, 2003.

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

~~RECEIVED~~

NOV 1 9 2003

Technology Center 2100

Sir:

### RESPONSE UNDER 37 CFR §1.111

### REMARKS

In response to the Office Action mailed September 2, 2003 in the above-identified application, reconsideration is respectfully requested.

Claims 1-20 are pending in this application, with claims 1, 7, and 15 being independent claims. No amendments have been made to the claims, as that is believed to be unnecessary for the reasons set forth below.

### Notification Under 37 CFR §1.565(a)

Paragraph 3 of the Office Action reminded the patent owner of the continuing responsibility under 37 CFR §1.565(a) to apprise the U.S. Patent and Trademark Office of any litigation activity, or other prior or concurrent proceeding, involving U.S. Patent No. 5,999,939 throughout the course of this reexamination proceeding. In compliance with this responsibility, the undersigned hereby informs the U.S. Patent and Trademark Office that a Complaint was filed

732574.1

Serial No.: 90/006,570                    - 2 -                    Art Unit: 2171

in the United States District Court For the District of Massachusetts on July 31, 2000 involving U.S. Patent No. 5,999,939, Civil Action No. 00CV11525JLT. A copy of this Complaint is attached hereto along with a copy of an updated docket for this matter. As indicated at page 2 of the updated docket, Civil Action No. 00CV11525JLT was voluntarily dismissed without prejudice on May 14, 2002.

### Rejections Under 35 USC §103(a)

In Paragraph 4 of the Office Action, claims 1, 2, 4-8, 10, 12-15, and 17-20 were rejected. The Office Action states that the claims are unpatentable under 35 USC §103(a) as obvious based on the Noah and Weeks article entitled, "TRW: Description of the DEFT System as Used for MUC-5" (hereinafter "the Noah and Weeks article"), in view of PCT Publication 95/24687 (hereinafter "the PCT publication"). Claims 3, 9, 11, and 16 were rejected under 35 USC §103(a) as being unpatentable over the combination of the Noah and Weeks article and the PCT Publication further in view of U.S. Patent No. 6,246,996 to Stein et al (hereinafter "Stein"). These rejections are respectfully traversed.

The asserted combination fails to disclose, teach, or suggest the combination of limitations recited in each of independent claims 1, 7 and 15. As acknowledged in the Office Action, although the Noah and Weeks article discloses a text analysis tool in which lexicon entries (e.g., target data strings) that are extracted from a source data stream may be edited by a "user," that "user" *is not the originator of the data stream from which those entries (e.g., target data strings) are extracted*. In fact, that "user" is a person running the DEFT software who is presumed to be knowledgeable in DEFT's lexicon and frame routing rules, as well as numerous other aspects of the DEFT software -- the Noah and Weeks article describes a system unsuitable for presentation of extracted text to the author of the text. As noted in the Office Action, each of claims 1-20 requires that the originator of the data stream be allowed to edit the extracted text.

To correct this deficit in the Noah and Weeks article, the Office Action cites the PCT publication. The PCT publication discloses, however, a Seller's Interface 300 that permits a user to correct *character recognition errors in documents scanned in by the user*. This ability is limited to the scanned-in documents, *and does not extend to extracted data*. Indeed, in the PCT publication, once the scanned-in document is corrected by the user, it is simply associated with product information pertaining to the user, but no data is extracted therefrom.

732574.1

Serial No.: 90/006,570                    - 3 -                    Art Unit: 2171

Thus, the 103 rejections should be withdrawn for three reasons.

First, not one of the cited references discloses presenting *extracted data* to the *originator* of the document for editing. The Noah and Weeks article teaches presenting extracted data to system operators (who are presumably trained for the system and, the types of data to be extracted and the range of acceptable results) – not the originators of the document. The PCT publication refers only to allowing users to *correct only OCR scans of a text document to fix characters and words that are misread*. Since no reference discloses the missing element of allowing an originator to edit extracted data, no combination of the references can render the claims obvious. See Carl Zeiss Stiftung v. Renishaw PCL, 945 F.2d 1173 (Fed Cir. 1991) (If a claim limitation is not suggested by either of the references, then even if the combination of references were proper, the claim would not be obvious).

Second, a combination of Noah and Weeks with the PCT publication would manifestly lead to a system different than that described in the present claims. If these two references are combined, the originator of a document would scan it in and perform corrections on any OCR errors. The result is a text file *just like what is submitted to the Noah and Weeks system – an electronic document*. Were Noah and Weeks combined with the PCT publication, therefore, the originator would scan, correct and submit the electronic document to the Noah and Weeks DEFT system (just as Noah and Weeks contemplates) -- that system would then extract data and present it *to a DEFT operator* for review. Again, no combination of the Noah and Weeks article and the PCT publication would call for the *extracted* data to be provided to the originator of the document.

Third, the combination is inconsistent with the teachings of the Noah and Weeks article and, as a result, there is no motivation to combine the two references. In the Noah and Weeks article, extracted data is presented to a sophisticated operator who is a skilled programmer and trained in text analysis and use of the software. The Noah and Weeks article cannot be combined with the PCT publication – where members of the public are asked to correct OCR errors (the equivalent of correcting typos) – without ignoring the teaching of Noah and Weeks that the person editing extracted data is highly skilled and trained to use the system. To do so would be legal error. See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 448 (Fed. Cir. 1986) (impermissible "to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts....").

732574 1

Serial No.: 90/006,570                - 4 -                Art Unit: 2171

Because Stein cannot cure these deficiencies (and the Office Action does not attempt to use Stein for this purpose), each of claims 1-20 patentably distinguishes over the Noah and Weeks article, the PCT publication, and Stein, alone or in combination.

### 1. The Disclosure of the Noah and Weeks Article

The Noah and Weeks article is directed to a text analysis tool called DEFT (Data Extraction From Text) that is capable of processing large volumes of text at very high speeds, identifying patterns which serve as indicators for the presence of relevant objects, relationships, or concepts in the data. These indicators are processed by a series of system-supplied utilities or custom-written functions which refine the data and re-formulate it into frames which can be presented to a user for review, editing, and submission to a downstream application or database. (Page 237, paragraph 1.)

The DEFT system may receive documents from multiple sources (i.e., it is intended to be embedded in a message handling system) through a "message queue." The text typically processed by DEFT included government cables, wire service input, native wire services, an existing full-text database, CD-ROM, and so on. (Page 238, paragraph 4.)

DEFT uses patterns to locate data of interest in text, and these patterns are contained in DEFT's lexicons. (Page 240, paragraph 2.) During execution, DEFT creates a "tag file," which is a list of textual patterns identified by DEFT in the text or data created by an extraction function. (Page 240, top two lines.) The data elements in the tag file are constructed into "frames." When a pattern is found in the text and that gives rise to a slot value of a type defined for a given frame class, the slot is automatically mapped to any frame whose scope encompasses the location of the pattern. Thus, if names of corporations occur within a two sentence range of a frame defined by a pattern of words indicative of a joint venture, a slot of the frame for the names of corporations would be filled by the instances of the names of the corporations occurring within that two sentence range. (Page 241, paragraphs 4 and 5.)

According to the Noah and Weeks article, and as noted in the Office Action, the DEFT system "was developed under the assumption that a user would always be in the loop; it was not intended to run autonomously." (Page 242, paragraph 5.) This involvement of the user is particularly "important" for frame review, and for this reason, DEFT "supports the simultaneous display of messages and the frames derived from them, providing highlights to show where slot values were extracted. Menus of valid values drawn from the lexicons assist the user in filling slots that were omitted by DEFT." (Page 242, paragraph 5.)

732574 1

Serial No.: 90/006,570                    - 5 -                    Art Unit: 2171

The Noah and Weeks article makes it clear that the "user" is a person running the DEFT software and is expected to be knowledgeable in DEFT's lexicon and frame routing rules, as well as numerous other aspects of the DEFT software. (Page 242, paragraphs 2-5.) In particular, the "user" is a person knowledgeable in "different computing environments and problem domains," "external specification files that govern the interface with the surrounding message handling system, the output data model, FDF [Fast Data Finder –a pattern matching facility] configuration, and other "'housekeeping' functions," and "lexicons and the frame routing rules" of the system. (Page 242, paragraphs 2 and 3.) Thus, the "user" described in the Noah and Weeks article is very clearly not the source of the original document, as the original document is obtained from a "messaging system like TRW's ELCSS or KOALA that receives government cables, wire service input, etc." (Page 238, paragraph 4.)

### 2. The Disclosure of the PCT Publication

The PCT publication describes a system, which, in its broadest description, is for brokering transactions between sellers and buyers of goods and services, although the example provided in the patent relates to hiring personnel. (Page 1, lines 5-11.) The "seller" in this example is a job candidate, and the "buyer" is a potential employer. The system includes a seller's interface that enables sellers to interactively enter information including multimedia information, into the database. (Page 1, lines 21-29.)

The PCT publication describes an interactive process through which information about the candidate (seller) may be placed into a database. The candidate (seller) is interviewed by the Seller Interface 300 to collect information for a product profile, such as the position the seller seeks, desired salary and geography, and experience. In addition to this information, free-form text such as a work sample, still images such as a resume, or multimedia information may be incorporated into the seller's profile in the database. (Page 5, lines 16-24.)

With respect to resumes, the PCT publication describes that, with a scanner, the Seller's Interface 300 "can accept scanned-in documents, for instance work samples or a resume." (Page 13, lines 1-3.) The Seller's Interface may optionally run the document through a "character recognizer (step 376) to produce free-form text," and selected keywords may also be identified for use in retrieval. (Page 13, lines 3-7.) To correct character recognition errors, "the seller's interface would present the resulting text to the seller for review and correction (step 378)." (Page 13, lines 7-10.)

As can be appreciated by reviewing the flowchart of the seller's activities in Fig. 3b, the Seller's Interface 300 does not extract any data from the documents that are scanned-in at

732574 1

Serial No.: 90/006,570                 - 6 -                 Art Unit:  2171

step 376, nor does the Seller's Interface permit correction of extracted data, as correction is limited to the scanned-in document itself. (See Fig. 3b, steps 374-378.)  Further, the operation of the Buyer's Interface 500 makes it clear that the documents scanned in at step 376 are stored in association with a particular seller (product), and that no data is extracted therefrom. (See page 17, lines 10-18 and also page 6, line 1- page 7, line 3 describing that additional information, such as a resume or video or audio clips are not stored in the Product Table 202.) Accordingly, although the PCT publication discloses a system in which a seller can scan in a resume and correct or modify the scanned-in data that has been interpreted by a character recognizer, the PCT publication does not disclose or suggest extracting data from that scanned-in data, and thus it clearly cannot disclose or suggest enabling the originator of that scanned-in data to modify the extracted data.

### 3.  The Office Action Fails to Set Forth a Prima Facie Case of Obviousness

As noted in the MPEP, to establish a prima facie case of obviousness, three basic criteria must be met.  First, there must be some suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings.  Second, there must be a reasonable expectation of success.  Finally, the prior art reference (or references when combined) must teach or suggest all the claim limitations. (MPEP Section 2143, Rev. 1, Feb 2003.)  The rejection of claims 1-20 fails to meet at least two of these criteria.

#### A.    The Combination of the Noah and Weeks Article and the PCT Publication is Improper

The Noah and Weeks article and the PCT publication fail to provide any suggestion or motivation to combine their teachings in the manner asserted by the Office Action, as the "user" in each is an entirely different person.  In the Noah and Weeks article, the "user" that is provided with an ability to modify data extracted by the DEFT system is a person operating the DEFT system, and not the originator of the data stream (e g., the author of the article provided by message handling system, or even the message handling system itself).

This "user" is presumed to be knowledgeable in DEFT's lexicon and frame routing rules, as well as numerous other aspects of the DEFT software, such as external specification files that govern the interface with the surrounding message handling system, the output data model, FDF configuration, and other "housekeeping" functions. (See page 242, paragraphs 2 and 3.)

732574 1

Serial No.: 90/006,570                     - 7 -                     Art Unit: 2171

By contrast, in the PCT publication, the "user" that is permitted to correct character recognition errors in scanned-in documents is the "seller" or "candidate." (Page 5, lines 16-17.)

Because the "user" referenced in the Noah and Weeks article and the PCT publication are distinctly different persons (e.g., a skilled computer programmer with a knowledge of text analysis versus a job (potentially any job) seeker), the assertion that one of ordinary skill in the art would have been motivated "to make the user in the loop of Noah and Weeks the originator of the data stream from which target data strings are extracted in order to allow the originator of the data stream to control data extraction and to correct text resulting from the data extraction process" lacks any support in the references.

Further, the assertion that making "the user in the loop of Noah and Weeks the originator of the data stream from which target data strings are extracted in order to allow the originator of the data stream to control data extraction and to correct text resulting from the data extraction process" makes no logical sense given the clear teachings of the references.

The "originator" of the data stream in the DEFT system of Noah and Weeks is the author of the article or document picked up by the government cable or wire service. To assert that it would have been obvious make this author the "user" of the DEFT system to control data extraction and to correct text ignores the clear teaching of the Noah and Weeks article. Indeed, even if the messaging system of Noah and Weeks were viewed as the "originator" of the data stream, this assertion is similarly without merit.

Nor do the references provide any suggestion or motivation to combine their teachings. The reason for involving the "user" in the processes described in the Noah and Weeks article is distinctly different from that of the PCT publication. In the Noah and Weeks article, the "user" is involved so that they may view what data is extracted in a document and from where, and fill in omitted data or superfluous delete data. (Page 242, paragraph 5.) That is, the user is included to perform the job of assuring that the extraction meets technical requirements for the system.

By contrast, in the PCT publication, the "user" is simply permitted to correct errors resulting from the character recognition process, i.e., to verify that the scanned-in document matches the original. There is no need to verify whether a scanned-in document matches the original in the DEFT system, as the DEFT system operates on data received in electronic form from a message service. Accordingly, because there is no suggestion or motivation in the Noah

732574.1

Serial No.: 90/006,570                  - 8 -                        Art Unit:  2171

and Weeks article and the PCT publication to combine their teachings, the rejection of claims 1-20 over this combination of references is improper and should be withdrawn.

In short, the combination of Noah and Weeks with the PCT publication is improper because it is inconsistent with the teaching of the primary reference.  The Noah and Weeks system allows a sophisticated operator trained in use of the software and text analysis to check and edit extracted data.  To hand this function over to an untrained, unskilled, inexperienced consumer, standing at a kiosk in a mall, would be inconceivable in the context of the Noah and Weeks system.  Without improper use of hindsight, one of ordinary skill in the art would never combine these two references.

B.       The Asserted Combination Fails to Teach or Suggest All the Claim Limitations

The combination of the Noah and Weeks article and the PCT publication fails to teach or suggest all the claim limitations recited in each independent claim.  Specifically, neither reference alone or in combination teaches or suggests enabling a document originator to modify (claim 7) or modify and/or accept (claim 1)  target data strings inserted within a displayed form corresponding to a source data stream originating from the user as recited in either of independent claims 1 and 7, or data entry apparatus for enabling each user to alter fields (having target data strings inserted therein) of a form corresponding to a source data stream originating from the user before accepting the form as recited in claim 15.

Although the Noah and Weeks article discloses a text analysis tool in which lexicon entries (e.g., target data strings) that are extracted from a source data stream may be edited by a user, that user is not the originator of the data stream from which those entries (e.g., target data strings) are extracted, as acknowledged in the Office Action.

The PCT publication discloses a Seller's Interface 300 that permits a user to correct character recognition errors in documents scanned in by the user.  But, this ability is limited to the scanned-in documents and cannot extend to extracted data, as indeed no data is even extracted from the scanned-in document.  This reference also does not disclose the missing limitation.

Stein does not cure this deficiency (and the Office Action does not suggest otherwise).  Since no reference includes this limitation, no combination of them could render the claim obvious.  See Carl Zeiss Stiftung v. Renishaw PCL, 945 F.2d 1173 (Fed Cir. 1991) (If a claim limitation is not suggested by either of the references, then even if the combination of references

732574.1

Serial No.: 90/006,570          - 9 -          Art Unit: 2171

were proper, the claim would not be obvious). Each of independent claims 1, 7, and 15 therefore patentably distinguishes over the Noah and Weeks article, the PCT publication, and Stein, alone or in combination.

Claims 2-6, 8-14, and 16-20 depend either directly or indirectly from one of claims 1, 7, and 15, and patentably distinguish over the combination of the Noah and Weeks article, the PCT publication, and Stein for at least the same reasons. Further, many of these claims recite additional limitations that further patentably distinguish over the asserted combination of references.

For example, each of claims 2, 3, 8, 9, 10, 11, and 16 depend either directly or indirectly from one of independent claims 1, 7 and 15 and patentably distinguishes over the asserted combination of references for reasons in addition to the independent claim from which they depend.

Claim 2 depends from claim 1 and further recites that said supplying and displaying steps use a remote communication interface. This further limitation is not taught or suggested by the Noah and Weeks article or the PCT publication, alone or in combination. For both, the system does not extract (or even OCR) data and then communicate that data using a remote interface (claim 2) or using the internet (claim 3) for the purpose of displaying it to a user; rather, for both, the display is done at the same location as the extraction (or OCRing) of data.

In the Noah and Weeks article, the step of displaying a structured form that includes extracted data is performed at a location (i.e., the central facility wherein a skilled programmer trained in text analysis and the use of the DEFT software reviews data extracted from the source data stream) that is the same as where the data was extracted.—No remote communication (claim 2) or use of the internet (claim 3) would be involved. Similarly, although the PCT publication describes that information from a user may be collected by the Seller's Interface 300 at a workstation or automated kiosk (see page 11, lines 10-28), the PCT publication does not display any extracted data to the user, it simply permits the user to correct any errors resulting from the OCR process used to supply source data. Further, the data generated by the OCR process is displayed to the user at the same location where it is generated, no remote communication (claim 2) or use of the internet (claim 3) is involved.

Accordingly, because the combination of references fails to disclose or suggest that the steps of supplying and displaying are performed using a remote communication interface (claim

732574.1

Serial No.: 90/006,570                    - 10 -                    Art Unit: 2171

2), or using the internet (claim 3), these claims further patentably distinguish over the asserted combination of the Noah and Weeks article, the PCT publication, and Stein.

Claims 8, 9, 10, 11, and 16 further patentably distinguish over the asserted combination of references for reasons similar to those discussed above with respect to claims 2 and 3.

## CONCLUSION

In view of the foregoing remarks, confirmation of the patentability of all claims of the '939 patent over the cited references is respectfully requested. If the Examiner believes, after this amendment, that the application is not in condition for allowance, the Examiner is requested to call the Applicant's attorney at the telephone number listed below.

If this response is not considered timely filed and if a request for an extension of time is otherwise absent, Applicant hereby requests any necessary extension of time. If there is a fee occasioned by this response, including an extension fee that is not covered by an enclosed check, please charge any deficiency to Deposit Account No. 50/2762.

Respectfully submitted,
*de Hilster et al . Applicants*

By:
Robert A. Skrvanek, Jr., Reg. No. 41,316
LOWRIE, LANDO & ANASTASI, LLP
One Main Street
Cambridge, Massachusetts 02142
United States of America
Telephone:  617-395-7000
Facsimile:  617-395-7070

Docket No.: H00644.70004.US
Date:  November 3, 2003

732574 1

Docket No.: H00644-70004.US

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:        de Hilster et al.
Serial No:        90/006,570 (Reexamination of U.S. Patent No. 5,999,939)
Confirmation No:  1696
Filed:            March 24, 2003
For:              SYSTEM AND METHOD FOR DISPLAYING AND
                  ENTERING INTERACTIVELY MODIFIED STREAM
                  DATA INTO A STRUCTURED FORM

Examiner:         Uyen Le
Art Unit:         2171

RECEIVED

NOV 1 9 2003

Technology Center 2100

## CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to the Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the 3rd day of November, 2003.

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Transmitted herewith are the following documents:

[X]   Response Under 37 CFR §1.111
[X]   Copy of Complaint, Civil Action No. 00cv11525 Involving U.S. Patent
      No. 5,999,939
[X]   CourtLink Online Docket Sheet for Civil Action No. 00cv11525, 2 pages
[X]   Return Receipt Postcard

If the enclosed papers are considered incomplete, the Mail Room and/or the Application Branch is respectfully requested to contact the undersigned at (617) 395-7000.

Serial No : 90/006,570
Docket No.: H00644-70004 US
Page 2 of 2

A check is not enclosed. If a fee is required, the Commissioner is hereby authorized to
charge Deposit Account No. 50/2762. A duplicate of this sheet is enclosed.

Respectfully submitted,
*de Hilster et al , Applicants*

By:
Robert A. Skrivanek, Jr., Reg. No. 41,316
LOWRIE, LANDO & ANASTASI, LLP
One Main Street
Cambridge, Massachusetts 02142
United States of America
Telephone:  617-395-7000
Facsimile:  617-395-7070

Docket No : H00644.70004 US
Date:  November 3, 2003

01/20/2004  15:52   6173957870           LLA                    PAGE  04/05

Attorney Docket No.: H00644.70004 US

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:        de Hilster et al.
Serial No.:        90/006,570 (Reexamination of U.S. Patent No. 5,999,939)
Confirmation No.:  1696
Filed:             March 24, 2003
For:               SYSTEM AND METHOD FOR DISPLAYING AND ENTERING
                   INTERACTIVELY MODIFIED STREAM DATA INTO A
                   STRUCTURED FORM
Examiner:          Uyen T. Le
Art Unit:          2171

**CERTIFICATE OF FACSIMILE TRANSMISSION UNDER 37 C.F.R. §1.8(a)**

The undersigned hereby certifies that this document is being transmitted via facsimile to the
attention of Examiner Uyen T. Le, at fax number 703.872.9306, at the United States Patent and Trademark
Office on the 20th day of January, 2004.



Lori A. Biancuzzo

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**REQUEST TO CHANGE ATTORNEY CORRESPONDENCE ADDRESS**

Please change the attorney's correspondence address on the above-identified
application as recorded in the Patent and Trademark Office Records:

FROM:    Customer Number 23628

TO:      Robert A. Skrivanek, Jr., Reg. No. 41,316
         LOWRIE, LANDO & ANASTASI, LLP
         Riverfront Office Park
         One Main Street
         Cambridge, MA 02142

         Customer Number 37462

*(vertical left margin)* 90006570.012204

01/20/2004 ,15:52    6173957070    LLA    PAGE  05/05

Attorney Docket No. H00644.70004.US
Serial No. 90/006,570

No fee is enclosed.  If a fee is necessary, the Commissioner is hereby authorized to charge Deposit Account No. 50/2762.

Respectfully submitted,
*de Hilster et al., Applicants*

By: _____
Robert A. Skrivanek, Jr., Rég. No. 41,316
LOWRIE, LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street – 11ᵗʰ Floor
Cambridge, MA 02142

Attorney's Docket No.:  H00644.70004.US
xNDDx

90006570.012204

2

01/20/2004  15:52    6173957070                     LLA                          PAGE  02/05

Attorney Docket No.: H00644.70004.US

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**RECEIVED**
**CENTRAL FAX CENTER**

JAN 2 2 2004

**OFFICIAL**

| | |
|---|---|
| Applicants: | de Hilster et al. |
| Serial No.: | 90/006,570 (Reexamination of U.S. Patent No. 5,999,939) |
| Confirmation No.: | 1696 |
| Filed: | March 24, 2003 |
| For: | SYSTEM AND METHOD FOR DISPLAYING AND ENTERING INTERACTIVELY MODIFIED STREAM DATA INTO A STRUCTURED FORM |
| Examiner: | Uyen T. Le |
| Art Unit: | 2171 |

**CERTIFICATE OF FACSIMILE TRANSMISSION UNDER 37 C.F.R. §1.8(a)**

The undersigned hereby certifies that this document is being transmitted via facsimile to the attention of Examiner Uyen T. Le, at fax number 703.872.9306, at the United States Patent and Trademark Office on the 20th day of January, 2004


Lori A. Bancuzzo

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Transmitted herewith are the following documents:

[X]    Request to Change Attorney Correspondence Address

No fee is enclosed. If a fee is necessary, the Commissioner is hereby authorized to charge Deposit Account No. 50/2762.

Respectfully submitted,
*de Hilster et al., Applicants*

By
Robert A. Skrivanek, Jr., Reg. No. 41,316
LOWRIE, LANDO & ANASTASI, LLP
Riverfront Office Park
One Main Street – 11th Floor
Cambridge, MA 02142

Attorney's Docket No.: H00644.70004.US
xNDDx

01/20/2004  15:52   6173957878                    LLA                                    PAGE  03/05

Attorney Docket No.: H00644.70004.US

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants:       de Hilster et al.
Serial No.:       90/006,570 (Reexamination of U.S. Patent No. 5,999,939)
Confirmation No.: 1696
Filed:            March 24, 2003
For:              SYSTEM AND METHOD FOR DISPLAYING AND ENTERING
                  INTERACTIVELY MODIFIED STREAM DATA INTO A
                  STRUCTURED FORM
Examiner:         Uyen T. Le
Art Unit:         2171

CERTIFICATE OF FACSIMILE TRANSMISSION UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being transmitted via facsimile to the attention of
Examiner Uyen T. Le, at fax number 703 872 9306, at the United States Patent and Trademark Office on the 20th
day of January, 2004.

                                    _Lori A) Biancuzzo_

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Transmitted herewith are the following documents:

    [X]    Request to Change Attorney Correspondence Address

    No fee is enclosed.  If a fee is necessary, the Commissioner is hereby authorized to
charge Deposit Account No. 50/2762.

                              Respectfully submitted,
                              _de Hilster et al._, Applicants

                              By
                              Robert A. Skrivanek, Jr., Reg. No. 41,316
                              LOWRIE, LANDO & ANASTASI, LLP
                              Riverfront Office Park
                              One Main Street – 11th Floor
                              Cambridge, MA 02142

Attorney's Docket No.: H00644.70004.US
xNDDx

PAGE 3/5 * RCVD AT 1/20/2004 3:50:17 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-1/3 * DNIS:8729306 * CSID:6173957070 * DURATION (mm-ss):01-12

01/20/2004  15:52    6173957070    LLA    #9

PAGE  01/05

**RECEIVED**
**CENTRAL FAX CENTER**

**JAN 2 2 2004**

▼ LOWRIE, LANDO
& ANASTASI, LLP
*Devoted to Intellectual Property Law*

| Date | January 20, 2004 | Number of pages (including cover): | 4 |

## FAX COVER

**********************OFFICIAL FAX***********************

| To | Examiner Uyen T. Le |
| Company | United States Patent and Trademark Office |
| Fax | 703.872.9306 |
| | From | Robert A. Skrivanek, Jr. |
| | Direct dial | 617-395-7014 |
| | Our File # | H00644-70004.US |

OFFICIA

**CERTIFICATE OF FACSIMILE TRANSMISSION 37 C.F.R. § 1.8(a)**

The undersigned hereby certifies that this document is being transmitted via facsimile to the attention of Examiner Uyen T. Le, FAX number 703.872.9306, at P.O. Box 1450, Alexandria, VA 22313-1450, in accordance with 37 C.F.R. § 1.6(d), on the 20th day of January, 2004.

Lori A. Biancuzzo

**ORIGINAL DOCUMENTS WILL NOT BE MAILED.**

**Message:** Transmitted herewith is a Transmittal Letter, in duplicate; and Request to Change Attorney Correspondence Address.

This transmission contains confidential information intended for use only by the above-named recipient. Reading, discussing, distributing, or copying this message by anyone other than the named recipient, or his or her employees or agents, is strictly prohibited. If you have received this fax in error, please notify us immediately by telephone (collect), and return the original message to us at the address below via the U.S. Postal Service.

**IF YOU DID NOT RECEIVE ALL OF THE PAGES OF THIS TRANSMISSION OR IF ANY OF THE PAGES ARE ILLEGIBLE, PLEASE CALL (617) 395-7000 IMMEDIATELY.**

PATENTS    TRADEMARKS    COPYRIGHTS    TECHNOLOGY TRANSFERS    LITIGATION

Riverfront Office Park, One Main Street, Eleventh Floor, Cambridge, MA 02142    T 617-395-7000    F 617-395-7070
www.ll-a.com

PAGE 1/5 * RCVD AT 1/20/2004 3:50:17 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-1/3 * DNIS:8729306 * CSID:6173957070 * DURATION (mm-ss):01-12



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,570 | 03/24/2003 | 5999939 | H00644.70004.US | 1696 |

37462      7590      07/08/2004
LOWRIE, LANDO & ANASTASI
RIVERFRONT OFFICE
ONE MAIN STREET, ELEVENTH FLOOR
CAMBRIDGE, MA  02142

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 10 |

DATE MAILED: 07/08/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

90005470.0412204

PTO-90C (Rev. 10/03)

| *Notice of Intent to Issue*<br>*Ex Parte Reexamination Certificate* | Control No.<br>90/006,570 | Patent Under Reexamination<br>5999939 |
|---|---|---|
| | Examiner<br>Uyen T. Le | Art Unit<br>2171 |

*– The MAILING DATE of this communication appears on the cover sheet with the correspondence address –*

1  ☒ Prosecution on the merits is (or remains) closed in this ex parte reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of

   (a) ☒ Patent owner's communication(s) filed: 06 November 2003.

   (b) ☐ Patent owner's late response filed: _____

   (c) ☐ Patent owner's failure to file an appropriate response to the Office action mailed: _____.

   (d) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 1.192).

   (e) ☐ Other: _____.

   Status of *Ex Parte* Reexamination:

   (f) Change in the Specification: ☐ Yes.    ☒ No

   (g) Change in the Drawing:    ☐ Yes.    ☒ No

   (h) Status of the Claim(s):
       (1)  Patent claim(s) confirmed: *1-20*.
       (2)  Patent claim(s) amended (including dependent on amended claim(s)): _____.
       (3)  Patent claim(s) cancelled: _____.
       (4)  Newly presented claim(s) patentable: _____.
       (5)  Newly presented cancelled claims: _____.

2  ☒ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

3  ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).

4  ☐ Note attached LIST OF REFERENCES CITED (PTO-1449).

5  ☐ The drawing correction request filed on _____ is: ☐ approved    ☐ disapproved.

6  ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
       a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have
           ☐ been received.
           ☐ not been received.
           ☐ been filed in Application No. _____.
           ☐ been filed in reexamination Control No. _____.
           ☐ been received by the International Bureau in PCT Application No. _____.
       * Certified copies not received: _____.

7  ☐ Note attached Examiner's Amendment.

8  ☐ Note attached Interview Summary (PTO-474).

9  ☐ Other: _____

cc: Requester (if third party requester)



UNITED STATES DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

# R E E X A M I N A T I O N

## REASONS FOR PATENTABILITY / CONFIRMATION

Reexamination Control No. _90/006,570_          Attachment to Paper No. _10_.

Art Unit _2171_.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Applicant's arguments have been fully considered and found persuasive.
The patentability of claims 1-20 is confirmed for the reasons presented by the applicant in the response dated 6 November 2003 herein
incorporated by reference.

Conferees:
Saleh Metjahic

Frantz Coby

UYEN LE
PRIMARY EXAMINER

_____
(Examiner's Signature)

PTOL-473 (Rev 03-98)

# TRW:
## DESCRIPTION OF THE DEFT SYSTEM AS USED FOR MUC-5

*WILLIAM W. NOAH, Ph.D.*
*ROLLIN V. WEEKS*

TRW SYSTEMS DEVELOPMENT DIVISION
ONE SPACE PARK
REDONDO BEACH, CA 90278
R2/2186

## BACKGROUND

For the past three years, TRW has been developing a text analysis tool called DEFT-Data Extraction from Text. Based on the Fast Data Finder (FDF), DEFT processes large volumes of text at very high speeds, identifying patterns which serve as indicators for the presence of relevant objects, relationships, or concepts in the data. These indicators are processed by a series of system-supplied utilities or custom-written functions which refine the data and re-formulate it into frames which can be presented to a user for review, editing, and submission to a downstream application or database.

Superficially, DEFT resembles a Natural language Understanding (NLU) system; however, there are key differences. DEFT entertains very limited goals in the processing of natural language input. Although DEFT processes unconstrained input, it is looking for textual entities which are tightly constrained and presented to the system as a list of expressions or in a powerful pattern specification language. It exploits expectations about how a small set of entities will be expressed to reduce the amount of computation required to locate those-- and only those-- entities. The broader question of the "meaning" of the text in the document is bypassed in favor of rapid, robust processing that can be readily moved from domain to domain. As long as the input for a particular domain is sufficiently predictable, data extraction with a satisfactory level of recall and precision for many applications can be achieved. We are currently installing three DEFT systems for a United States government agency; initial reviews have been highly favorable.

Our involvement in MUC-5 derives from a request by the government to turn DEFT to a COTS product, with the intent of having a fully-supported version of the system by the end of the year. An analysis of the broader commercial and government market for text extraction suggested that the scope of problems that DEFT should be able to address needed to be expanded; however, it was established that replication of the on-going research and development work in the NLU community was an inappropriate role for our development group. Rather, we wanted DEFT to be able to integrate with systems already developed or in development for functionality which falls outside the narrow boundaries of DEFT's pattern-based capabilities. At the same time, DEFT's ability to express patterns needed to be extended from it's current, highly effective means for defining "atomic" patterns to the definition of patterns in relationship to each other, permitting simple syntactic information to be added to DEFT's lexical knowledge. Thus, DEFT would have the potential to find entities not expressly defined

237

in a lexicon, improve its ability to correctly determine the relation between entities, and decrease the overgeneration that tends to be associated with approaches that rely exclusively on pattern matching.

A mechanism was selected for enhancing pattern specification which was felt to be compatible with the notion of integrating DEFT with third-party systems. As will be described in some detail, DEFT is intrinsically an engineering shell which is intended to facilitate such integration while making its rapid pattern-matching services available to the other system components. Unfortunately, the software implementing this concept was not available at the time of the final MUC-5 evaluation, the results of which therefore serve only to confirm our expectations that the recognition of "simple" (i.e. isolated) patterns is woefully insufficient for complex data extraction problems.

While we regret that the capabilities of the extended version of DEFT could not be demonstrated for MUC-5, we feel that the outcomes justify our belief that real-world message understanding problems necessitate an engineering solution that can pit a choice of technologies against the specific problem at hand-- different technologies being optimum for different tasks. We believe that DEFT's success in handling simple data extraction problems can be extended, and that DEFT is well-suited to a role as an integrator of text analysis capabilities. It is toward this end that we are focusing our on-going productization efforts.

## SYSTEM DESCRIPTION

It is convenient to envision DEFT as a pipeline, as shown in Figure 1. At the head is a standardized document interface to message handling systems. At the tail is a process which generates frames and distributes these to the appropriate destinations on the basis of content. In between is a series of text analysis "filters" which apply DEFT lexicons (pattern searches) against the text (using the FDF) and call specific extraction functions to process the textual fragments located by the lexicons. All processes are controlled by means of external configuration files and a "workbench" which contains tools for interacting with DEFT and the data DEFT extracts. We will describe each of these major components in turn.

*The Document Interface: Message Queuing:* It is assumed that DEFT will be embedded in an existing automated message handling (AMH) system. DEFT's interface with these systems is called Message Queuing (MQ). Text is typically disseminated to MQ (e.g. by a messaging system like TRW's ELCSS or KOALA that receives government cables, wire service input, etc.) on the basis of subject matter, source, structure, or other characteristic with salience for how the message's language will be analyzed. MQ can also accommodate documents loaded from other sources, such as native wire services, an existing full-text database, CD-ROM, OCR, and so on. Text is assumed to be in ASCII or extended ASCII. In the near future, DEFT will build on work currently underway to allow the FDF to accommodate Unicode for foreign character sets such as Japanese. Structural features, such as document boundaries, sentence boundaries, paragraphs, tabularization, encoded tags (such as SGML), embedded non-textual media, etc. can be defined for a particular document class using DEFT specification files.

MQ utilizes a configuration file to assign a processing thread tailored to the problem domain to each category of document classified by the dissemination system or by whatever means (including manual) is used to route documents to DEFT. Documents

238

are associated with a processing thread, by placing them in a particular MQ "in-basket" (a standard Unix directory). Each in-basket is polled periodically, using a set of criteria (time and number of messages since the last processing thread was initiated) defined in the configuration file.



**Figure 1: DEFT Functional Architecture**

*Extracting Data: Text Analysis Filters.* When MQ assigns a document to a processing thread, it is subjected to a sequence of procedures which operate on the text to locate patterns of interest and use these patterns as a guide to extract the data required for a particular problem domain. This sequence of processes determines what is extracted and how it is extracted. The sequence is defined as an ordered list of "extraction phases" in a configuration file. This list can be changed at any time to substitute or add new extraction phases to refine a text processing thread. New threads can be modeled on existing ones, facilitating transitions to new problem areas.

Each extraction phase is an executable program. The behavior of a phase is dependent on the order in which it is called (i.e., its relationship to the phases that have been executed before it) and, on parameters which are supplied in the configuration file. In this way, a generalized extraction phase can be configured for a specific analytic objective. DEFT has a library of extraction phases that perform the most elementary analytic processes; new phases are be written on a problem-specific basis. DEFT provides an application programming interface (API) in the form of a library of utilities which allows a custom extraction phase to interact with the data structure which is common to all extraction phases, and which is used to communicate between phases. This structure is the DEFT Tag File.

The Tag File is a cumulative record of the processing performed by each extraction phase. Each phase receives the Tag File from the preceding phase, and passes it to

the next. A "tag" represents a textual pattern identified by DEFT in the text or data created by an extraction function.

Much of the power of DEFT comes from the ability to apply a mixture of extraction phases that is optimally suited for a given class of document and extraction problem. For example, one extraction phase might reason about the relative time of occurrence of events located in the text, basing its analysis on the occurrence of various forms of date/time indicators as well as the presence of such modifiers as "last week," or "three years ago." Another phase might construct corporate names on the basis of the occurrence of a known name or the presence of a designator (e.g. "Inc." or "S.A."). Yet another phase might act upon these names to reason about their potential relationship in a joint venture.

*Locating Data: DEFT Lexicons.* The patterns that DEFT uses to locate data of interest in the text are contained in DEFT's lexicons. Lexicons serve various purposes: to identify potential frames; to determine the "scope" of a frame in the text (i.e. the boundaries to be used to find data to fill the frame slots); to find the contents for a slot in a frame, to determine structural elements (e.g. sentences, paragraphs, header information), and to set the attributes of a text object (e.g. classification level).

Lexicons are of two types: list and pattern. The list lexicon associates a set of synonyms (or spelling variants) with a given object. It is useful when the complete set of strings associated with an object can be specified. The pattern lexicon is used when the textual variations associated with an object cannot be specified. For example, all possible monetary values cannot be conveniently enumerated, but a single pattern describing monetary values in terms of digits, punctuation, and denomination strings can be constructed.

Associated with lexicon entries are attributes, representing the semantics of the problem domain. An attribute is a characteristic of the object represented in the text by its synonym list or pattern. It might be the normalized form of a name or other data about an object which is useful to map into a frame, such as the country associated with a corporate name. In a list lexicon, these attributes are known explicitly when an entry is created; they are not inferred from the text. In a pattern lexicon, however, the attributes cannot be known in advance because it is not known what exact value will hit against the pattern. For this reason, attributes must be extracted for a pattern lexicon. Attribute extraction is handled by a C or C++ program referred to as an "extraction function." For example, given the location of a corporate designator, a function might reconstruct the corporate name.

The success of a data extraction system that relies on pattern matching and string finding depends on how exhaustively it can search for the variations expected in input language. DEFT has proved successful in its current applications in part because its lexicons can be extremely large (thanks to the capabilities (in terms of both functionality and performance) of the FDF.

*Searching Text for Lexicon Entries: The FDF.* DEFT uses the TRW-developed Fast Data Finder to rapidly locate instances of a potentially enormous set of patterns in the input text. The power of the FDF originates in two ways: the hardware architecture and the expressiveness of its Pattern Specification Language (PSL).

The current generation FDF-3, now a CDIS product manufactured by Paracel, Inc. uses a massively parallel architecture to stream text past a search pattern at disk speeds (currently 3.5-million characters/second using a standard SCSI disk).

240

Searches are compiled into micro code for a proprietary chip set which can accommodate up to 3,600 simultaneous character searches or Boolean operations. Lexicons are broken into "pipelines" which fully fill the chip set; each pipeline is run against all of the text in the set of documents currently being processed. MQ batches messages as they come in so as to optimize the use of the FDF-- larger message sets are processed more efficiently than several smaller ones. The tradeoff between batching and "real-time" processing can be independently balanced in the MQ configuration file for each in-basket and processing thread.

Search patterns are specified in PSL. Because the FDF uses a streaming approach, PSL is not dependent on word boundaries. Extremely complex patterns can be expressed, which can include such features as error tolerance, sliding windows, multiple wildcard options, nested macros, character masking, ranging, and the usual Boolean operations. Features that support "fuzzy matching" like error tolerance, are extremely important for handling "noisy" input.

*Output Generation: Frame Assembly and Routing.* When the filters that comprise a processing sequence have executed, the Tag File is passed to the "Frame Assembly and Region Routing" (FARR) module. This program, which constitutes the "tail" of the DEFT pipeline, assembles the data elements generated during the analysis thread into frames based on an external definition file. This file specifies which slots are associated with which frames, how to transform a data value for display to the user (e.g. normalize "England" to "United Kingdom"), how to transform a value for storage in a downstream database (e.g. abbreviate "England" as "UK"), how to validate a data value, whether a data type can be multiply-occurring, and so on.

One issue that arises during frame assembly is *when* to associate a data value with an instance of the frame class for which it is defined. In DEFT, this operation is associated with "scoping." Scoping is the process of determining the extent in the text of a concept associated with a pattern. For example, if a pattern of words indicative of a joint venture is found, the scope of the "tie-up" frame might be taken to be the location of the pattern plus or minus two sentences. The unit of scoping (in this case, sentence) need not be a syntactic unit-- it can be any pattern stored in a special type of lexicon used exclusively for determining frame scope. The unit of scoping and its extent (e.g., "plus or minus *n*") can be determined independently for each frame class.

When a pattern that gives rise to a slot value of a type defined for a given frame class is found in the text, the slot is automatically mapped by FARR to any frame whose scope encompasses the location of the pattern. Thus, if the name of a corporation were to occur within the two-sentence range of the tie-up frame in our example, it would appear in that frame. Of course, this may not be accurate-- DEFT has a tendency to overgenerate slots through bogus associations that arise because of this weak scoping mechanism.

Another issue that is encountered is overlapping frames. The "best available" resolution can be specified in the frame definition file. One alternative is simply to accept both frames, since they may be describing separate concepts. If the frames are of different classes, FARR supports the attribution of a priority to each class, and only the frame with the highest priority need be retained. If the frames are of the same class, FARR supports a "non-multiply occurring" attribute, which optionally suppresses all but one of the frames. Unfortunately, the action taken is generalized to all situations-- the specifics of a given case cannot be taken into account. Thus, DEFT tends to either overgenerate or lose frames.

241

When a message's frames have been generated and ambiguities resolved (to the extent that DEFT can resolve them), the frames (and the message) are routed to a destination directory on the basis of their content. Routing instructions are defined in a rule base using a normalized conjunctive form of field-value pairs. It should be kept in mind that although DEFT's primary mission is extraction, not dissemination, the routing capability (since it is based on knowledge representation) provides a sensitive mechanism for determining the destination of a message and the structured representation of its contents.

*Controlling the System: DEFT Tools and Specification Management.* In order to make DEFT portable to different computing environments and problem domains, the definition of user-modifiable system characteristics has been exported to a set of external specification files. These files govern the interface with the surrounding message handling system, the output data model, HDF configuration, and other "housekeeping" functions. Specification files are maintained using any convenient text editor.

The most important system specifications from the standpoint of the end-user are the lexicons and the frame routing rules. To facilitate lexicon development and maintenance, a lexicon editor is bundled with DEFT that provides a graphic user interface (under X/Motif) for interactively defining lexicons and entering/editing lexicon entries. Lexicons can also be created/updated from databases or external machine-readable files (e.g. gazetteers, corporate name lists) using a batch load protocol.

Like the lexicon editor, the routing rule manager provides a GUI for maintaining routing rules. It uses a spreadsheet metaphor to minimize the user's exposure to the potentially complex Boolean logic that the rules can involve. Menus of valid values and conditions tests are automatically provided.

Another important DEFT tool is frame review. DEFT was developed under the assumption that a user would always be in the loop; it was not intended to run autonomously. This package therefore supports simultaneous display of messages and the frames derived from them, providing highlights that show where slot values were extracted. Menus of valid values drawn from the lexicons assist the user in filling slots that were omitted by DEFT. Features for selectively deleting superfluous slots and frames are particularly important, since DEFT (like other pattern-based approaches to text analysis) tends to overgenerate data. A mechanism is also provided to facilitate manually linking frames of different classes into higher-level logical aggregations, since DEFT was not originally designed with an automated linking capability. Clearly, these two design assumptions— human interaction and manual frame linking—had an impact on working with the MUC-5 data.

## DEFT as an Engineering Shell

This description of the DEFT system has emphasized that analysis threads are composed of independent components which communicate through a common data structure using a library of utilities that constitute an API. It is our contention that

242

DEFT's strengths are:

- A powerful pattern searching capability, which we are extending.

- The ability to integrate COTS, GOTS, and custom-written programs within the DEFT architecture.

We believe that there will probably not be a single text analysis or NLU system that meets the requirements of all conceivable applications. There will always be a tradeoff between such factors as speed, depth of analysis, breadth of coverage, portability, robustness, and analysis methodology that will favor one technology over another for a particular problem. The real question is not "What is the best system?", but "What is the best system at this moment?"

Our current development work on DEFT is chiefly targeted at its usefulness as an integration tool. DEFT provides a high-speed pattern searching capability which can successfully extract data from structured or tightly constrained textual inputs, while providing pre-processing services (e.g., tagging words with part of speech or semantic attributes) for third-party software which performs more extensive natural language processing for unconstrained textual inputs. This approach should be especially efficient for applications in which messages are mixed (formatted and unformatted), text analysis tasks are varied in complexity, and throughput is a major consideration.

## Inherent Limitations in DEFT's Pattern-Matching Approach

Because DEFT was not originally intended for problems of the scope of MUC-5, its simplistic approach posed some major problems. Among the most fundamental were:

*Syntactical Patterns.* DEFT has very powerful mechanisms for specifying "atomic" patterns-- a corporate name, a place name, a set of words that indicate a joint venture, etc. DEFT was not designed to have the capability of expressing relationships among the patterns in its lexicons and providing for the assignment of values defined with respect to these patterns to variables. These are essential capabilities for the implementation of the most rudimentary semantic grammar. For example, DEFT had no way to express: "Look for a corporate name followed by a joint venture formation phrase and take the following corporate name as the partner in the joint venture."

*Frame Scoping.* DEFT was designed to interpret the scope of a frame as a function of proximity to the "hit location" of the pattern that resulted in a frame's instantiation. The boundaries are determined by a pre-defined number of repetitions of a pattern contained in a scope-lexicon. An upper ceiling determined by a fixed number of characters can also be specified, in case the scoping pattern is not detected; a "reasonable" distance from the site of the hit. All occurrences of slots defined for a frame within these boundaries are automatically included in the frame when it is assembled by FARR.

For highly formatted text (e.g. messages in Military Text Format), such a mechanism is adequate. For free-text, it is not. In the MUC-5 evaluation, DEFT failed to report valid objects that it located (notably entities) because they were not within the scope of a tie-up, as DEFT measured scope.

243

*Frame Linking.* The original DEFT design assumed that a human operator would perform this task. Automated linking is obviously needed for "unattended" operation and is clearly useful even if there is a human-in-the-loop.

## Solutions

Current internal research and development work aimed at resolving each of these problems for the eventual DEFT product adheres to the constraint that architectural extensions must be philosophically compatible with the pattern-based approach, while avoiding significant overlap with NLU (which we prefer to view as an integratable component in a complex system). As noted earlier, key software being developed under IR&D was not available for the MUC-5 final evaluation; however, work continues and will be tested on the MUC-5 corpus in the near future to validate the approach.

*Syntactical Patterns.* This is the specific area that was not developed in time for the evaluation; unfortunately, it is also the most critical for dealing with even the simple aspects of the MUC problem. The approach we selected is intended to be compatible with the integration of more powerful text understanding components in the future, while extending the range of problems DEFT can solve by itself. It exploits DEFT's atomic pattern-recognition capabilities while separating the definition of a semantic grammar into an independent extraction phase. This phase could easily be replaced (or supplemented) with an NLU system which can optionally take advantage of the DEFT lexical pre-processing while performing deep syntactic and semantic analyses. This separation is in part intended to provide an initial test of our belief that the integration of DEFT with an NLU component creates a symbiotic association with better performance characteristics than either system by itself.

To stay within the (admittedly loosely defined) bounds of pattern matching, our approach to exploiting syntax consists of providing DEFT with a simple mechanism for expressing "meta-patterns"-- that is, patterns whose components may be the atomic patterns (and, by reference, their attributes) located by the DEFT lexicons. We decided to use a BNF specification to define a semantic grammar based on a combination of literal strings and DEFT-identified tokens.

The key issue was how to pass the results of DEFT pattern-matching to the parser. An integrated NLU component within the DEFT shell could interface directly with the DEFT Tag File through the API; the component could also interface with the frames generated by DEFT, providing a preliminary level of analysis on which to build. For our prototype, however, we chose to mark terms in the text with SGML-like tags to indicate their properties. The grammar directly references these tags; and routines were provided within the parser for assigning text strings to slots by extracting DEFT-lexicon attributes (e.g., normalized values, or semantic characteristics); or collecting words intervening between two tags (of the same or different class). Additional primitives for manipulating the strings prior to slot assignment were also built into the parser infrastructure to control frame generation and the assignment of slots (including pointers to other frames) to frames. This significantly improves on the primitive scoping capability provided with the current version of DEFT.

The approach selected thus provides a vocabulary for expressing both the expected contents of documents and the rules for instantiating and linking templates. (At the

same time, its intermediate product is human-readable (and, in fact, could be used as a general-purpose "tagger") and easily interpreted by other programs.

*Frame Scoping.* Fundamental changes in the DEFT frame-scoping mechanism are planned which will exploit domain knowledge as well as limited syntactic (from the meta-patterns) and semantic (from lexicon attributes) data. For MUC-5, the basic DEFT mechanism was retained, with its inherent limitations.

*Frame Linking.* A primitive frame linking capability was added to DEFT. It was based on frame scoping, however, and therefore suffered from the same limitations. The DEFT frame definition file format was extended to accommodate hierarchical relationships; any frame defined as a child of another frame had its generated frame ID automatically included as a slot value in the parent frame if its "hit location" fell within the scope of the parent frame. Of course, multiple and spurious associations are easily generated in this way. In the future, frame linking will be improved by combining syntactic and domain knowledge in a final extraction phase to resolve inter-object relations.

## RESULTS

The results of the final MUC evaluation were strongly influenced by the unavailability of the parser, which was an essential component of the DEFT approach to MUC-5. The resulting scores indicate the magnitude of the problems inherent in a simple pattern-matching strategy which is not informed with even a crude semantic grammar. It should be noted that a decision was made to focus only on a subset of templates and slots required for the preliminary run. These were the document template, tie-up-relationship, and entity. The F-measures for the final evaluation were:

| P&R | 2P&R | P&2R |
|-----|------|------|
| 1.15 | 2.64 | 0.74 |

Not surprisingly, these were the lowest scores for any system in the evaluation. A detailed analysis of the run is of little utility, however there are some points of interest seen in the walk-through sample document.

## Walkthrough Document

The identifying data (document number, source, and date) were correctly extracted.

Some simple atomic patterns were defined in a DEFT lexicon for tie-up relations. These were to be factored into a semantic grammar, as noted in the parser was not available at the time of the run. Therefore the patterns were run as a simple search: It incorrectly identified the presence of a joint venture in the sample document, incorrectly instantiating two tie-up templates (one for each of two out of three references to the venture) and entering their IDs in the content slot of the document template. DEFT currently does not determine that multiple references have a common object unless the frames overlap.

A single entity was mis-identified, "Jiji Press Ltd.," which is actually the document source. This entity was incorrectly associated with the first tie-up. The foregoing explanation of the DEFT scoping mechanism makes it clear why this false association

took place. The name of the "BRIDGESTONE SPORTS CO." was correctly reconstructed from the corporate designator ("CO.") and assigned to the first tie-up. The name of the joint venture, "BRIDGESTONE SPORTS TAIWAN CO.," was also constructed and associated with the second tie-up instance. No other features were correctly identified.

Among the other corporate names, the algorithm used by DEFT would not have identified "UNION PRECISON CASTING CO.," but did identify "TAGA CO." However, this entity was considered out of scope of the tie-up templates and was (incorrectly) not attached to one. DEFT had no facility for recognizing "BRIDGESTONE SPORTS" nor for tracking the reference to "THE NEW COMPANY."

## What Worked

DEFT was effective at recognizing literal strings and patterns contained in its lexicons. DEFT frequently generated correct entity names that were not in the corporate name lexicon using a set of heuristics that reasoned backwards from a designator. For example, "BRIDGESTONE SPORTS CO." was constructed. DEFT of course had little problem with the tagged items for the document template. These are precisely the kinds of elemental functions that DEFT is expected to perform well.

DEFT recognized the occurrence of some of the joint ventures, based on a very limited set of patterns that were originally defined for use in connection with a semantic grammar. This set could have been extended to produce improved recall had we known the parser would not be available. These few successes indicate that even a simple pattern-based approach can recognize concepts of this type in restricted cases.

## What Failed

The lexicons and extraction phases that were rapidly developed for MUC-5 contained some bugs that were not observed during training; some corporate names were missed, for example, that should have been constructed. The chief failings were inadequate lexicons for identifying joint ventures and inadequate scoping. These two problems combined to suppress the instantiation of the many valid entities that DEFT found, but could not associate with a tie-up relation and therefore did not report. In general, the system was configured to reduce the anticipated overgeneration, with the expectation that tie-ups and entity relations would be identified and scoped by the semantic grammar. In the absence of the parser, undergeneration became severe.

## System Training and Resources Expended

The effort expended on MUC-5 testing and documentation was approximately two person-weeks. System development activities undertaken independently of MUC-5 were exploited for the MUC-5 evaluation run. These included:

- Analysis: 1 person-months
- Lexicon Development and Data Definitions: 1.25 person-months
- Extraction Phases and Functions: 3 person-months

The total level of effort for all activities impacting MUC-5 was therefore roughly 5.5 person-months.

As we have noted, key system components were ultimately unavailable for the MUC-5 evaluation. Although we won't know "how we would have done" until the components are completed and our internal tests against the MUC data are repeated, it is our expectation that significant improvement will be obtained with little additional effort-- although performance is neither expected nor required to approach that of true NLU systems, given our view of DEFT as an integration environment.

Most of the effort in creating a new DEFT application usually centers on lexicon development. For MUC-5, most lexicons were batch loaded the data supplied via the Consortium for Lexical Research. A few lexicons for joint venture identification and scoping were developed manually. These were quite simple and their actual creation required minimal time.

Much of the time on MUC-5 was occupied with writing C-code for extraction routines, particularly for corporate names. The need to write so much code for a new application is a current weakness in DEFT which will be remedied to a degree when the parser becomes available.

Of course, a key activity was the analysis of the test corpus and development of a semantic grammar appropriate to the EJV problem. The results of this analysis were manifested in the tie-up relation lexicon and the BNF grammar for the parser. Only the former was ready in time for the evaluation. Analysis was a cyclical, iterative process; refinement continued during system training.

DEFT system training consisted of a series of runs against samples of the training corpus, utilizing the frame review tool to examine the results. Lexicons were manually refined as a result of missed objects and false hits. Early runs resulted in changes to the batch loading sequence for some of the lexicons (e.g. the corporate designators). Feedback into the grammar would also have been derived from this process, had the parser been available and time permitted. As it was, time was insufficient even for lexicon refinement; for example, a few key errors in the corporate designator lexicon resulting from a bug in the program that prepared the file provided through the Consortium for batch uploading were noted only after the final evaluation run was analyzed. This was partially responsible for some of the undergeneration.

## What We Learned

It came as no surprise that simple patterns are inadequate to extract the complex ideas expressed in the EJV documents. We view the results as validating the concept that DEFT, operating as a standalone system, is best qualified to perform on problems involving well-defined, constrained, sets of text objects to be extracted, even with the addition of a "meta-pattern" or grammatical capability. DEFT should excel on such problems when throughput is a major consideration.

The selection (and on-going implementation) of a mechanism for expressing meta-patterns that is compatible with all of the goals discussed earlier is a major outcome of our MUC work, even though it was not available in time. We believe that this approach will significantly empower DEFT and broaden the range of applications for which it is a suitable tool, while increasing the flexibility with which it can be integrated with other text-analysis tools. This will prove highly valuable to our

current government customers, as well as future DEFT users in the government or commercial sector.

DEFT's potential as an integration environment was underscored by the fact that we successfully ran documents through:

- A complex set of extraction phases

- With extremely large lexicons

that are beyond the scope of anything that has been tried in existing DEFT applications. The robustness of the architecture and efficiency of the pattern searches were our major consolation in the MUC-5 evaluation. We therefore look for opportunities to combine DEFT's system engineering and search capabilities with the sophisticated analytical power of NLU-based solutions when real-world problems are encountered which are out of scope of DEFT's simple extraction mechanisms.

**COPY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED

JUL 31  3 56 PM '00

US DIS
DI
MASS

| | |
|---|---|
| BRASSRING INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) **00**CV **11525** JLT |
| vs. | ) Civil Action No. |
| | ) JURY TRIAL DEMANDED |
| INTERACTIVE SEARCH, INC. | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff BrassRing Inc. ("BrassRing"), brings this civil action against defendant Interactive Search, Inc. ("I-Search"). BrassRing has been wrongly accused by I-Search of infringing United States Patent No. 5,999,939 and threatened with legal action  In addition, I-Search has been wrongfully interfering, and attempting to interfere, with BrassRing's advantageous and prospective business relations.

## PARTIES

1.    BrassRing is a Delaware corporation having a principal place of business at 77 Rumford Avenue, Suite 4, Waltham, Massachusetts 02453.

2.    On information and belief, defendant I-Search is a California corporation having a principle place of business at 5959 W. Century Boulevard, Suite 1100, Los Angeles, California

471935.1

-2-

3.      On information and belief, I-Search transacts and does business in the Commonwealth of Massachusetts, including selling goods and services related to the subject matter of the '939 patent.

4.      I-Search has threatened BrassRing with litigation for alleged infringement of U.S. Patent No. 5,999,939, entitled "System and Method for Displaying and Entering Interactively Modified Stream Data Into a Structured Form," issued December 7, 1999, a copy of which is attached hereto as Exhibit A (the "'939 patent"). These threats were directed to BrassRing's employees in the Commonwealth of Massachusetts.

5.      This is a civil action for declaratory judgment under 28 U.S.C. §2201(a) and §2202 that products and services sold by BrassRing (and its division "BrassRing Systems" which was formerly called "HireSystems") do not infringe the '939 patent and that the '939 patent is invalid and unenforceable.

6.      This is also an action for interference with advantageous and prospective business relations.

7.      This Court has jurisdiction under 28 U.S.C. §1338(a) and under the doctrine of pendent jurisdiction.

8.      Venue in this Court is proper pursuant to 28 U.S.C. §1391(b) and (c).

## STATEMENT OF FACTS

9.      I-Search has represented that it is the owner of the '939 patent and has standing to sue for alleged infringement of this patent.

441936.1

-3-

10.   I-Search has charged BrassRing with infringement of the '939 patent.

11.   I-Search has stated to BrassRing that if the matter could not be resolved by BrassRing entering into a license agreement with I-Search, I-Search would turn the matter over to their patent attorneys and pursue legal remedies.

12.   I-Search has told existing or potential customers of BrassRing that BrassRing infringes the '939.

13.   I-Search has told existing or potential customers of BrassRing that I-Search is or will be suing BrassRing.

14.   BrassRing has a reasonable apprehension that I-Search will file a lawsuit against BrassRing alleging infringement of the '939 patent.

15.   An actual controversy exists between the parties with respect to the validity, enforceability and infringement of the '939 patent.

16.   BrassRing's products and services do not infringe any claim of the '939 patent.

17.   The '939 patent is invalid for failure to meet the conditions of patentability of 35 U.S.C. § 101, et seq.

18.   When prosecuting the '939 patent, I-Search and the inventors misled the United States Patent and Trademark Office (the "PTO") and failed to disclose material information to the PTO. I-Search did so with the intent of deceiving the PTO.

441936 1

-4-

19.     The '939 patent is unenforceable because I-Search committed inequitable conduct in procuring the '939 patent.

20.     I-Search knows that its patent is invalid and unenforceable, but has nevertheless (i) alleged that BrassRing infringes, (ii) threatened BrassRing and (iii) used its wrongful allegation of infringement for competitive advantage with BrassRing's customers and potential customers, all in bad faith.

## COUNT I
### DECLARATORY JUDGMENT OF NONINFRINGEMENT

21.     The allegations of paragraphs 1-20 are realleged and incorporated by reference as if fully set forth herein.

22.     This is a civil action for declaratory judgment under 28 U S.C. §2201(a) and §2202 that products and services sold by BrassRing (and its division "BrassRing Systems") do not infringe the '939 patent.

23.     I-Search has threatened BrassRing with litigation for alleged infringement of the '939 patent.

24.     BrassRing's products and services do not infringe any claim of the '939 patent.

25.     BrassRing is entitled to a declaratory judgment that the '939 patent has not been infringed by BrassRing.

## COUNT II
### DECLARATORY JUDGMENT OF INVALIDITY

441936.1

-5-

26.    The allegations of paragraphs 1-25 are realleged and incorporated by reference as if fully set forth herein.

27.    This is a civil action for declaratory judgment under 28 U.S.C. §2201(a) and §2202 that the '939 patent is invalid.

28.    I-Search has threatened BrassRing with litigation for alleged infringement of the '939 patent.

29.    The '939 patent is invalid for failure to meet the conditions of patentability of 35 U.S.C. §§ 101, et seq.

30.    BrassRing is entitled to a declaration that the '939 patent is invalid.

## COUNT III
### DECLARATORY JUDGMENT OF UNENFORCEABILITY

31.    The allegations of paragraphs 1-30 are realleged and incorporated by reference as if fully set forth herein.

32.    This is a civil action for declaratory judgment under 28 U.S.C. §2201(a) and §2202 that the '939 patent is unenforceable.

33.    I-Search has threatened BrassRing with litigation for alleged infringement of the '939 patent.

441936.1

-6-

34.    The '939 patent is unenforceable due to inequitable conduct committed in procuring the

'939 patent.

35.    BrassRing is entitled to a declaration that the '939 patent is unenforceable due to

inequitable conduct.

## COUNT IV
### TORTIOUS INTERFERENCE

36.    The allegations of paragraphs 1-35 are realleged and incorporated by reference as if fully

set forth herein.

37.    BrassRing has advantageous and prospective business relationships with various

independent customers for automated resume processing services and products across the United

States and in the Commonwealth of Massachusetts.  The independent customers are and were

both actual and prospective customers of BrassRing.

38.    I-Search knew of these advantageous and prospective business relationships and

intentionally acted with both improper means and an improper motive for the purpose of

damaging the relationships.  I-Search's unjustified and intentional interference with

advantageous and prospective business relationships includes telling actual or potential

BrassRing customers that BrassRing infringes the '939 patent and that I-Search is taking legal

action against BrassRing, when I-Search knew that the patent is invalid and unenforceable.

441936.1

-7-

39.     I-Search's allegations of patent infringement to BrassRing's customers and potential customers were made in bad faith.

40.     I-Search's unjustified and intentional interference with advantageous and prospective business relationships of BrassRing has proximately caused and will cause BrassRing to lose actual and prospective business and, thereby, suffer damages.

41.     Such damages have been and will be realized, as I-Search could have reasonably foreseen, in the Commonwealth of Massachusetts.

## EXCEPTIONAL CASE

42.     This is an exceptional case warranting an award of attorneys fees to BrassRing under 35 U.S.C. §285.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Fed.R.Civ.P., BrassRing demands a jury trial.

441936.1

-8-

WHEREFORE, BrassRing prays:

A.    For entry of judgment that BrassRing does not infringe any of the claims of the '939 patent;

B.    For entry of judgment that the '939 patent is invalid;

C.    For entry of judgment that the '939 is unenforceable because of inequitable conduct in procuring the '939 patent;

D.    For entry of judgment awarding BrassRing its attorneys' fees pursuant to 35 U.S.C. §285 and/or the general power of the court;

E.    For entry of judgment awarding BrassRing damages resulting from I-Search's interference with BrassRing's advantageous and prospective business relationships;

F.    For an injunction preventing I-Search from further interfering with BrassRing's advantageous and prospective business relationships;

G.    For entry of judgment granting BrassRing costs; and

H.    For such other and further relief as the Court may deem proper.

441936 1

-9-

Dated: _July 31, 2000_

BrassRing Inc.

Matthew B. Lowrie, BBO No. 563,414
M. Brad Lawrence, BBO No. 641,100
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Federal Reserve Plaza
Boston, MA 02210
Tel.: (617) 720-3500

441936.1

**Addendum**

1.   This is a civil action for declaratory judgment under 28 U.S.C. §2201(a) and §2201 that products and services sold by Brass Ring (and its division "Hire Systems") do not infringe the '939 patent and that the '939 patent is invalid and unenforceable. This is also an action for interference with advantageous and prospective business relations

CourtLink - Display A Docket (Free View)



**Online Docket Sheet**

⬤ my CourtLink   ⬤ CourtLink Home

# US District Court Civil Docket

## US District Court for the District of Massachusetts (Boston)

### 1:00cv11525

### Brassring, Inc v. Interactive Search

This case was retrieved from the court on Wednesday, October 29, 2003

| | |
|---|---|
| Date Filed: 07/31/2000 | Class Code: CLOSED |
| Assigned To: Judge Joseph L Tauro | Closed: Yes |
| Referred To: | Status: 28:1391 |
| Nature of suit: Patent (830) | Jury Demand: Plaintiff |
| Cause: Personal Injury | Demand Amount: $0 |
| Lead Docket: None | |
| Other Docket: None | |
| Jurisdiction: Federal Question | |

| Litigants | Attorneys |
|---|---|
| Brassring, Inc<br>PLAINTIFF | Matthew B Lawrence<br>[COR LD NTC]<br>Wolf, Greenfield & Sacks, PC<br>600 Atlantic Avenue<br>Boston , MA  02110<br>USA<br>617-720-3500<br>Fax : 817-720-2110<br>Email: Blawrence@wolfgreenfield com<br><br>Matthew B Lowrie<br>[COR LD NTC]<br>Lowrie, Lando and Anastasi, LLP<br>Riverfront Office Park<br>One Main Street<br>Cambridge . MA  02142<br>USA<br>617-395-7000<br>Fax : 617-395-7070<br>Email: Mlowrie@ll-A com |

v.

Interactive Search
DEFENDANT

**Date    #    Proceeding Text**

| | | |
|---|---|---|
| 07/31/2000 | 1 | Complaint filed. Case assigned to Judge: Tauro. Receipt #: 24217 Amount:$ 150.00. Fee Status: pd  (kf) (Entered: 08/01/2000) |
| 07/31/2000 | -- | Summons issued for Interactive Search (kf) (Entered: 08/01/2000) |
| 11/14/2000 | 2 | Return of service executed as to Interactive Search in 1:00-cv-11525 with service on 11/3/00 filed. Answer due on 11/23/00 for Interactive Search (cmg) (Entered: 02/08/2001) |
| 07/03/2001 | -- | Case closed. (cmg) (Entered: 07/03/2001) |
| 07/18/2001 | 3 | Notice of Bankruptcy Filing and Imposition of Automatic stay by Interactive Search in 1:00-cv-11525 by Matthew B. Lowrie in 1:00-cv-11525. FILED (c/s) (cmg) (Entered: 07/23/2001) |
| 05/14/2002 | 4 | Notice of voluntary dismissal by Brassring, Inc. in 1:00-cv-11525, Interactive Search in 1:00-cv-11525 as to Brassring, Inc. in 1:00-cv-11525, Interactive Search in 1:00-cv-11525, filed. (fmr) (Entered: 05/14/2002) |

Copyright © 2003 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***



AD 440 (Rev. 10/03) Summons in a Civil Action

# United States District Court

DISTRICT OF _____ MASSACHUSETTS

NOV 0 6 2003

Brassring, Inc.
V.
Interactive Search, Inc.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

## 00cv 11525 JLT

TO: (Name and address of defendant)
Interactive Search, Inc.
5959 W. Century Blvd, Suite 1100
Los Angeles, California

**YOU ARE HEREBY SUMMONED** and required to serve up on PLAINTIFF'S ATTORNEY (name and address)

Matthew B. Lowrie
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
617-7203500

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days afte
service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a
reasonable period of time after service.

TONY ANASTAS

CLERK                                    DATE

DAVID BOLDEN

(BY) DEPUTY CLERK

DOCKETED
RESPONSE DUE