IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENEXA BRASSRING INC.,          )
                                )
            Plaintiff,          )
                                )
      v.                        )          Civ. No. 07-521-SLR
                                )
TALEO CORPORATION, et al.,      )
                                )
            Defendants.         )

---

Frederick L. Cottrell III, Esquire, Steven J. Fineman, Esquire and Sarah R. Stafford, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Matthew B. Lowrie, Esquire, Robert J. Silverman, Esquire, and Lucas I. Silva, Esquire of Foley & Lardner LLP, Boston, Massachusetts

Thomas C. Grimm, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Richard D. Rochford, Jr., Esquire of Nixon Peabody LLP, Rochester, New York, Jason C. Kravitz, Esquire, Mark D. Robbins, Esquire, and Gina M. McCreadie, Esquire of Nixon Peabody LLP, Boston, Massachusetts, David C. McKone, Esquire of Nixon Peabody LLP, Chicago, Illinois.

---

## MEMORANDUM OPINION

Dated: November 18, 2010
Wilmington, Delaware

ROBINSON, District Judge

# I. INTRODUCTION

Plaintiff Kenexa Brassring, Inc ("plaintiff") owns two patents directed to systems and methods for accurately entering information into a highly structured database from multiple non-uniformly formatted data sources. On August 27, 2007, plaintiff commenced this patent infringement action against defendants Taleo Corporation ("Taleo") and Vurv Technology, Inc. ("Vurv") (collectively "defendants") alleging that multiple products sold by each company infringe U.S. Patent Nos. 5,999,939 ("the '939 patent") and 6,996,561 ("the '561 patent"). (D.I. 1) Defendants have asserted various affirmative defenses and counterclaims in response to plaintiff's complaint, including noninfringement and invalidity of the patents in suit. (D.I. 6)

The parties have proffered meanings for the disputed claim limitations and move for summary judgment. Plaintiff seeks summary judgment of infringement, and defendants seek summary judgment of invalidity of the patents in suit. (D.I. 156; D.I. 153) The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. For the reasons that follow, the court        the motions.

# II. BACKGROUND

## A. The Parties and the Technology at Issue

The technology at issue concerns systems and methods for collecting and maintaining information about job applicants. (D.I. 156 at 2) The parties provide "applicant tracking systems" that permit job applicants to submit resumes in electronic form over the internet. (Id.) Once an applicant has submitted his resume, the system scans the resume looking for key information such as telephone number, work history,

or educational background. (*Id.*) Once this information is identified, it is extracted and presented to the applicant for verification. (*Id.* at 2-3) During this time, the applicant may be asked to submit supplemental information that was not collected by the resume processing. (*Id.* at 3) After the applicant verifies that the extracted information is correct and responds to the supplemental inquiries, the information is stored in a structured database. (*Id.* at 2) It is through this verification that the systems ensure the accuracy of the information contained in the database.

Defendants Taleo and Vurv both sell products that compete with plaintiff's applicant tracking systems. (*Id.* at 3) During the pendency of this case, Taleo acquired Vurv, and this combined entity has emerged as the market leader. (*Id.*)

## B. The Patents in Suit

### 1. The '939 patent

The '939 patent is directed to a system and method for accurately entering information into a highly structured database from multiple non-uniformly formatted data sources by allowing the user to interactively modify data extracted by the algorithm before said data is stored in the database. ('939 patent, abstract) The '939 patent issued on December 7, 1999 and claims priority to a provisional application filed on December 21, 1997. Plaintiff alleges that defendants' products infringe every claim of the '939 patent. (D.I. 156 at 10)

The patent contains twenty claims, three of which are independent. Independent claim 1 is illustrative:

> A method for facilitating the accurate transfer of information from each of a plurality of nonuniformly formatted source data streams into a

2

structured database, said method comprising the steps of:
>> supplying digital data representing each of a plurality of source
>> data streams from a plurality of users, each said source data
>> stream containing data corresponding to multiple discernible
>> source data strings;
>> processing said digital data for extracting selected ones of said
>> source data strings and generating related target data
>> strings;
>> displaying a structured form comprised of multiple fields, each field
>> being capable of accommodating a data string and wherein
>> one or more of said fields have said target data strings
>> inserted within;
>> enabling each user to modify and/or accept said target data strings
>> inserted within said displayed form corresponding to said
>> source data stream originating from said user; and
>> storing data corresponding to said data strings from said form fields
>> into a database.

('939 patent, col. 6:35-55)

The remaining independent claims slightly alter claim 1 by claiming "a system for facilitating" instead of "a method for facilitating."

### 2. The '561 patent

The '561 patent is a continuation of an abandoned application which was, in turn, a continuation-in-part of the '939 patent. The '561 patent issued February 7, 2006. The '561 and '939 patents are so similar that the '561 patent is subject to a terminal disclaimer; its abstract is a mirror of the '939's abstract. The '561 patent contains 36 claims, five of which are independent. Plaintiff alleges that Taleo's products infringe claims 1-3, 5-16, and 18-36 of the '561 patent, and that Vurv's products infringe them all. (D.I. 156 at 10)

Independent claim 1 is illustrative of the asserted claims, and reads as follows:

>> A method for facilitating the accurate transfer of information into a
>> structured database, said method comprising the steps of:
>> receiving digital data from one or more users representing one or

3

> more nonuniformly formatted source data streams, each said
> source data stream containing digital data corresponding to
> one or more discernable source data strings, wherein said
> digital data includes first digital data that is personal
> information about a first user;
>
> extracting selected ones of said source data strings from said source
> data streams and generating related target data strings;
>
> sending a structured form to said first user comprised of multiple
> fields, each field being capable of accommodating a data string
> and wherein any said generated target data strings are
> inserted;
>
> enabling said first user to modify and/or accept said target data
> strings inserted within said structured form;
>
> receiving digital data from said first user corresponding to said target
> data strings from said structured form fields; and
>
> storing said digital data corresponding to said target data strings from
> said structured form fields in said database.

('561 patent, col. 8:45-9:3) As with the '939 patent, subsequent independent claims

slightly alter claim 1 by claiming "a system for facilitating," instead of "a method for

facilitating." (See, e.g., '561 patent, col. 9:21-45)

Other independent claims require the "data stream" to be a digital representation

of a resume. Independent claim 21 highlights this change:

> A method for facilitating the accurate transfer of resume information
> from a nonuniformly formatted source data stream to a structured database,
> said method comprising the steps of:
>
> receiving a digital representation of a resume from a first job
> applicant;
>
> extracting data strings from said digital representation and generating
> related target data strings;
>
> sending at least a portion of said target data strings to said first job
> applicant; and
>
> enabling said first job applicant to modify said target data strings to
> create modified data strings;
>
> receiving said modified data strings from said first job applicant; and
> storing said modified data strings in the database.

('561 patent, col. 10:48-63)

## C. The Accused Products

4

### 1. Vurv vs. Taleo

The accused products sold by defendants fall into two general groups:  (1) those created by Taleo, e.g., Taleo's "Enterprise Edition," "Business Edition," and "Edge Edition;" and (2) those created by Vurv, e.g., Vurv's "Corporate Edition," "Staffing Edition," and "Express."  It is undisputed that the two groups of products function with at least one major difference:  the Taleo products include a hyperlink that shows the user his or her original resume when clicked on, whereas the Vurv products include the user's original resume in a text box below where the fields containing the extracted strings are displayed.  (D.I. 193 at 41:15-42:10)

### 2. Differentiation of products within the Vurv and Taleo product lines

The parties disagree as to whether plaintiff has shown that the products within the Taleo and Vurv lines operate in the same manner, i.e., do Taleo's "Enterprise Edition," "Business Edition," and "Edge Edition" all operate in the same manner for purposes of this suit, and do Vurv's "Corporate Edition," "Staffing Edition," and "Express" also function in the same way?  Plaintiff claims that, in response to its contention interrogatories and questions to 30(b)(6) designees, defendants did not identify any manner in which the products operate differently.  (D.I. 179 at 2-3) Defendants stress that plaintiff has the burden to demonstrate equivalent functionality. (D.I. 170 at 6-8)  Plaintiff argues that defendants should be estopped from making this argument in view of their interrogatory and 30(b)(6) designee responses.  (D.I. 179 at 2-3)

Specifically, plaintiff's interrogatory 10 asked:

> For **each** Resume Product identified in the answer to Interrogatory 2, and for each claim of each of the patents-in-suit, identify any claim limitation that Vurv contends is not met, and for such limitation (i) state Vurvs interpretation of the claim limitation, (ii) explain why the limitation is not met literally, (iii) explain why the limitation is not met by equivalents, and (iv) identify any and all facts, evidence, and documents in support of Vurv's contention.

(D.I. 160, ex. 7 at 1-2) (emphasis added)

Defendants objected to the interrogatory, then proceeded to list multiple claim limitations, referring to the "Resume Products" collectively.[1] Defendants never identified how an individual product worked, nor explained how any product functioned differently from any other product. (*Id.* at 2-19) There were multiple occasions when defendants answered that the products' functionality varied "in some instances," yet they did not specify whether the products' functionality varied from product to product, or whether their output varied in the same manner based on user input.

When questioned about the resume submission portion of Taleo's products, Taleo's 30(b)(6) designee[2] participated in the following dialogue:

> Q: [Is] there[] something that is lurking in the back of your mind about how these two systems operate, just in terms of the resume submission portion of it? A: Not really, unless we come into extremely technical detail, you know. I mean so far we haven't gone into these details so I don't see what

---

[1] For example, in response to the "means for generating a structured form comprised of multiple fields, each field capable of accommodating a data string and wherein any said generated target data strings are inserted" limitation of claim 7 of the '561 patent, defendants stated that "[t]he Resume Products, in some instances, send a form to the user that includes multiple fields. Some of the fields are not capable of accommodating a string." (*Id.* at 5) Defendants did not specify which products sent a form to the user that includes multiple fields, nor did they specify under what circumstances the products would not send the form.

[2] Taleo had multiple 30(b)(6) designees. The cited reference is to the testimony of Mr. Zenadocchio, Taleo's 30(b)(6) designee for technical testimony with respect to how the Taleo products work. (D.I. 160, ex. 4 at 5:9-15)

kind of differences that I could talk about.

(D.I. 160, ex. 4 at 8:23-9:8)  During his deposition, Vurv's designee was asked a similar

question about the Vurv products' "resume uploading feature," and gave a similar

response.  (D.I. 160, ex. 3 at 62:11-13) ("Q: I mean, as you are sitting here today you

can't think of anything that distinguishes [Vurv's products]?  A: No, I can't think of

anything.")

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears

the burden of proving that no genuine issue of material fact exists. See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

which a rational person could conclude that the position of the person with the burden

of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co.,

57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has

demonstrated an absence of material fact, the nonmoving party then "must come

forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita,

475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The court will "view the underlying facts

and all reasonable inferences therefrom in the light most favorable to the party

opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The

7

mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Infringement

#### 1. Standard

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A two-step analysis is employed in making an infringement determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning and scope. *Id*. Construction of the claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. *Markman*, 52 F.3d at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform or use each and every step or element of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498

8

F.3d 1373, 1378 (Fed. Cir. 2007). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

## 2. Differentiation of defendants' products

As discussed above, defendants claim that plaintiff has failed to prove that their products function in the same manner for purposes of infringement. Plaintiff responded that defendants had admitted their products worked the same in their response to contention interrogatories and by their 30(b)(6) designees. In their argument, defendants do not explain their limited responses to contention interrogatories, nor do they attempt to distinguish the cited testimony of Taleo's 30(b)(6) designee. However, despite the similarity in testimony, defendants argue that Vurv's 30(b)(6) designee was only talking about the "'resume uploading feature,' which says nothing about any of the numerous other limitations of the claims of the patents in suit." (D.I. 170 at 7) This argument is unpersuasive. Defendants appear to imply that the "resume upload feature" is limited to the user sending a digital copy of his resume to the server and nothing more. This is not true. For purposes of this lawsuit, the only relevant functionality of defendants' products is that functionality which handles the user's

9

resume from the point the user transmits the raw, unformatted version to a server, until the parsed data strings are stored in a database.  This is the resume uploading feature of the accused products.  Any other functionality is irrelevant.

Defendants' designees knew or should have known what plaintiff's attorneys meant by the "resume upload feature."  The Vurv designee had spent the prior 32 pages of deposition testimony describing the old system of uploading and parsing a resume that involved the use of a scanner, optical character recognition software, and an employee to extract the data and put it into the appropriate database fields.  (D.I. 160, ex. 3 at 11-43)  The designee was then shown a series of screen shots of defendants' product that plaintiff's lawyer called "the resume uploading feature." (*Id.* at 61:23-62:16)  When the Vurv designee was questioned as to which product it was, he could not tell if the product in the screen shot was the corporate or the staffing product. (*Id.* at 61:5-22)  The designee then proceeded to explain how the system generally worked, beyond merely transmitting a resume to a server, without enumerating any point of differentiation between the potential products.  (*Id.* at 62:22-102:25)

Given plaintiff's questions and defendants' responses, the court finds that plaintiff has met its burden of proving that defendants' products function the same way for purposes of patent infringement within their respective product lines.  This is not a case where plaintiff failed to ask the defendant questions, and is baldly asserting that the products in question are homogeneous without any form of proof.  Here, interrogatory number 10 specifically asked defendants why **each** product did not infringe the patents in suit, yet both defendants responded in the same manner for all.

10

Plaintiff specifically asked both defendants' 30(b)(6) designees if the resume uploading feature was the same across the product line, and both designees answered that it was. For the Vurv designee especially, this answer came not in a vacuum, but in the context of discussing how the previous generation of products worked from resume transmission to processing by an employee. After admitting that he could not identify which product was shown in plaintiff's screen shots, the designee explained how the products worked without differentiating any differences between them. Defendants cannot group their products together when asked whether they differ, then turn around and claim that plaintiff has failed to meet its burden of showing that they operate in the same way.

### 3. Claim limitations

Plaintiff moves for summary judgment that the Vurv products infringe each asserted claim of the patents in suit. Plaintiff also moves for summary judgment that the Taleo products infringe claims 1-3, 5-16, and 18-36 of the '561 patent and each claim of the '939 patent. (D.I. 156 at 10) Defendants allege that plaintiff has not established that the accused products meet the limitations of the claims that are not subject to the claim construction disputes. (D.I. 170 at 8) Plaintiff responds that its expert addressed each claim on limitation by limitation basis, and it only briefed those claim limitations that are subject to construction disputes because: (1) defendants' responses to interrogatories indicated that these are the only claim limitations not met by their products; and (2) defendants expressly admitted that "all infringement questions

11

would be resolved by the issue identified in the Joint Claim Construction Statement."[3] (D.I. 156 at 2)

As discussed *supra*, plaintiff served defendants with an interrogatory wherein defendants were requested to list each claim limitation of the patents in suit that is not met by their products. (D.I. 160, ex. 7 at 1-2)  Defendants responded by returning a specific list of claim limitations that were not met. (*Id.* at 2-19)  Plaintiff argues that defendants' interrogatory responses serve as an admission that defendants' products meet the claim limitations that were not listed as being in contention, and that the claim limitations that are in contention are the very limitations that plaintiff briefed. (D.I. 179 at 4)

The court agrees. Defendants were asked "for **each claim** of each of the patents-in-suit, **identify any claim limitation** that [defendants] contend[] is not met." (D.I. 160 at Ex 7, pp 1-2) (emphasis added)  By responding with a finite list that did not include every limitation of every claim, defendants conceded that the remaining limitations are met by their products. There is no indication that plaintiff had any opportunity to flesh out defendants' new argument during the discovery period. Moreover, plaintiff's expert details why every claim limitation is met by defendants' products.

### 4. The '939 and '561 patents

Plaintiff alleges that defendants' products infringe every claim of the '939 patent. (D.I. 156 at 10)  In addition, plaintiff alleges that Taleo's products infringe claims 1-3, 5-

---

[3]Neither defendants nor the court have located the exhibit that plaintiff cites for defendants' alleged express admission.  (D.I. 156 at 2 n.2); (D.I. 170 at 8)

12

16, and 18-36 of the '561 patent, and that Vurv's products infringe them all. (Id.) As
the court has stated previously in this opinion, the '561 patent shares much in common
with the '939 patent. Due to this overlap, in all but a few instances, the parties make
collective arguments regarding both claim construction and the application of the claims
to defendants' products. Accordingly, where the parities make collective arguments,
the court's analysis will apply to the patents in suit with equal weight. Where they differ
will be specifically noted.

### a. "Target data string" limitations

The parties' dispute over this claim limitation concerns not the interpretation of its
text, but the sequence of its operation. (D.I. 170 at 10)  Defendants argue that the
patents in suit require that the target data strings are displayed to the user prior to
storage in the database. (Id.)  In making this argument, defendants attempt to add a
limitation to the claims that does not exist. ('939 patent, col. 6:34-8:30; '561 patent, col.
8:48-12:1)  The crux of the invention is that the user is given the opportunity to verify
the target data strings and that said strings are ultimately stored in the database.  This
"facilitat[es] the accurate transfer of information . . . to a highly structured database."
('939 patent, col. 1:34-37; '561 patent, col. 1:41-43)  The utility of the patent is not
vitiated by storing the target data strings temporarily in the database prior to verification
by the user.  Defendants do not contest that their products display the source data
strings and that the strings are updated after verification.  Defendants merely argue that
their products do not infringe the patents in suit because the data strings are initially
displayed after storage, and not before. (D.I. 170 at 10)  Because the utility of the

13

patent is tied to the ultimate storage of the strings after verification, both products
satisfy this claim limitation.

### b. "Each field being capable of [accommodating/accepting] . . . [a] data string"

The court has interpreted this term according to its plain language, that is, "each
field of the form is capable of having a data string inserted therein." The question now
before the court is whether "**each** field being capable of accomodating/accepting . . . a
data string" means "**every** field is capable of accomodating/accepting . . . a data string."
(D.I. 193 at 136:8-10; D.I. 159 at 13; D.I. 169 at 12) (emphasis added)  Defendants'
expert, Dr. Martin E. Kaliski ("Kaliski"), states that "[defendants'] systems deal with
structured forms in which not all fields are intended to accommodate data strings
extracted from source data streams, e.g., forms with graphic fields or pull-down menus."
(D.I. 160, ex. 9 at 6)  Plaintiff counters that "each" does not mean "every" since "the
claim language does not exclude the possibility that in addition to those 'multiple fields,'
there may be other fields that cannot (or do not) contain a 'data string.'"  (D.I. 159 at 13)

Construing "each" in accordance with the specification, the court finds that "each"
does not mean "every."  Figure 6C of the patents in suit shows a structured form with
drop-down boxes that prompt the user for information that includes current clearances,
citizenship, and travel preferences.  According to defendants' interpretation of "each,"
this preferred embodiment would not be covered by the claims of the patent, because
drop-down boxes do not "accomodat[e]/accept[] a target data string."  The Federal
Circuit has been clear in holding that "exclud[ing] from claim scope [a] preferred

embodiment of [a patent is] a disfavored result." *Bowers v. Baystate Techs. Inc.*, 320 F.3d 1317, 1332 (Fed. Cir. 2003).

While defendants admit that some of the fields in their structured form are capable of accepting/accommodating a data string, they argue that they do not infringe the patents in suit because every field does not. (D.I. 160, ex. 9 at 6) Because the court declines to find that each means every, both Taleo's and Vurv's products meet this claim limitation.

### c. "Source data stream" terms

The "source data stream" terms of the '939 patent and claim 18 of the '561 patent do not require that the source data stream is displayed within the structured form, merely that it is displayed to the user. For example, claim 4 of the '939 patent requires "said displaying step additionally includes displaying said source data stream." ('939 patent, col. 6:60-61) The displaying step requires "displaying structure form comprised of multiple fields" (*Id.*, col. 6:46) When combined, these two steps require only that the source data stream be displayed. They do not require that it be displayed in a "structured form." (D.I. 159 at 11) This distinction is clear when viewed in light of claims 4 and 17 of the '561 patent which, despite containing nearly the same specification, explicitly require that "said structured form additionally comprises said source data stream." ('561 patent, col. 9:8-9, 10:30-31)

Therefore, this limitation is met by the Vurv products which include a box containing "the actual text that was originally extracted from the Word document that was uploaded." (D.I. 160, ex. 3 at 95:1-2) However, in the Taleo products, the source data stream is available only via a hyperlink that the user must engage before the

15

stream is displayed. (D.I. 170 at 15) There is no dispute between the parties as to the user's involvement in displaying the source data stream. It is not automatically displayed by Taleo's products. Under the court's precedent, this level of required user activity is sufficient to grant summary judgment of noninfringement. *Grafia.com, Inc. v. IAC Search & Media, Inc.*, Civ. No 07-787, 2009 WL 3074712 at *3 (D. Del. Sept. 25, 2009) (finding divided infringement where "the software did not cause a preview image to be displayed automatically, that is, [the software] required a user to 'mouse-over' or click on a hyperlink in order for a preview image to appear.") Although defendants have not made a motion for summary judgment of noninfringement, "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). Accordingly, the court finds that the Taleo products do not infringe this limitation as a matter of law.

The "source data stream" terms of claims 4 and 17 of the '561 patent expressly require that the source data stream be displayed within the structured form. ('561 patent, col. 9:8-9, 10:30-31) This limitation is met by the Vurv products, which include a box containing "the actual text that was originally extracted from the Word document that was uploaded." (D.I. 160, ex. 3 at 95:1-2) However, these claims are not asserted against the Taleo products, so the court need not address their application.

### d. "Displaying a structured form comprised of multiple fields"

This limitation is unique to the '939 patent. The court finds that the proper

construction of this term is "causing a structured form comprised of multiple fields to appear." Under this construction, the Taleo products meet the claim limitations. Taleo's 30(b)(6) designee stated that "so what's done by [the] parsing engine [is] to extract the content, put it in various fields. Then we . . . show them to the [applicant] for review." (D.I. 160, ex. 1 at 130:15-18) This shows that Taleo's products cause a structured form comprised of multiple fields to appear. The same is true for the Vurv products, as Vurv's 30(b)(6) designee testified that "we're transmitting the [extracted data] back to the browser on the next page . . . and presenting the information in these fields." (D.I. 160, ex. 3 at 69:21-25) This too demonstrates that Vurv's products meet this claim limitation.

Defendants attempt to make a divided infringement argument to avoid infringement. Defendants allege that their "products do not render a structured form comprised of multiple fields on a display device. . . . Instead, it is the users who own and control the display devices (e.g., computer monitors) that render the structured forms. Defendants do not have control over the users." (D.I. 170 at 16) Under this logic, it would be difficult to prove infringement by any software program of a computer-related patent that has a display step, because "the users . . . own and control the display devices." Ownership of the display device is irrelevant to the patented invention. It is the software program itself that tells the display device what to render.[4]

_____

[4] It likely is more technically correct to say that the software communicates with the display device drivers, which in turn control the monitor. Or, if the software is a web application, that the software communicates with the internet browser, which in turn communicates with the display device drivers, which in turn control the monitor. *See* http://technet.microsoft.com/en-us/library/cc776371(WS.10).aspx.

17

The user has little control while using the program. Certainly a user can chose to not run the program but, once he does, it is the program that controls the display function. The user inputs values and makes selections, but which selections he is given and what fields are returned is under the sole control of the program.

The display activity of defendants' products differs from display activity that this court has found to constitute divided infringement. *See Grafia.com*, 2009 WL 3074712 at *3. In the case before the court, the products render a structured form comprised of multiple fields on the user's display as he progresses through the application process. He has no choice in the matter, and has no control over what is displayed.

### e. "Supplying" terms

This limitation is unique to the '939 patent. During the *Markman* hearing, defendants stated that they were no longer pursuing their "copying and pasting" construction for the "supplying" claim limitations. (D.I. 193 at 60:8-9) Accordingly, the court interprets these terms to require "providing digital data that represents each of a plurality of source data streams that originate from a plurality of users." Such a construction requires that the software system supplies its parser with a resume stream that was supplied at an earlier time by one or more users. ('939 patent, fig. 4) The performance of the method occurs **after** the user has supplied the data.

Defendants are unable to make a divided infringement argument because it is the software that performs all necessary steps of the patent. A user is necessarily involved at least at some point in most computer method patents; simple involvement, however, is not enough to give rise to divided infringement. For example, even the

18

famous Amazon.com 1-click patent has a limitation requiring a "response to only a single action being performed." (U.S. Patent No. 5,960,411, col. 10:19) The user necessarily is the one who performs this "single action" (*id.*, col. 1:56-60) after going to the web page and searching for the item. (*Id.*, col. 1:36-36) If simple user involvement were enough to give rise to divided infringement, few, if any, software patents could be infringed.

Defendants' 30(b)(6) designees consistently speak in terms of applicants or users uploading a resume which is then parsed. This usually takes place in two different servers, meaning that the defendants' products provide digital data that represents each of a plurality of source data streams that originate from a plurality of users. For example, Taleo's 30(b)(6) designee testified that "when you . . . upload a resume [] the file . . . [is] sent from the browser to the server in our data center and then this other server . . . will parse that raw text resume and extract some information." (D.I. 160, ex. 4 at 14:14-15:6)

Vurv's 30(b)(6) designee testified similarly. When talking about the resume uploading feature of the Vurv products, the designee explained the different types of servers, be they web, database, or application. (D.I. 160 at 83:3-88:17) The web server component of the Vurv products is relatively unsophisticated. It takes the resume that is uploaded by the applicant, and will route it to the application server, where data extraction occurs. (*Id.*, at 84:13-20)

### f. "Supplemental inquiry form"

Reading this claim limitation in conjunction with the patent's specification and

19

other claims, the court construes this term to mean "a form having fields for receiving

entry of data that may be different from the data actually extracted from the source data

stream." (D.I. 169 at 4) The evidence of record demonstrates that defendants'

products perform exactly this process. Taleo's 30(b)(6) designee testified that

> the candidate continues through various pages where the candidate can
> complete the information [requested by the extractor], review the information,
> and/or submit additional information related to information not extracted from
> the resume or extracted from the resume, depending on how it is built. . . .
> [information such as] employment equity or equal opportunity fields, this is
> not extracted at all; they have to provide it directly. All prescreening
> information, they need to provide it directly.

(D.I. 160, ex. 1 at 130:24-131:10)

The Vurv products have similar functionality. Vurv's 30(b)(6) designee

participated in the following dialogue: "Q: So they would have – they would – aside

from what they extracted or tried to extract from a resume, they would have additional

questions [for the applicant] – A: yes." (D.I. 160, ex. 3 at 87:8-12)

### g. "Nonuniformly formatted source data streams"

The court interprets the term to mean that each resume ("data stream") may be

different with respect to the ordering of data contained therein. In this regard, the

patents in suit only state that the stream is "**generally** unstructured relative to the highly

structured form of the database." ('939 patent; col. 4:54-55; '561 patent, col. 5:14-15)

(emphasis added) What is of key importance is not the file type that is uploaded,[5] but

that the data contained within that file varies in format, i.e., not every resume has the

applicant's first name as the first word on the page. (D.I. 170 at 8-9)

---

[5] Defendants argue that Microsoft Word documents are structured, not that the
resumes contained therein are structured. (D.I. 170 at 19-20)

It is uncontested that the format of the resumes' themselves vary from stream to stream. Vurv's 30(b)(6) designee explained "the reason why the Vurv software uses a sort of set of states as opposed to just putting in the name of the state that was written" was "because it forces consistency in the data." (D.I. 160, ex. 3 at 74:19-24)  After all, "everybody has so many different resume formats." (*Id.* at 71:1-2).  Taleo's 30(b)(6) designee describes a similar situation wherein the Taleo products extract formatted (structured) data from a raw (unformatted) source data file.  (D.I. 160, ex. 4 at 14:1-18:10)  The Taleo products "get[] rid of all the variation that the user might have within his raw resume."  This illustrates that the Taleo products receive "structured or unstructured data streams that vary in format from one stream to the next."

### 5. Conclusion

Under the court's claim construction, the Vurv products infringe all asserted claims of all of the patents in suit.  The Taleo products infringe all asserted claims except claims 4 and 17 of the '949 patent, and claim 18 of the '561 patent.

### B. Invalidity

#### 1. The '939 patent's priority date

##### a. Standard

The threshold question in the invalidity analysis is that of the '939 patent's priority date.[6]  Plaintiff attempts to swear behind the prior art references cited by defendants by establishing a conception date of June 1, 1996. (D.I. 172 at 6)

The party alleging prior invention must establish prior invention by clear and

---

[6] Since the '561 patent is a continuation of the '939 patent, it will share the priority date of the '939 patent.

convincing evidence. *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1037-38 (Fed. Cir. 2001). To this end, a party alleging prior invention can establish that he was the first to invent by showing either: (1) he was first to reduce the invention to practice; or (2) he was first to conceive the invention and then exercised reasonable diligence in attempting to reduce the invention to practice from a date just prior to the applicant's conception to the date of his reduction to practice. 35 U.S.C. § 102(g) ("In determining priority of invention . . . there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was the first to conceive and last to reduce to practice, from a time prior to conception by the other."). As recognized by the Federal Circuit,

> [a] principal purpose of § 102(g) is to ensure that a patent is awarded to a first inventor. However, it also encourages prompt public disclosure of an invention by penalizing the unexcused delay or failure of a first inventor to share the "benefit of the knowledge of [the] invention" with the public after the invention has been completed.

*Checkpoint Sys. v. United States Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed. Cir. 1995) (citing *Paulik v. Rizkalla*, 760 F.2d 1270, 1280 (Fed. Cir. 1985)).

Conception is the "formation in the inventor's mind of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (citations omitted). A conception must encompass all limitations of the claimed invention, and "is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2002) (citations omitted). Put differently, every limitation must be shown to

have been known to the inventor at the time the invention is alleged to have been conceived. *Davis v. Reddy*, 620 F.2d 885, 889 (C.C.P.A. 1980) (citing *Schur v. Muller*, 372 F.2d 546, 551 (1967); *Anderson v. Anderson*, 403 F. Supp. 834, 846 (D. D.C. 1975)). Because conception is a mental act, "it must be proven by evidence showing what the inventor has disclosed to others and what that disclosure means to one of ordinary skill in the art." *In re Jolly*, 308 F.3d 1317, 1321 (Fed. Cir. 2002) (quoting *Spero v. Ringold*, 377 F.2d 652, 660 (C.C.P.A. 1967)). The Federal Circuit has opined that a court should apply the "rule of reason" in determining conception. That is, the court should examine, analyze, and evaluate reasonably all pertinent evidence when weighing credibility of an inventor's story. *Holmwood v. Sugavanam*, 948 F.2d 1236, 1239 (Fed. Cir. 1991). Evidence in the form of independent documents does not need to be corroborated. *Id.* Rather, an alleged prior inventor "'must provide independent corroborating evidence in addition to his own statements and documents.'" *Procter & Gamble Co. V. Teva Pharm. USA, Inc.*, 556 F.3d 989, 999 (Fed. Cir. 2009) (citing *Hahn v. Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989)).

Reduction to practice may either occur actually or constructively. Actual reduction to practice requires a showing by the inventor that "the invention is suitable for its intended purpose." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996). This may require actual testing for a complicated invention or may require only the complete construction of a prototype for a simple invention with obvious purpose and workability. Id. For a party alleging prior invention to establish that he actually reduced his invention to practice by testimony, he must corroborate his proffered testimony with

23

independent evidence, which is evaluated under a rule of reason considering all the evidence. *Loral Fairchild Corp. v. Matsushita Elec. Indus. Corp. Ltd.*, 266 F.3d 1358, 1363 (Fed. Cir. 2001). Notably, there is no requirement that the "prior invention" be commercialized in order for it to be actually reduced to practice. *Steinberg v. Seitz*, 517 F.2d 1359, 1363 (C.C.P.A. 1975). The key is whether the invention can be commercialized or has reached the point where "practical men [would] take the risk of commercializing the invention." *Goodrich v. Harmsen*, 442 F.2d 377, 383 (C.C.P.A. 1971). Constructive reduction to practice, in contrast, occurs when a party alleging prior invention files a patent application on the claimed invention. *Hybritech*, 802 F.2d at 1376.

The party alleging prior invention must be able to show diligence "from a date just prior to the other party's conception to . . . [the date of] reduction to practice [by the party first to conceive]." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2002); *Mahurkar*, 79 F.3d at 1577. However, it is not necessary for a party alleging prior invention to drop all other work and concentrate solely on the particular invention involved. *Rines v. Morgan*, 250 F.2d 365, 369 (C.C.P.A. 1957). There also need not be evidence of activity on every single day if a satisfactory explanation is evidenced. *Monsanto*, 261 F.3d at 1369 (citations omitted). Additionally, determining whether the required "reasonable diligence" has been satisfied involves specific inquiry. *Id.* (citations omitted).

#### b. Discussion

Plaintiff relies on the testimony and documents of John Reese ("Reese"), one of

24

Case 1:07-cv-00521-SLR   Document 214   Filed 11/18/10   Page 26 of 42 PageID #: 4404

the inventors of the '939 patent, to establish a conception date of June 1, 1996. (D.I. 172 at 6) In his testimony, Reese claims that he conceived of a way to ensure the accuracy of data extracted from an uploaded resume and saved in the structured database by "flip[ing] it around, and have the jobseeker do the verification or part of the verification that [plaintiff] normally ha[d] [its] back office people do." (D.I. 172 at 6) Plaintiff claims Reese's testimony is corroborated by a single line in a "Private Placement Memorandum" which states that plaintiff's company has plans to "support interactive submissions from applicants having access through the WWW."[7] (D.I. 173, ex. 2 at 22)

Neither Reece's testimony nor the Private Placement Memorandum establish by clear and convincing evidence that there was a "formation in the inventor's mind of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech*, 802 F.2d at 1376. There is no indication from Reece's testimony that every claim of the invention was known to him at the time he claims to have had the idea. Moreover, the line from the Private Placement Memorandum that supposedly supports Reese's testimony is even less clear, as it simply claims that plaintiff was planning "interactive submissions." It says nothing about a user being able to submit a resume, which is then: (1) parsed for target data strings; (2) the data strings are displayed back to the user; (3) the data strings are verified and

---

[7] Plaintiff also relies on a "Letter of Intent" dated July 17, 1997 to support Mr. Reese's testimony. The Letter of Intent however, says nothing about interactive resume submission functionality, and merely states that "[plaintiff] would expand its existing online job posting/resume submission services . . . to incorporate the additional resumes and information generated by Ziff Davis' promotional efforts." (D.I. 172 at 18)

25

modified by the user; and (4) the data strings are then stored in a database. "Interactive submissions" could have a myriad of meanings, and the document says nothing further to clarify the term's definition. For all intents and purposes, an "interactive submission" could simply involve the user uploading a resume to a website and clicking on a button labeled "send." This hardly meets the "clear and convincing" standard needed to establish conception prior to a patent's filing date.

Plaintiff also attempts to establish conception by the testimony and documents of another of the '939 patent's co-inventors, George Alan Porter ("Porter"). (D.I. 172 at 7) Porter produced a document entitled "Interactive Search Applicant Processing System Version 2.0" which is dated November 6, 1996. (D.I. 173, ex. 3) This document, a first draft written by Porter, includes a reference to "Applicants Electronic Resume Edit/Review." (Id.) This single line is the only relevant portion of the document. Porter also produced a self-created document entitled "Web Input" with a handwritten date of June 13, 1997. (D.I. 155, ex 8) This document shows a flow chart of resume upload and extraction features that essentially mirror the claims of the patent. (Id.)

Porter's testimony fails to establish conception of the '939 patent. Just a few lines under plaintiff's quoted text, where Porter states that the applicant edit/review system that is described in the "Interactive Search Applicant Processing System document "do[es] ultimately what [] the patent talks about" (D.I. 173, ex. 4 at 31:11-13), Porter is asked if he could describe how the system would work as contemplated in November 1996. (Id. at 32:3-7) He replied that "we weren't that far along in – in November. I – just had an outline. . . of the proposed Version 2." (Id. at 32:9-13) When asked "if he had a sense of how it would work in the time frame," he responded that they "hadn't

26

given it serious consideration at that – at that time." (*Id.* at 32:14-19) Porter's testimony regarding the "Web Input Document" is a bit more on point. While he admits that plaintiff's products did not have the described functionality at the alleged time the document was written, he does say that plaintiff had the design, i.e., the invention's conception. (*Id.* at 68:7-69:4) At most, this testimony could establish a date of conception of June 13, 1997. However, as an inventor, his testimony requires independent corroborating evidence, something which neither document provides.

Plaintiff's "Interactive Search Applicant Processing System" document fails to establish conception for a variety of reasons. As discussed in the court's analysis of the Reese testimony, the one relevant sentence hardly shows that plaintiff had "a definite and permanent idea of the complete and operative invention." Even if the document did list every claim limitation, it is insufficient to establish conception since it is written by an inventor and contains no independent verification. Case law clearly establishes that, to prove both conception and reduction to practice, an alleged prior inventor "must provide independent corroborating evidence in addition to his own statements and documents." *Procter & Gamble*, 556 F.3d at 999. This document is markedly different than an inventor's holographic notebook that is witnessed periodically by an independent third party, and it fails to establish conception. *Id.*

A similar reasoning applies to the "Web Input" document. It was created by Porter, and contains a dubious, handwritten date reference. (D.I. 155, ex 8) While the document appears to describe the essential features of the '939 patent, it is not "independent" and fails to rise to the level of clear and convincing evidence.

Because plaintiff has failed to establish conception earlier than the '939 patent's

27

priority date of December 21, 1997, the court finds that both the '939 patent and its '561

child patent have a priority date of December 21, 1997.

### 2. Anticipation

#### a. Standard

The standard of proof to establish the invalidity of a patent is "clear and

convincing evidence." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054,

1058 (Fed. Cir. 2004). In conjunction with this burden, the Federal Circuit has explained

that,

> [w]hen no prior art other than that which was considered by the PTO
> examiner is relied on by the attacker, he has the added burden of overcoming
> the deference that is due to a qualified government agency presumed to have
> properly done its job, which includes one or more examiners who are
> assumed to have some expertise in interpreting the references and to be
> familiar from their work with the level of skill in the art and whose duty it is to
> issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting

*Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

An anticipation inquiry involves two steps. First, the court must construe the

claims of the patent in suit as a matter of law. *See Key Pharms. v. Hercon Labs. Corp.*,

161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the

construed claims against the prior art. *See id.*

Proving a patent invalid by anticipation "requires that the four corners of a single,

prior art document describe every element of the claimed invention, either expressly or

inherently, such that a person of ordinary skill in the art could practice the invention

without undue experimentation." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212

F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). The elements of the prior art must be arranged or combined in the same manner as in the claim at issue, but the reference need not satisfy an ipsissimis verbis test. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. Mar. 26, 2009) (citations omitted). "In determining whether a patented invention is [explicitly] anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted "[i]f needed to impart clarity or avoid ambiguity" in ascertaining whether the invention is novel or was previously known in the art. *Id.* (internal citations omitted).

### b. The '848 patent

Defendants argue that U.S. Patent No. 5,864,848 ("the '848 patent") anticipates all asserted claims of the '939 and '561 patents. The '848 patent was filed on January 31, 1997; accordingly, it is prior art to the '939 and '561 patents under 35 U.S.C. § 102(g)(2).[8] Generally, the '848 patent discloses a "system for ascertaining a computer

---

[8]Plaintiff argues that the '848 patent is not prior art because plaintiff can swear behind its filing date, and because it is not analogous art. Plaintiff cannot swear behind the filing date of the '848 patent for the reasons already explained in this opinion. In addition, plaintiff's expert has not explained why the '848 patent is not analogous. He merely states that it is a "completely different technology, addressed to an entirely different set of problems, than [] what is claimed by the patents-in-suit." (D.I. 173, ex. 24 at 8) It is well established that conclusory expert declarations without supporting facts do not raise a genuine issue of material fact. *Zelinski v. Brunswick Corp.,* 185

user's goals and automatically extracting untagged data from one or more source

objects and applying the data to one or more target objects." ('848 patent, abstract)

The '848 patent describes a preferred embodiment in the form of an autoscheduler that

extracts schedule information from emails, and applies it to a user's electronic calendar

files. ('848 patent, col. 5:43-47)  The autoscheduler begins by receiving the email in the

form of a free-text (unstructured) source file. (*Id.*, fig. 7)  It then extracts schedule

related information from the e-mail and presents it to the user to modify or complete.

(*Id.*)  The results are saved in a target file. (*Id.*)  The '848 patent also contemplates

extraction of information from other forms of free-text files for storage in a database.

(*Id.*, col. 3:41)  The examiner did not consider the '848 patent during examination of the

'939 and '561 patents.

Plaintiff's sole argument in its brief against anticipation by the '848 patent is that

the patent "lacks the 'user' required by each claim of the patents in suit as well as

multiple other claimed features."[9]  (D.I. 172 at 20)  Plaintiff's rebuttal consists of a single

sentence directing the court to the declaration of plaintiff's expert, Dr. Michael D. Siegel

("Siegel"). (*Id.*) (citing D.I. 173, ex. 24 at 8-10)

The '848 patent provides that the "user" in that system is the individual that

**verifies** the extracted information from the email.  ('848 patent, col. 19:11-24) (stating

---

F.3d 1311, 1317 (Fed. Cir. 1999).

[9]Plaintiff claims that defendants' arguments relating to the user in the '848 patent have been substantially rejected by the United States Patent and Trademark Office ("PTO") during inter-partes reexamination proceedings.  (D.I. 172 at 5)  However, "case law consistently provides that a court is never bound by an examiner's finding in an [inter partes] patent [] proceeding." *Pfizer, Inc. v. Apotex, Inc.*, 480 F. 3d 1348, 1359 (Fed. Cir 2007).

30

that the user "complete[s] and/or correct[s] the target data fields of the application-

specific template") In his declaration, Siegel states that the '848 patent cannot

anticipate because the "user" of the patents in suit must be the one who both **authors**

the data that is parsed by the system and **verifies** the accuracy of the extracted strings.

(D.I. 173, ex. 24 at 9) ("[The '848 patent] does not include the "source data stream" of

the patents in suit because the "source object" cannot "originate from" the claimed

"user," as required.[10]  (D.I. 173, ex. 24 at 9)  That is,

> [the '848 patent] lacks the claimed "user" of the patents in suit from whom the
> "source data stream" "originat[ed]," or by whom it was "generat[ed]," as required.
> If the person who "generat[ed]" the email message – in [the '848 patent] – were
> the email sender, there would be no need to ascertain his or her own "predefined"
> goal or carry out the additional steps described by the reference.

(D.I. 173, ex. 24 at 8)

Siegel's construction of "user" contradicts language in the specifications of both

patents in suit providing that the user is "**typically**, the author of the source

document/file." ('939 patent, col. 1:46-47; '561 patent, col. 1:52-53) (emphasis added)

According to the specifications of the patents in suit, then, the "user" may be, but does

not have to be, the author the source document.  The "user" is only required to be the

person who verifies the accuracy of the strings extracted from said document.  ('939

patent, col. 5:48-64; '561 patent, col. 6:8-24)

The court next addresses whether the '848 patent teaches a "plurality" of users as

required by the claims of the '939 patent.  As described above, the "user" of the patents

in suit verifies the extracted data string.  ('939 patent, col. 5:48-64; '561 patent, col. 6:8-

---

[10]Siegel does not argue that a source object does not exist.

24) However, in contrast to the '561 patent, the claims of the '939 patent require a "plurality" of users.[11]  ('939 patent, col. 6:40-8:15)

Siegel briefly argues that the '848 patent lacks disclosure of a "plurality" of users (or "job applicants)." (D.I. 173, ex. 24 at 9)  The Federal Circuit has held that "'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary." *Dayco Prods. v. Total Containment, Inc.*, 285 F.3d 1317, 1328 (Fed. Cir. 2001). In support of their motion, defendants do not point to specific evidence demonstrating the presence of two or more users in the '848 patent disclosure. Defendants' own citation demonstrates that the inventors of the '848 patent used "the user" throughout the specification. (D.I. 154 at 18) (citing '848 patent, col. 17:54-60) This lexicography is present, for example, in the background of the invention, providing that the application programs run on the "computer system 8," an individual PC[12] rather than a network of multiple computers. ('848 patent, col. 8:27-40)  Defendants have not provided clear and convincing evidence of anticipation of the '939 patent in this regard.

The court notes at this juncture that plaintiff (through Siegel's expert opinion) does not provide additional non-anticipation positions with respect to the majority of the asserted claims of the '561 patent.[13]  Granting summary judgment in defendants' favor,

---

[11] In contrast to the '939 patent, the claims of the '561 patent expressly contemplate "one or more users." ('561 patent, col. 8:45-11:19)  Because the '848 patent teaches one user, the claims of the '561 patent are anticipated.

[12] ('848 patent, fig. 1; col. 6:25-29)

[13] Siegel does opine that the '848 patent does not disclose the "supplemental inquiry form" feature of claim 6, 14 and 20. The rejected construction of "user" forms the basis for the majority of Siegel's three-page opinion. (D.I. 173, ex. 24 at 8-10)

32

however, would invalidate a (presumably valid) patent without having elicited a factual determination regarding the weight of defendants' evidence.  Defendants' anticipation analysis primarily incorporates by reference the opinion of Kaliski, and addresses perceived error in Siegel's analysis.[14]  (D.I. 154 at 17-20)  Ultimately, irrespective of plaintiff's evidence, a reasonable jury could determine that defendants' evidence of invalidity does not rise to the level of clear and convincing.  There are many reasons this may be so, for example, Kaliski may be perceived as less than entirely credible.  Invalidation of the patents, notwithstanding plaintiff's failure to present a sufficient rebuttal case at summary judgment, essentially supplants the court for the finder of fact in these critical areas.  Moreover, although Siegel's testimony is limited to subjects addressed in his report (or otherwise vetted through expert discovery), the court is unaware of what (if any) additional factual evidence plaintiff may possess that may be used, for example, to cross-examine Kaliski at trial.

It is the court's conclusion that the present conundrum is best resolved by the denial of summary judgment of invalidity with respect to both the '939 and the '561 patents, i.e., putting defendants to their proof.  Should plaintiff fail to present evidence sufficient to rebut defendants' proffered evidence at trial, however, the court will enter judgment as a matter of law prior to sending the matter to the jury.

### c. The IntelliMatch system

[14] The court appreciates that, under the new local rules for page limitations, parties are not at liberty to devote as many pages to their claims as they wish.  The court does not suggest that quantity supplants quality, but simply highlights the few pages devoted to the parties' arguments in support for its observation that the evidence introduced at trial (by both parties) may vary greatly from that presented on summary judgment.

Defendants move for summary judgment that the IntelliMatch system anticipates all of the claims of the patents in suit under 35 USC §§ 102(a) and 102(g)(2).  (D.I. 154 at 9)  There are two areas of contention between the parties regarding the system:  (1) its date of conception and reduction to practice; and (2) whether it meets all of the claims of the patents in suit.

### (1) Date of conception and reduction to practice

In attempting to establish the dates of conception and reduction to practice, defendants rely on the testimony of Dr. Charanjit Pangali ("Pangali"), the former CEO of Intellimatch, Ranjit Padmanabhan ("Padmanabhan"), an engineer hired to build IntelliMatch's web-based resume extraction process, and Jeffrey Hunter ("Hunter"), director of IntelliMatch's product marketing.  (D.I. 154 at 10)

While all three witnesses fail to remember the exact dates of conception and reduction to practice, their testimony is consistent that, at the very least, the IntelliMatch system was built no later than April 1997.  Pangali testified that IntelliMatch had actually built a resume extraction system that permitted user self-correction by September 1996.[15]  (D.I. 173, ex. 6 at 21:7-8)  Padmanabhan testified that they had built the IntelliMatch system by the end of 1996 or early 1997, and that he worked over Christmas to get the project done.  (D.I. 173, ex. 7 at 13:3-20)  Hunter testified that he was "fairly confident" that the IntelliMatch product was developed in November-

---

[15] Plaintiff argues that the court should exclude the testimony of Pangali because he is testifying about what happened after he left IntelliMatch.  (D.I. 172 at 13) However, Pangali was still involved with the IntelliMatch product while working for one of its distributors during the relevant time frame, and he testified that the product was developed prior to his departure.  (D.I. 173, ex. 6 at 27:17-28:20)

December of 1996, and he was sure that it was being used by customers in April 1997. (D.I. 173, ex. 8 at 14:5-15:1)

Defendants also rely on several documents in support of their argument. Pangali produced the source code of the IntelliMatch product that bears an automatic time stamp in the general range of January to May 1997. (D.I. 155, ex. 14) Defendants also produced an archived version of IntelliMatch's home page from May 14, 1997 which advertizes a "2-Minute Resume." Mr. Hunter confirmed that it was consistent with IntelliMatch's resume extraction system at that time. (D.I. 173, ex. 8 at 28:18-29:17)

Plaintiff argues that the witnesses' testimony, combined with defendants' documentation, is not clear and convincing evidence of conception and reduction to practice. Beyond objecting to the inconsistency in the witnesses' recollection of the date of creation of the IntelliMatch system, plaintiff also argues that Pangali is biased in favor of Taleo due to animosity he harbors against plaintiff. (D.I. 172 at 10) Specifically, Pangali is alleged to have described members of a company that was acquired by plaintiff as being "not honorable people" (D.I. 173, ex. 6 at 29:13-19), and that plaintiff "lifted a lot of [IntelliMatch's] stuff and copied it." (Id. at 33:21-25) Additionally, plaintiff claims that Padmanabhan and Hunter's testimony is called into question because of the fact that they both worked for a predecessor of Taleo after leaving IntelliMatch. (D.I. 173, ex. 7 at 67:14-68:1, ex. 8 at 48:12-15)

A genuine issue of material fact exists as to the IntelliMatch system's date of conception, reduction to practice, and functionality. Defendants' witnesses' credibility must be judged by the trier of fact. Moreover, while the IntelliMatch source code files are admissible, a reasonable jury could find them unpersuasive due to the sequence of

35

events that led to their possession by Pengali.[16]  Because a genuine issue of material fact exists regarding the IntelliMatch system's conception, reduction to practice, and functionality, the court need not address its anticipation of the patents in suit.

### c. Hotjobs' "ResLex" product

Defendants move for summary judgment that ResLex anticipates all of the claims of the patents in suit under 35 USC §§ 102(a) and 102(g)(2).  (D.I. 154 at 15) There are two areas of contention between the parties regarding Reslex:  (1) its date of conception and redaction to practice; and (2) whether it meets all of the claims of the patents in suit.

### (1)  Date of conception and reduction to practice

In attempting to establish the dates of conception and reduction to practice, defendants rely on timestamped source code files, as well as the testimony of Christopher Zimm ("Zimm"), the engineer who developed Reslex.  (D.I. 154 at 15) Defendants also rely on Hotjobs' trademark application for "ResLex" that shows a first public use of October 7, 1997.  (D.I. 154 at 16)

Defendants' evidence is insufficient to demonstrate ResLex's conception and reduction to practice before the priority date of the '939 patent as a matter of law.  As an inventor, Zimm's testimony requires independent corroboration.  *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 556 F.3d 989, 999 (Fed. Cir. 2009)  His timestamped source code files fail to provide sufficient independent corroboration.  While the source code

---

[16] Plaintiff argues that the source files which Pangali references are inadmissible because he did not create the files about which he testifies, cannot authenticate them or verify their chain of custody.  (D. I. 172 at 14)

36

undoubtably shows the functionality of the ResLex product, it is akin to an unwitnessed

inventor's notebook. It is evidence, but it is not independent evidence. *Brown v.*

*Baracid,* 276 F.3d 1327, 1335 (Fed. Cir 2002) (finding that "an inventor's own

unwitnessed documentation does not [independently] corroborate inventor's testimony

about [conception]."). The source code files themselves were written by Zimm. In

addition, timestamps can be easily modified, even accidently.[17]  A user can modify the

time stamp on a source code file by simply changing the system time on a development

computer and making a trivial modification to the file. (D.I. 173, ex. 25 at 3)  Indeed,

numerous applications exist to change the timestamp on a file regardless of the time on

a computer's system clock.[18]  Even if the source code qualified as independent

evidence, issues with the timestamp prevent it from satisfying the clear and convincing

standard necessary to prove prior invention. *Compare Netscape Commc'ns Corp. v.*

*ValueClick, Inc.,* 707 F. Supp. 2d 640, 652 (E.D. Va. 2010) (finding that timestamped

source code and an expert report was sufficient to prevent summary judgment of no

anticipation because a reasonable jury could find by clear and convincing evidence that

the patent in suit was anticipated by said source code).

---

[17] For example, the computer system clock gets the date and time from the Real Time Clock chip on the motherboard. This real time clock chip is powered by a battery to ensure that it maintains time even when the system is off. If the battery were to run out, the system time would no longer be accurate, and all timestamps based on the system clock would be erroneous. (D.I. 173, ex. 25 at 2-4) *See also* HowStuffWorks, *Why does my computer need a battery?,* http://computer.howstuffworks.com/question319.htm (last visited November 10, 2010).

[18] (D.I. 173, ex. 25 at 4)  The court notes that a Google search for "change a file's timestamp" returns multiple applications for changing a file's timestamp ranging from "Timestamp" to "SKTimeStamp."

Hotjobs' trademark application also fails to corroborate Zimm's testimony. The application merely states that the mark was in public use by October 7, 1997. (D.I. 155, ex. 31) It says nothing about whether or not there was a developed product associated with the mark at the time of use, or what the exact functionality of that product was. While the application does contain a screen shot that describes a product that could very well meet all of the claims of the patents in suit, the screen shot is undated, and could have been taken the day of filing: July 1, 2008. (Id.) For all intents and purposes, a functional version of ResLex may have existed on October 7,1997, but failed to meet any of the claims of the patents in suit. Or, an equally likely scenario is that "ResLex" was used in commerce at that time as an advertising tool to market a product that was still in development. The trademark application is evidence that the ResLex product existed as claimed on July 1, 2008, but not before.

Because defendants cannot establish that ResLex was conceived or reduced to practice before the priority date of the '939 patent, the court need not address anticipation.

## 2. Obviousness

### a. Standard

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on several underlying factual inquiries.

38

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). "Because patents are presumed to be valid, *see* 35 U.S.C. § 282, an alleged infringer seeking to invalidate a patent on obviousness grounds must establish its obviousness by facts supported by clear and convincing evidence." *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006) (citation omitted).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show, by clear and convincing evidence, that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. *Id.* at 418-19. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. *Id.* at 419-20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, a defendant must also demonstrate, by clear and convincing evidence, that "such a

Case 1:07-cv-00521-SLR Document 214 Filed 11/18/10 Page 41 of 42 PageID #: 4419

person would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

### b. Discussion

Obviousness was not the focus of either party's briefing. Defendants dedicated the last page of their opening brief to argue that, "to the extent that the court finds any limitations not disclosed in the '848 patent, the doctrine of near-simultaneous invention shows that those limitations would have been obvious." (D.I. 154 at 20) Defendants never cited an expert report, nor provided any other indicia of obviousness.

Plaintiff's discussion is just as sparse. It consists of a single paragraph on the last page of its brief. (D.I. 172 at 20) Plaintiff also fails to cite an expert report, and only asserts that "defendants offer none of the requisite factual basis to support an obviousness argument." (*Id.*)

The court cannot grant summary judgement on such a record. "Because patents are presumed to be valid . . . an alleged infringer seeking to invalidate a patent on obviousness grounds must establish obviousness by facts supported by clear and convincing evidence." *Kao Corp. v. Unilever U.S., Inc.*, 441 F. 3d 963, 968 (Fed. Cir. 2006). Defendants have failed to meet their burden, and summary judgment is denied.[19]

---

[19] Plaintiff has filed a motion for submission of supplemental authority, arguing that emails produced by defendants after the close of discovery affect plaintiff's infringement theory and obviousness defense. (D.I. 203) After reviewing the motion and accompanying exhibits, the court denies the motion. The emails provide no additional support for plaintiffs' infringement argument. More importantly, plaintiff misstates the emails' substance in relation to its obviousness defense. The technology that the emails discuss is not the technology of the patents in suit, but is instead the technology that covers the underlying parsing engine that is run as one of the steps of the patents. This is the engine that extracts target data strings from the source data stream prior to presentation to the user. Exemplifying this distinction is defendants'

40

statement that "[a third party] found better results when parsing these resumes using [plaintiff's] technology compared to [defendants']. This isn't just limited to phone numbers/personal information. Education and Experience did parse better (i.e. more accurate and more of them parsed)." (*Id.*, ex. 1 at 1)  Had the emails discussed a need to have the user verify information extracted from the parser, such a statement would have been relevant to the obviousness of the patents. However, these emails talk about a different technology, the technology for identifying the target strings in a resume, and are thus irrelevant to plaintiff's obviousness defense.